UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

LEROY PEOPLES                              :
                                           :          SECOND AMENDED
                          Plaintiff,       :          COMPLAINT
                                           :
        -versus-                           :
                                           :
BRIAN FISCHER, Commissioner of the         :
New York State Department of Corrections and :
Community Supervision; ALBERT PRACK,       :          11 Civ. 2694 (SAS)
Director of Special Housing and Inmate     :
Discipline; NORMAN BEZIO, former Director  :
of Special Housing and Inmate Discipline;  :
WILLIAM LEE, former Superintendent of      :          ECF CASE
Green Haven Correctional Facility; DAVID ROCK, :
Superintendent of Upstate Correctional Facility, :
and CURTIS DROWN, Commissioner's Hearing   :
Officer at Green Haven Correctional Facility, :
by his Estate.                             :
                                           :
                                           :
                          Defendants,      :

------------------------------------------------------------X

RECEIVED
DEC 0 6 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## **PRELIMINARY STATEMENT**

     1.     This civil rights action challenges the constitutionality of New York State's practice of arbitrarily sentencing tens of thousands of incarcerated individuals to months and years of extreme isolation and solitary confinement for alleged infractions that often present no threat to prison safety. A disproportionate number of individuals sent to New York's isolation cells are black, and many suffer from serious mental illness. New York's arbitrary use of extreme isolation as punishment inflicts enormous damage on the incarcerated, and it is the essence of "cruel and unusual" punishment.

     2.     New York State uses extreme isolation as punishment more than any other prison system in the United States. Between 2007 and 2011 alone, New York imposed nearly 70,000

sentences to extreme isolation, and on any given day, approximately 4,300 people are locked down 23 hours a day in tiny concrete cells. Extreme isolation is imposed as a sanction for offenses as minor as "untidy cell or person," "unfastened long hair," "littering," and "unreported illness." Many prisoners are sentenced to New York's isolation cells for years.

3.     The conditions inside New York's isolation cells are deplorable and result in severe physical and psychological harm. Individuals are confined idle and isolated for months and years on end in tiny cells. They are allowed only one hour of exercise a day in barren cages smaller than their cell. As additional punishment, prison staff may issue orders depriving individuals of what little remains—access to nourishing and edible food, exercise, bedding, and showers may all be denied. At some prisons, two men are forced to share a single isolation cell for weeks and months on end, often leading to violence. Requests for mental health care must be discussed through the food slot in the cell door.

4.     The experience of plaintiff Leroy Peoples typifies what is wrong and unconstitutional about New York's disciplinary system. An African-American man with a history of mental illness prior to his incarceration, Mr. Peoples has twice been sentenced to solitary confinement for offenses that involved no violence or threat to prison security. In 2009 he was sentenced to three years in extreme isolation for unauthorized legal materials and filings. Four years earlier, he was sentenced to six months for unauthorized possession of nutritional supplements. These confinements caused severe and long-lasting harm, and he dreads the prospect of being sent back to "the box" as punishment. Defendants' policies, which result in unjustified, arbitrary, and grossly disproportionate sentences to extreme isolation, pose a substantial risk that Mr. Peoples will be resentenced to extreme isolation. In fact, in just the last

2

few months, corrections officers threatened to do just that because of complaints Mr. Peoples voiced about restrictions on his religious practices.

5. Defendants' actions, policies, and procedures have violated and are violating Mr. Peoples' rights under the Eighth Amendment and Fourteenth Amendments to the United States Constitution. Mr. Peoples seeks declaratory and injunctive relief to protect him against the risk of future unlawful sentencing to extreme isolation, and damages for his confinement in 2009.

## PARTIES

6. Plaintiff LEROY PEOPLES is a 30 year-old African-American man, married, a practicing Muslim, and currently incarcerated at Attica Correctional Facility. His earliest release date is 2017. When released, Mr. Peoples intends to return to the New York City area to live with his wife.

7. Defendant BRIAN FISCHER is the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"), and is sued for declaratory and injunctive relief. Commissioner Fischer has final policy-making and supervisory authority within DOCCS.

8. Defendant ALBERT PRACK is the current Director of the Special Housing and Inmate Disciplinary Program. He is sued for declaratory and injunctive relief. Director Prack has policy-making and supervisory authority with regard to the Special Housing Unit ("SHU") and DOCCS' disciplinary process.

9. Defendant NORMAN BEZIO was the Director of the Special Housing and Inmate Disciplinary Program at the time of Mr. Peoples' sentence to three years of punitive isolation in 2009. He is sued for declaratory and monetary relief. In 2009, Mr. Bezio had policy-

making and supervisory authority with regard to SHU and the DOCCS' disciplinary process, and he participated directly in Mr. Peoples' unconstitutional SHU confinement.

10. Defendant DAVID ROCK is the Superintendent of Upstate Correctional Facility. He is sued for declaratory and monetary relief. Superintendent Rock has policy-making and supervisory authority with regard to Upstate, and he participated directly in Mr. Peoples' unconstitutional SHU confinement.

11. Defendant WILLIAM LEE was the Superintendent of Green Haven Correctional Facility at the time of Mr. Peoples' unconstitutional sentence to SHU in 2009. He is sued for declaratory and monetary relief. Superintendent Lee had policy-making and supervisory authority with regard to Green Haven, and he participated directly in Mr. People's unconstitutional SHU confinement.

12. Defendant CURTIS DROWN, deceased, is a former corrections officer. His estate is being sued for declaratory and monetary relief. Mr. Drown presided over Mr. Peoples' October 2009 disciplinary hearing at Green Haven. Acting pursuant to DOCCS' policy and custom, Mr. Drown imposed the unconstitutional three-year SHU sentence on Mr. Peoples.

## FACTS

### The Severe Risk of Harm Caused by Extreme Isolation

13. The practice of punishing incarcerated individuals with isolation and severe deprivation goes by numerous names—solitary confinement, punitive segregation, disciplinary segregation, and extreme isolation. Regardless of the label, the practice has long been shown to cause a risk of severe psychological and physical harm.

14. Subjecting individuals to extreme isolation causes pain, suffering, psychological trauma, physical injury and, in extreme cases, death. Documented psychological harms include

4

hallucinations, anxiety, nervousness, panic attacks, irrational anger, rage, loss of impulse control, paranoia, severe and chronic depression, claustrophobia, concentration deficits, difficulties with memory, perceptual distortions, illusions, social withdrawal, confusion, apathy, nightmares, and depersonalization. Physiological harms include migraines, insomnia, appetite loss, weight loss, heart palpitations, sudden excessive sweating, back and joint pain, dizziness, hypersensitivity to external stimuli, lethargy, gastro-intestinal, cardiovascular and genito-urinary problems, tremulousness, and deterioration of eyesight. These effects are particularly devastating for prisoners who have preexisting physical and mental health conditions. Studies have demonstrated, however, that otherwise healthy prisoners placed in extreme isolation can suffer profound psychological and physiological harm as well, even after short periods of confinement.

15. Precisely because of the risk of harm caused by extreme isolation, correctional authorities in other states, corrections experts, mental health professionals, legal organizations, and human rights bodies have promulgated minimum standards intended to closely govern the circumstances and conditions under which individuals may be separated from the general prison population.

16. For example, the recommended standards of the American Bar Association abolish extreme forms of isolation under any circumstances. In order to avoid the unnecessary and unjustified harm caused by the overuse of isolation as punishment, the ABA standards recommend that correctional authorities adopt criteria to ensure that prisoners are separated from the general prison population only after a finding that (1) the individual committed a severe disciplinary infraction in which safety or security was seriously threatened, or (2) the individual presents a credible continuing and serious threat to others or himself. The ABA standards also

require safeguards to ensure that separation is for the briefest term and under the conditions of confinement that are the least restrictive practicable.

17.     Human rights bodies have recommended prohibitions and restrictions designed to protect against the harms of extreme isolation.  For example, the United Nations Special Rapporteur on Torture has found that using extreme isolation as a punishment for more than 15 days amounts to torture or cruel, inhuman, or degrading treatment, and recommended that the use of extreme isolation in excess of 15 days be abolished in all cases. The UN General Assembly has called for an "absolute abolition" on these types of conditions as punishment. Similarly, the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment recommends that extreme isolation only be used as punishment in exceptional cases as a last resort, and for the shortest period of time possible, due to its potentially damaging effects.

18.     The recommendations of these and other various experts and organizations reflect the overwhelming consensus that prisoner isolation should be used sparingly, for short amounts of time, and under tight controls.

## New York's Disciplinary Policies and Procedures

19.     Despite the obvious and well-recognized severe risk of harm caused by extreme isolation, New York permits it to be used as a disciplinary tool of first resort for the violation of any one of over one hundred internal prison regulations. New York uses extreme isolation as punishment more frequently than any other prison system in the United States. DOCCS maintains 5,000 isolation beds, located in "Special Housing Units" or "SHUs" throughout the state, that are used to separate individuals from the general prison population and subject them to punishing forms of isolation and deprivation. From 2007-2011, DOCCS issued nearly 70,000

sentences to SHU as punishment for the violation of prison rules. On any given day, approximately 4,300 people are locked down 23 hours a day serving months- or years- long sentences in one of New York's sparse isolation cells.

20.     The frequency with which DOCCS uses extreme isolation as punishment is the result of a system-wide regime governing the conduct and punishment of all individuals incarcerated throughout the New York prison system. In contrast to the clearly-defined standards and criteria discussed above, the policies and procedures of the New York prison system readily permit the use of extreme isolation for long amounts of time as punishment for conduct that poses no threat to safety or security. Defendants Fischer, Bezio and Pratt were and are personally involved in the continuation of the unconstitutional policies and customs described below.

21.     DOCCS has promulgated over 100 internal regulations governing every aspect of behavior. These rules cover a wide range of conduct, including personal grooming, cafeteria policy, and approved reading materials, as well as prohibiting assault, escape, and the possession of weapons.

22.     If corrections staff believe that an individual has violated any one or more of these rules, they may respond to the misbehavior by speaking with the individual or imposing an informal reprimand. At their discretion, they may also initiate a formal disciplinary process by writing a "misbehavior report." The misbehavior report documents the alleged misbehavior and contains a citation to the regulation or regulations allegedly violated.

23.     A "review officer" at the correctional facility assigns a "tier" rating to the misbehavior report that determines the severity of the suspected infraction and, ultimately, the type of punishment imposed on the convicted. A Tier I rating is intended for less serious infractions, and a Tier III rating for the most serious. A conviction for an infraction given a Tier

II or III rating may result in a punitive sentence to extreme isolation in SHU. Numerous rule violations that are eligible for such ratings govern behavior that is nonviolent, non-disruptive, and/or poses no threat to the safety and security of others.

24. DOCCS policies provide minimal guidance to corrections staff regarding how to assign tier ratings to alleged misbehavior. DOCCS policies do not provide incarcerated individuals with an adequate explanation of what types of conduct may result in more or less severe tier ratings. DOCCS policies do not provide incarcerated individuals with notice of potential sentencing ranges to SHU if convicted for an infraction.

25. Individuals facing a Tier III charge are afforded a limited hearing, with minimal due process, to adjudicate their guilt. Hearing officers, who are themselves DOCCS employees, may credit the testimony of corrections staff over that of a prisoner. The DOCCS disciplinary process almost always secures a conviction. From 2007 to 2011, DOCCS conducted more than 105,500 Tier III disciplinary hearings, with a conviction rate of approximately 95%.

26. If an individual facing a Tier III charge is among the 95% who are convicted, he or she is more likely than not to be punished with time in extreme isolation. Of all Tier III disciplinary hearings that resulted in a conviction from 2007 to 2011, a SHU sanction was imposed as punishment approximately 70% of the time.

27. DOCCS' policies permit, and even encourage, sentences to extreme isolation for behavior that demonstrates no risk of harming others or endangering prison security. A substantial number of sentences to SHU are for this type of behavior. From 2007-2011, only 16% of sentences to extreme isolation were for infractions that implicated violent conduct or weapons. For example, from 2007-2011 DOCCS staff imposed SHU as a punitive sanction for the following infractions:

8

a. Over 200 SHU sentences for "untidy cell or person";

b. Over 300 SHU sentences for "smoking in an unauthorized area";

c. Nearly 200 SHU sentences for "no ID card";

d. Over 200 SHU sentences for "delaying cell count";

e. Over 2,100 SHU sentences for "facility correspondence violations";

f. Over 100 SHU sentences for "littering";

g. Over 170 SHU sentences for "excessive tobacco";

h. Nearly 100 SHU sentences for "unauthorized jewelry";

i. Over 50 SHU sentences for "unauthorized literature";

j. Over 1,000 SHU sentences for "refusing double celling" assignments;

k. Over 600 SHU sentences for "unreported illness";

l. Over 500 SHU sentences for "tattooing";

m. Over 480 SHU sentences for "messhall serving/seating violations;"

n. Over 100 SHU sentences for "unauthorized legal assistance."

28.     DOCCS records show that SHU has also been imposed as a sanction for infractions including "unfastened long hair"; "fire drill violation"; "family reunion violation"; "unauthorized use of phone"; and "unreported ID card loss."

29.     When an individual is sentenced to SHU, DOCCS' policies permit staff wide discretion in imposing the length of the sentence. DOCCS' policies provide no mandatory sentence ranges, few guidelines or protocols, and no upper limit on the length of any single sentence.

30.     DOCCS' policies also do not place any upper limit on the number of consecutive sentences to SHU that a prisoner may be forced to serve. Individuals may, and do, spend years in extreme isolation as the result of multiple consecutive sentences to SHU.

31.     Furthermore, DOCCS' policies permit staff to impose extreme isolation as punishment without taking into account factors that might make such confinement particularly harmful for that individual. DOCCS' staff are permitted to use SHU confinement without restriction to punish juveniles, the elderly, the disabled (including those with HIV or other serious medical illness), and those with severe substance abuse problems. For example, as of January 2012, 402 individuals held in SHU were juveniles aged 16-21; 856 individuals were aged 21 to 25.

32.     While New York state law requires DOCCS to divert those with the most severe forms of mental illness from SHU into a residential mental health treatment unit, DOCCS' policies permit staff to use extreme isolation to punish individuals with less severe, but nevertheless serious, mental health illnesses. In January 2012, approximately 14% of the individuals confined in SHU were on DOCCS' mental health caseload; 35% of these individuals had been diagnosed with a serious mental illness.

33.     DOCCS data also reveals that black individuals are more likely to receive SHU sentences, and to receive longer SHU sentences, as compared to individuals of other racial and ethnic groups. For example, in June 2011, black individuals accounted for approximately 62% of the individuals held at Upstate and Southport correctional facilities, where individuals with the longest SHU sentences are generally incarcerated. In contrast, approximately 49% of the general prison population is black.

34.     Once an individual begins serving his or her SHU sentence, DOCCS' policies do not require subsequent individualized reviews to determine whether it is still necessary to confine that individual in the SHU, even if the individual is serving a years-long SHU sentence.

35.     In combination, these policies and customs result in unjustified, inconsistent, and harmful punishments. Individuals receive lengthy SHU sentences that are grossly disproportionate as compared to the underlying misbehavior. Similarly situated prisoners receive inconsistent, often vastly different, sentences for similar misconduct.

36.     Commissioner Fischer has final policy-making authority within DOCCS. As commissioner, and pursuant to New York law, he has ultimate authority with regard to all of DOCCS' internal rules, regulations, policies, procedures and customs. Commissioner Fischer and his staff periodically review these policies and procedures. He reviews data and statistical analyses that reflect the effects of these policies and procedures. If he deems it necessary, Commissioner Fischer has the authority to cause disciplinary policies and procedures to be amended, adopted or repealed.

37.     The Director of Special Housing and Inmate Disciplinary Program, a position formerly held by defendant Bezio and now held by defendant Pratt, reviews, develops, implements, amends, and monitors DOCCS' disciplinary policies and procedures and its consequences. The director evaluates statistical data to analyze trends and patterns in the disciplinary process. The director is responsible for staff training and supervision on disciplinary policies and procedures. The director is responsible for developing a program of on-site inspections of the conditions of DOCCS' SHU facilities. The director reviews all appealed determinations of Tier III hearings and sustains, overturns or amends those dispositions.

38.     Together, defendants Fischer, Bezio, and Pratt were, and are, aware of all the disciplinary policies and procedures detailed in this complaint. They have the responsibility to review and evaluate DOCCS' disciplinary policies and procedures, and the authority to adopt, amend, or revise them.

39.     Defendants Fischer, Bezio, and Pratt are also aware of the harm caused by DOCCS' disciplinary policies and customs. Defendants' own statistical data demonstrates that, for years, these policies have resulted in unjustified, arbitrary, and grossly disproportionate sentences to SHU, often for infractions that pose no arguable threat to prison safety or security.

40.     Defendants are aware of the inadequacy of their policies as the result of numerous communications to them from outside advocacy organizations and entities, which for years have documented numerous systemic deficiencies in the DOCCS disciplinary process and the consequences. Defendants are also aware of a pattern of deficiencies through complaints they have received through disciplinary appeals, grievances, and civil litigation challenging the arbitrary and unjustified sentences that result from the disciplinary process.

41.     Defendants are aware that DOCCS' disciplinary procedures fail to provide the minimum safeguards recommended by correctional, legal, mental health, and human rights experts. The certainty that these policies will lead to unjustified and harmful SHU sentences is plain from the lack of adequate guidance contained in DOCCS' written policies themselves. In fact, Commissioner Fischer made public remarks to the New York State Bar Association in January 2012, conceding that DOCCS "overuse[s]" SHU confinement and that reform would require the agency to "change the culture" of corrections in New York State.

42.     There is no penological justification for the defendants' failure to adopt adequate policies and customs. To the contrary, the overwhelming evidence from other corrections

systems and from experts is that the unjustified use of punitive extreme isolation exacerbates harms for both incarcerated individuals and staff and that is counterproductive to prison safety and rehabilitative goals. Implementing procedural safeguards—for example, adopting stricter criteria before a formal disciplinary process may be initiated; restricting the use of SHU to behavior that shows a demonstrable safety or security threat; requiring that an individual's particular vulnerabilities be considered before SHU is imposed for any length of time—would significantly protect against the risk of erroneous deprivations of core constitutional rights, and would not place any undue burden on defendants' legitimate interests.

43.     Despite all of the above, Defendants Fischer, Bezio and Pratt continued these policies and practices although they have the authority, ability, and ultimate responsibility to ensure their policies and procedures do not cause unnecessary harm to individuals incarcerated in New York prisons. By continuing these policies and practices, these defendants are responsible for the systemic and ongoing violations of the constitutional rights of individuals incarcerated in New York prisons, including the injuries caused to Mr. Peoples.

### Mr. Peoples' Unconstitutional Disciplinary Hearing and Sentence at Green Haven Correctional Facility

44.     Mr. Peoples, is a 30 year-old African-American and a practicing Muslim. As a juvenile, he struggled with serious mental illness and a tragic and difficult life in an impoverished home with little family support. He began serving a 13-16 year prison sentence in 2005. Originally from the New York City area, Mr. Peoples, who is married, plans to return to the area to life with his wife after his release from prison.

45.     In 2005, Mr. Peoples was sentenced to 180 days in SHU for the unauthorized possession of nutritional supplements. The pills discovered by corrections staff were available in the prison commissary, but Mr. Peoples was charged with violating rules against "unauthorized

medication" and "smuggling." Mr. Peoples' nonviolent misconduct posed no threat to the safety of himself or others.

46.     In 2009, these policies and procedures again resulted in a second SHU sentence for Mr. Peoples. On October 5, 2009, Mr. Peoples was incarcerated at Green Haven when corrections staff discovered and seized UCC documents from his cell that were considered contraband under DOCCS regulations. Mr. Peoples was escorted to the SHU unit at Green Haven and subject to pre-hearing SHU confinement.

47.     On October 6, 2009, Mr. Peoples was served with a misbehavior report that charged him with three infractions: unauthorized filing of a document creating a lien against a state official; unauthorized possession of Uniform Commercial Code documents; and violation of facility correspondence procedures.

48.     The infractions were given a Tier III rating by the Green Haven "review officer." Pursuant to DOCCS' policies and procedures authorized by Defendants Fischer and Bezio, the review officer was given wide discretion and little guidance when assigning this rating to the alleged misconduct.

49.     The misbehavior report, signed by Green Haven Sgt. O'Connor, alleged that the then Green Haven Superintendent William Lee received a packet of documents purporting to contain UCC lien instruments filed by Mr. Peoples against prosecutors from the Queens County District Attorney's office.

50.     Superintendent Lee was informed that Mr. Peoples' misconduct was given the most serious Tier III rating, resulting in a "Superintendent's Hearing," subjecting Mr. Peoples to the possibility of SHU confinement. Upon information and belief, Superintendent Lee did not

take steps to amend or correct the assignment of the Tier III rating, or otherwise attempt to prevent the risk of unjustified punishment that could result.

51. Superintendent Lee was informed that Mr. Peoples' had been transferred to pre-hearing confinement in his facility's SHU, and that this transfer was based on accusations of misconduct that posed no threat to the safety of staff or other prisoners. Upon information and belief, Superintendent Lee reviewed and ratified Mr. People's placement in SHU on these grounds.

52. On October 13, after eight days of pre-hearing confinement in the Green Haven SHU, a Tier III Superintendent's Hearing was conducted. Commissioner's Hearing Officer (C.H.O.) Curtis Drown presided over the hearing.

53. At the outset of the hearing, C.H.O. Drown reviewed the misbehavior report and commented that he was surprised a sex offender was intelligent enough to file UCC liens. Mr. Peoples responded that was irrelevant to the disciplinary hearing at hand. C.H.O. Drown asserted that Mr. Peoples was refusing to participate in the hearing and, over Mr. Peoples' objection, ejected him from the disciplinary hearing. Mr. Peoples was escorted back to his SHU cell.

54. In Mr. Peoples' absence, C.H.O. Drown heard testimony from three Green Haven employees. Upon information and belief, those corrections staff were Green Haven C.O. Malave, C.O. Engstrom, and Captain Bunett.

55. At the conclusion of the hearing, C.H.O. Drown found Mr. Peoples guilty of all three rule violations alleged in the misbehavior report. C.H.O. Drown sentenced Mr. Peoples to thirty-six months confinement in the SHU, as well as thirty-six months loss of commissary, phone and package privileges. C.H.O. Drown also recommended that Mr. Peoples lose seventy-two months of accrued good time credit.

56.     C.H.O. Drown, acting pursuant to DOCCS' policies and procedures, was permitted to impose the three-year sentence in the absence of sentencing protocols ensuring the proportionality of the sentence, or any upper limit on sentence length. Prior to the hearing, neither Mr. Peoples nor anyone else had notice of the SHU time that might be imposed for this infraction.

57.     C.H.O. Drown, acting pursuant to DOCCS' policies and procedures, did not determine, as a condition of imposing a SHU sentence, whether Mr. Peoples' culpable conduct posed any actual threat to the physical safety and security of staff and other prisoners.

58.     In fact, no accusations of violent behavior were leveled at Mr. Peoples at any time. In explaining his disposition, C.H.O. Drown said that Mr. Peoples needed to "conform" his behavior, that other inmates had to be "dissuaded" from following his example, and that public officers needed to be assured that their private lives would not be harassed by prisoners. Pursuant to DOCCS' policy and customs, these rationales were sufficient to subject Mr. Peoples to three years of SHU confinement for undisputedly nonviolent misbehavior.

59.     Pursuant to DOCCS' policy and custom, C.H.O. Drown was not required to evaluate the availability of less-restrictive alternatives or whether such alternatives would be just as effective at eliminating and deterring the alleged misbehavior without subjecting Mr. Peoples to the well-known risk of serious harm associated with SHU confinement.

60.     Mr. Peoples has a history of mental illness that predates his incarceration. Upon information and belief, defendants Lee, Bezio and Drown knew or should have known of Mr. Peoples' mental health history. Pursuant to DOCCS' policy and custom, however, the existence and severity of Mr. Peoples' mental illness was not considered or evaluated at the time that Green Haven staff imposed the three-year sentence to SHU.

61.    Superintendent Lee was aware of Mr. Peoples' disciplinary disposition and the resulting three-year SHU sentence. Superintendent Lee had the authority to reduce Mr. Peoples' penalty of three years of SHU confinement. Upon information and belief, Superintendent Lee did not do so, and instead continued the confinement of Mr. Peoples in his facility's SHU.

62.    Superintendent Lee provided periodic reports, pursuant to New York law, regarding the individuals in custody, including Mr. Peoples, to Commissioner Fischer and Director Bezio. Upon information and belief, no defendant took action to reduce or amend Mr. Peoples' three-year sentence upon receiving these reports.

63.    On November 5, 2009, Mr. Peoples was transferred to Upstate Correctional Facility, a dedicated SHU prison. Superintendent Rock received and reviewed information regarding Mr. Peoples' transfer to Upstate, the underlying misbehavior, and the SHU sentence imposed. Superintendent Rock had the authority under New York law to reduce Mr. Peoples' SHU sentence. Upon information and belief, Superintendent Rock did not do so.

64.    During the remainder of Mr. Peoples' approximately 780 day confinement at Upstate, Superintendent Rock provided periodic reports to Commissioner Fischer and Director Bezio regarding the individuals in his custody, including Mr. Peoples. Upon information and belief, no defendant took action to evaluate the adequacy of process that led to Mr. Peoples' sentence, the proportionality of the sentence, or Mr. Peoples' mental health history.

65.    Mr. Peoples fully exhausted all his available administrative remedies. He timely appealed the disposition and the 3-year sentence to Director Bezio. When presented with Mr. Peoples' direct appeal, Director Bezio "affirmed and confirmed" Mr. Peoples' full sentence. Director Bezio's actions were consistent with the policies, procedures and customs he had

personally authorized in his capacity as director, and which caused Mr. Peoples' unconstitutional disciplinary sentence.

66.     Mr. Peoples also submitted a grievance challenging the constitutionality of his SHU sentence. On March 9, 2011 the Inmate Grievance Resolution Committee denied Mr. Peoples' grievance. Mr. Peoples appealed the denial of his grievance to Superintendent Rock. Superintendent Rock denied the appeal, confirming Mr. Peoples' sentence on March 15, 2011. Two days later, on March 17, 2011, Mr. Peoples made his final appeal to the Central Office Review Committee (CORC). CORC's final denial of Mr. Peoples' appeal was rendered on June 8, 2011.

67.     Mr. Peoples ultimately spent twenty-six months of his three-year disciplinary sentence in extreme isolation. Pursuant to DOCCS policies and procedures authorized and continued by defendants Fischer and Bezio, no individualized evaluation was conducted to determine whether Mr. Peoples' continued years-long confinement in SHU was justified, under any criteria.

**Mr. Peoples' Unconstitutional SHU Confinement**

68.     Mr. Peoples' life in the SHU was drastically and severely different from his life in the general prison population at Green Haven. Commissioner Fischer, Director Bezio, Superintendent Lee and Superintendent Rock were personally responsible for the policies and customs which resulted in the conditions of confinement at the Green Haven SHU and at Upstate, where Plaintiff was confined for a total of over 780 days, as described below.

69.     While in the general prison population, Mr. Peoples was afforded a range of activities and freedoms. Many of the activities most important to Mr. Peoples were those that

would help his rehabilitation, and help prepare him to positively contribute to his family and community upon release from prison.

70. For example, in the general population Mr. Peoples was able to further his religious education and practice, which had become a central part of his life. Among other things, it had helped him begin the long process of reckoning with the terrible consequences of his criminal offenses. In the general population, he could take part in religious activities and services, and could seek the advice and counsel of Muslim clergy.

71. Mr. Peoples was able to gain valuable experience and skills preparing him for his eventual release by working in the industry program making desks and cabinets. In the general prison population, he was eligible to be placed on the waiting list for mandatory rehabilitative programs related to his criminal offense. He was able to educate himself further through reading and other activities.

72. Mr. Peoples also had access to social interaction and mental stimulation that helped maintain his psychological and emotional health and stability, particularly important in light of his mental illness. Mr. Peoples was able to maintain family ties. He could speak on the phone, have contact visits, and have conjugal visits with his wife. He was able to exercise outdoors in the recreation yard. He was permitted to eat meals with other prisoners in the cafeteria, move around the prison facility, and visit the law library. He could watch television and stay abreast of current events. He was able to have personal possessions, including a typewriter, numerous books, magazines, pictures, a personal jacket, personal sneakers, and other clothing.

73. On October 5, 2009, however, his access to all of these rehabilitative programs and other freedoms ceased when Mr. Peoples was removed from the general prison population

and confined to the SHU at Green Haven. Once in the Green Haven SHU, Mr. Peoples was subject the extreme deprivations of SHU confinement.

74.     Mr. Peoples' SHU cell at Green Haven was a barren space about the size of an average elevator. His cell contained only a toilet, a sink, and a bedframe with a mattress. Mr. Peoples used his personal possessions as a chair and his bed as a desk. He was confined in the SHU cell 23 hours a day, 7 days a week. He was allowed only one hour of exercise alone in a small empty pen on the roof of the facility barely larger than his cell, surrounded by a high metal fencing.

75.     He was deprived of all meaningful human contact and mental stimulation. He was not permitted to take part in activities, programs, or classes. He was only permitted to shower about twice per week, when he was handcuffed and led to the shower area by corrections officers. He was not permitted to speak on the phone to anyone, including his wife. Meals were delivered through a slot in the door. Personal visits were severely restricted.

76.     Few personal possessions were permitted: two sets of state issued uniforms, three T-shirts, three pairs of boxers and socks, two towels, paper and pen, cups for drinking. He was not allowed to possess a personal jacket or personal pair of sneakers. He was not permitted personal reading materials. A cart wheeled by the cell had only a few outdated books and magazines.

77.     Once in the Green Haven SHU, Mr. Peoples lived under the constant threat of "deprivation orders." Pursuant to DOCCS' policies, corrections staff may impose deprivation orders denying individuals in SHU any item or service as punishment. These orders may deprive prisoners of exercise, showers, clothing, bedding, and even toilet paper. Corrections officers are

granted broad discretion to impose deprivation orders as punishment for a wide range of alleged misbehavior.

78. Mr. Peoples was also subject to the constant threat of being placed on "restricted diet." DOCCS' policy permits staff to place individuals in SHU on a restricted diet depriving them of nourishing, edible food as punishment for rule violations. A restricted diet meal consists of a football-sized brick of baked bread-and-vegetable matter known as "the loaf." The loaf is accompanied by raw cabbage and water. This diet may be imposed for up to seven days prior to the relevant disciplinary hearing and can be reinstated in seven-day periods for an indefinite number of times.

79. Facing extreme isolation, the constant threat of additional deprivations, and with no productive social stimulation or interaction, Mr. Peoples struggled to maintain a semblance of mental and emotional stability in the Green Haven SHU. He planned out his day around mundane events such as meals. He attempted to stave off boredom and torpor by doing pushups, daydreaming, or yelling in his cell.

80. While confined in extreme isolation at Green Haven, Mr. Peoples experienced feelings of dread and fear caused by the isolation and deprivation. He suffered sudden and uncontrollable mood swings. He was alternately anxious, bored, paranoid, and apathetic. He suffered from regular headaches, depression, and creeping lethargy. Mr. Peoples had experienced some of these same effects when he was confined in the SHU in 2005.

81. On November 5, 2009, Mr. Peoples was transferred from the SHU at Green Haven to Upstate. The conditions Mr. Peoples endured at Upstate, which were the direct result of the policies and customs continued by defendants Fischer, Bezio, and Rock as described below, were worse still than those at Green Haven.

82.     At Upstate, one of two DOCCS facilities dedicated to SHU confinement, even harsher, more punitive treatment of individuals in encouraged and tolerated as a matter of policy and custom.  The extreme culture of deprivation at Upstate was the discussed at length in a 2006 report by the New York Correctional Association, an organization with statutory authority to inspect New York prisons. Defendants Fischer, Bezio, Pratt and Rock are aware of the report's findings.

83.     Mr. Peoples' was confined to his tiny cell at Upstate for the entire day, except for the exercise period when a door adjacent to his cell was opened remotely by corrections staff and he was allowed step into the barren concrete recreation area attached to his cell. Mr. Peoples could hear other prisoners shout and curse at all hours. Mr. Peoples was certain some of the men he heard were exhibiting obvious signs of mental illness and deterioration. His cell was lit day and night. Mr. Peoples' attempts to cover the light with his towel while sleeping resulted in staff waking him in the middle of the night demanding that he remove the towel.

84.     Other than sliding his food through the slot in the door, Mr. Peoples had no social interaction with staff.  Officers, nurses, mental health workers and other staff would pass infrequently and briskly through the long empty corridors, often ignoring pleas for assistance.

85.     Deprivation orders and diet restrictions are used frequently at Upstate. As a matter of unwritten custom, Upstate corrections staff also deprive prisoners of food by failing to ensure the delivery of their meal trays—a custom experienced by Mr. Peoples. Defendants Fischer, Bezio and Rock are aware of the informal disciplinary practice of food deprivation, which has been the subject of numerous prisoner complaints, and was also discussed in the 2006 report by the Correctional Association.

86. Upstate staff, who are overwhelmingly Caucasian, openly use racial epithets against the Upstate prisoner population, which is overwhelmingly people of color. Racially charged jokes and comments are made by staff over the facility's internal public address system. The existence of racial tension in Upstate was also addressed in the Correctional Association's 2006 report.

87. The occurrence and constant threat of unprovoked assaults on incarcerated individuals by Upstate corrections staff is well-known to all prisoners, including Mr. Peoples. The Correctional Association 2006 report documented that 80 percent of prisoners surveyed felt unsafe, and that reports of physical abuse by staff were consistent and credible.

88. Mr. Peoples was double-celled at Upstate. Pursuant to DOCCS' policy of double-celling in SHU, a policy authorized by Defendants Fischer, Bezio and Rock, double-celled individuals spend every moment of every day together. In a cell approximately 9 x 11 feet there are two bunks, a shower, a toilet and a writing desk. No partition or curtain provides privacy for an inmate using the shower or toilet. Prisoners must bathe, urinate and defecate in full view and in close proximity with their bunkmate.

89. Placing two adult men in a single isolation cell, while at the same time restricting or prohibiting all other avenues for normal social interaction has well-studied and predictable effects. Double-celling has been shown to generate tension, stress and anger between bunkmates. Double-celled bunkmates may become paranoid, hostile and violent toward one another. Fights and threats of violence between double-celled individuals are commonplace.

90. Defendants Fischer, Bezio and Rock are aware of these effects, nevertheless, they are responsible for continuing DOCCS' policy of double-celling and refusing separate

bunkmates until after a violent altercation has already occurred. This policy and custom is well-known to individuals in the SHU, and it exacerbates the risk of assaults between bunkmates.

91.     Mr. Peoples was in almost constant physical conflict with various bunkmates. One bunkmate had a long history of violence and mental and emotional instability, making their close proximity all the more stressful and potentially explosive. Mr. Peoples was assaulted by this bunkmate on numerous occasions. Another bunkmate threatened Mr. Peoples with a razor.

92.     Mr. Peoples wrote to the security staff and filed a grievance asking to have a new bunkmate. One Upstate sergeant responded to Mr. Peoples' grievance by questioning him about it in front of his bunkmate, causing even more tension. Mr. Peoples also wrote to Mr. Kemp, a mental health professional at Upstate, requesting assistance. Pursuant to DOCCS' policy and custom, staff refused to transfer Mr. Peoples until evidence of a serious assault could be proven.

93.     His relationship with one particular bunkmate, Larry Allen, completely deteriorated into violence. While Mr. Peoples and Mr. Allen were able to maintain a healthy relationship for a short time at the outset that they were first double-celled, the lack of privacy and close quarters created ever-increasing conflict between them. Eventually, Mr. Peoples was assaulted by Mr. Allen so violently that Mr. Peoples lost a tooth.

94.     Mr. Peoples' pre-existing mental illness was predictably affected by his SHU confinement. Mr. Peoples was afforded practically no confidentiality, however, with regard to requests for necessary medical or mental health care. Pursuant to DOCCS' policy authorized and maintained by defendants Fischer, Bezio and Rock, if Mr. Peoples requested such care, staff would come to the cell door and force Mr. Peoples' to articulate his confidential medical or mental health concerns through the flood slot, within earshot of staff and other prisoners, including his bunkmate.

95.     DOCCS' policies force double-celled individuals in the SHU to make a choice between divulging highly sensitive and embarrassing personal medical and mental health details that may subject them to abuse or exploitation in order to receive care, or to forego requesting care in order to preserve confidentiality and their personal safety.

96.     While in SHU, Mr. Peoples wrote to staff asking for mental health treatment and informing them of his mental health history and current mental health problems. In some instances, staff did not respond at all. When staff did respond, he merely came to speak with Mr. Peoples through his cell door in the presence of his bunkmate, despite the confidential nature of his mental health problems and despite the fact that Mr. Peoples' concerns often involved problems with the bunkmate who was standing within earshot of the conversation.

97.     Defendants Fischer, Bezio, Lee and Rock were personally responsible for the policies and practices that resulted in the harmful conditions of confinement experienced by Mr. Peoples at Green Haven and Upstate. Commissioner Fischer was personally involved in continuing to authorize system-wide policies and practices which regulated the general conditions and deprivations of all SHU units throughout DOCCS, including those at Upstate and Green Haven. Superintendent Rock and Superintendent Lee were directly responsible for the enforcement of these general policies and authorizing and managing the policies, procedures and customs governing day-to-day conditions of SHU confinement at their respective facilities. In his capacity as Director of SHU, defendant Bezio was personally aware of the conditions maintained by Superintendent Lee and Superintendent Rock in 2009, and he had the authority to cause changes to these conditions, but consistent with the policies he authorized as SHU director, he did not do so. Upon information and belief, the policies and procedures that existed at Green

Haven and Upstate in 2009 have been largely continued through the present day, without significant alteration, by defendants Fischer, Pratt, and Rock.

98.     As a result of the combined effects of the isolation, deprivations, inadequate mental health care, and the other conditions described above, Mr. Peoples experienced many of the well-studied and well-known risks of isolated confinement during the approximately 780 days that he spent in the SHU.

99.     Mr. Peoples experience in SHU was psychological torture. The SHU left him hopeless and in fear. Days and days on end of isolation and idleness, lack of healthy human interaction, physical assault by his bunkmates, the constant threat of assault by staff, the ever-present threat of deprivation orders, no meaningful mental health care and knowledge the sheer length of his SHU sentence quickly became debilitating and destructive. His emotions became capricious, uncontrollable, and extreme. He had thoughts of harming himself and committing suicide. He was certain he would lose his marriage. He suffered from anxiety, panic, apathy, paranoia, lethargy, uncontrollable rage, and depression. He experienced frequent physiological harms such as headaches and debilitating migraines.

100.     Mr. Peoples' time in extreme isolation left him with lasting physical, psychological and emotional effects. To this day, as a result of his lengthy SHU confinement, Mr. Peoples is withdrawn, has difficulty communicating with others, and avoids social situations. He still has trouble sleeping at night, and finds his mind wandering back to the time he spent in the box.

101.     Mr. Peoples fears the effects that additional SHU confinement may have on him. Given the consequences he has already suffered from his lengthy SHU confinement, and his pre-

existing mental illness, Mr. Peoples is susceptible to a serious risk of harm if subjected to additional isolated confinement.

102. Because of the acts and omissions of Defendants Fischer, Bezio, and Pratt, Mr. Peoples, like all other individuals incarcerated in New York's prisons, is at risk of future unjustified confinement in extreme isolation for violating just one of DOCCS' numerous rules even if his perceived misbehavior poses no arguable danger to safety or security. These policies put Mr. Peoples at risk of future SHU confinement for a simple misunderstanding between himself and a corrections officer, a good faith mistake in complying with DOCCS' many regulations, or for a momentary hesitation in immediately obeying correction officer's order. Given DOCCS' policies permitting a disciplinary conviction and SHU sentence based on the contested testimony of a single corrections officer, Mr. Peoples is at risk of SHU confinement for doing nothing culpable at all.

103. Mr. Peoples is also at risk of future unlawful SHU confinement due to his disciplinary history, which includes two prior sentences to extreme isolation and increases his chance of a formal misbehavior report for any rule infraction, and another SHU sanction if convicted. Finally, as an African-American, and as someone who has been convicted of a sex offense, Mr. Peoples is at an increased risk of future unconstitutional confinement because DOCCS' arbitrary and permissive policies tolerate bias and animus in the disciplinary process.

104. The substantial risk of Mr. Peoples' future SHU confinement is underscored by the statements of corrections staff threatening Mr. Peoples' with additional SHU time. For example, just in the last few months corrections staff threatened Mr. Peoples with additional time in isolation after Mr. Peoples' stated his intention to complain about restrictions on his religious practices.

## JURISDICTION AND VENUE

105.    This action is brought pursuant to 42 U.S.C. § 1983. Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343(a)(3).

106.    Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief. This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

107.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because defendants named in this action have their official residence in this district, and because substantial events and omissions giving rise to the claims in this action occurred at Green Haven C.F. in Stormville, NY, located in this district.

## CLAIMS FOR RELIEF

### First Cause of Action:

#### Violation of the Prohibition against Cruel and Unusual Punishment
#### Eighth and Fourteenth Amendments

108.    Mr. Peoples' three-year sentence to extreme isolation and the more than 780 days he was confined in the SHU violated the Eighth Amendment's prohibition against cruel and unusual punishment.

### Second Cause of Action

#### Violation of the Guarantee of Due Process of Law
#### Fourteenth Amendment

109.    Mr. Peoples' three-year sentence to extreme isolation in SHU and the more than 780 days he spent in SHU imposed a significant and atypical hardship in relation to the ordinary

incidents of prison life, and deprived him of a protected liberty interest, without adequate due process of law.

## REQUESTS FOR RELIEF

WHEREFORE Mr. Peoples respectfully requests that the Court:

    a. Declare that Defendants' acts and omissions violated Mr. Peoples' constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution and that these acts and omissions continue to cause an ongoing risk of the violation of those rights;

    b. Enter permanent injunctive relief requiring the Defendants to adopt policies, procedures, training, supervision and monitoring to abate the risk of future violations of Mr. Peoples' constitutional rights;

    c. Award compensatory and punitive damages for injuries sustained by Mr. Peoples;

    d. Award Mr. Peoples reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and;

    e. Grant any other relief the Court deems necessary and proper.

Dated: December 6, 2012
New York, New York

                         Taylor Pendergrass, Esq. TP-3608
Christopher Dunn, Esq. CD-3991
Gabriel Hopkins*
William Swearingen*
Kyle Valenti*
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3344 (phone)
(212) 607-3318 (fax)
tpendergrass@nyclu.org

* New York University School of Law
Civil Rights Clinic students admitted under
the SDNY student practice plan

*Counsel for Plaintiff*