UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

LEROY PEOPLES, TONJA FENTON :
and DEWAYNE RICHARDSON, individually :
and on behalf of a class of all others :
similarly situated, :
:
                                    Plaintiffs,      :
:
          -versus-                                   :
:
BRIAN FISCHER, Commissioner of the :
New York State Department of Corrections and :
Community Services; ALBERT PRACK, :
Director of Special Housing and Inmate :
Discipline; NORMAN BEZIO, former Director :
of Special Housing and Inmate Discipline; :
WILLIAM LEE, former Superintendent of :
Green Haven Correctional Facility; DAVID ROCK, :
Superintendent of Upstate Correctional Facility; :
CURTIS DROWN, Commissioner's Hearing :
Officer at Green Haven Correctional Facility, :
by his Estate; WILLIAM POWERS, :
Superintendent of Albion Correctional Facility; :
SABINA KAPLAN, Superintendent of Bedford :
Hills Correctional Facility; L. COLLINS, :
corrections officer at Albion Correctional Facility; :
DIANE CATALFU, Deputy Superintendent at :
Albion Correctional Facility; ADA PEREZ, :
Superintendent of Downstate Correctional; :
PATRICK GRIFFIN, Superintendent of Southport :
Correctional Facility; and JAMES CAVALERI, :
Captain at Downstate Correctional Facility, :
:
                                    Defendants.      :
------------------------------------------------------------------X



THIRD AMENDED
CLASS ACTION
COMPLAINT


11 Civ. 2694 (SAS)


ECF CASE

## PRELIMINARY STATEMENT

1.      This civil rights action challenges the constitutionality of New York State's

policies and customs that place every person incarcerated in New York at risk of extraordinarily

long and severely harmful extreme isolation and solitary confinement as punishment for

1

violating prison rules. This action is brought on behalf of three named plaintiffs incarcerated in New York state prisons and a class of similarly situated individuals. New York's cavalier and arbitrary use of extreme isolation as punishment inflicts enormous damage on the incarcerated for no legitimate reason, and it is the essence of "cruel and unusual" punishment.

2.    Between 2007 and 2011 alone, New York imposed nearly 70,000 extreme isolation sentences. On any given day in New York prisons, approximately 4,300 people, constituting approximately 8% of the New York prison population, are locked down 23 hours a day in tiny concrete cells. A disproportionate number of individuals sent to New York's isolation cells are black, and many suffer from serious mental illness.

3.    The conditions and deprivations in New York's extreme isolation cells, known as "Special Housing Units" or "SHU," are deplorable. Individuals held in extreme isolation are led in shackles to barren cages smaller than their cell for one hour of "recreation" a day. Food is delivered through a slot in the door. Idle for weeks and months on end, they are prohibited from participating in any rehabilitative programming. Requests for mental health treatment must be discussed in front of corrections staff through the cell door. Corrections staff may dispense additional punishment by depriving individuals of what little remains—access to nourishing and edible food, exercise, bedding, and showers may all be arbitrarily denied.

4.    Social interaction and mental stimulation are necessary for human beings. Even short periods of forced isolation may cause disruption in neurological functioning in healthy adults. Longer periods of isolation pose a substantial risk of permanent physical and mental harm. New York's practice of "double celling" some prisoners held in SHU—forcing two prisoners to live together in a single isolation cell for weeks, months and sometimes years on end—does not relieve the stress associated with the deprivation of SHU. Instead, it causes

increased violence and distress, predictable results of housing two strangers in a single isolation cell 23 hours a day.

5.     Because of the mental anguish and the well-known risk of serious harm caused by isolated confinement, mental health professionals, legal organizations, human rights experts, and correctional authorities advise that prisoners should be isolated from the general prison population only when absolutely necessary to protect the physical safety and security of prisoners or staff, and for short maximum periods of isolated confinement, such as 15 or 30 days.

6.     The policies and customs authorized by New York's top policy-making corrections officials, however, permit extreme isolation to be imposed as a sanction for minor and non-violent misbehavior that demonstrates no risk to the physical safety of prisoners or staff. As a matter of policy and custom, such sentences are imposed arbitrarily with inadequate sentencing procedures and no upper limit on the length of a sentence an individual may be forced to endure. The average extreme isolation sentence in New York is 150 days, approximately five to ten times the *maximum* tolerable amount according to mental health, legal, correctional, and human rights authorities. Many, including the plaintiffs in this lawsuit, have been condemned to live in New York's isolation cells for years.

7.     The experiences of plaintiffs Leroy Peoples, Tonja Fenton and Dewayne Richardson (collectively "Plaintiffs") typify what is wrong and unconstitutional about New York's disciplinary system. All were given grossly disproportionate sentences by hearing officers for non-violent misbehavior: 1,095 days for Mr. Peoples, 730 days for Ms. Fenton, and 1,095 days for Mr. Richardson. All were forced to endure the severely harmful conditions of SHU isolation for extraordinarily long periods: 780 days for Mr. Peoples, 270 days for Ms.

Fenton, and 425 days for Mr. Richardson. All have suffered serious harm as a result of their sentences.

8.    The astonishingly long sentences imposed on the Plaintiffs were arbitrary, grossly disproportionate to the underlying misbehavior, had no legitimate penological justification, and constituted a gratuitous infliction of wanton and unnecessary pain that fell far short of evolving standards of decency. The disciplinary hearing officers that imposed these severe and unjustified punishments, and the superintendents that authorized and enforced plaintiffs' confinement in the extreme isolation cells at their prisons, did so despite the fact that any reasonable official would have known that the extraordinary severity of these punishments would do little more than inflict unnecessary pain and put plaintiffs at an unjustified risk of harm in violation of their clearly established constitutional rights.

9.    Plaintiffs' sentences are just a few examples of the ongoing and systemic harms caused by the policies and customs authorized and maintained by New York's top corrections officials. Individuals confined in the New York prison system are a captive population in constant contact with corrections officers who are given wide discretion to enforce over 100 different prison regulations governing everything from failing to comply with cafeteria policy to failing to comply with an order. Once a corrections officer alleges an infraction has been committed, a conviction is secured 95% of the time. New York's polices and customs put all current and future prisoners at imminent risk of being sent to "the box" for long periods for no legitimate reason at all.

10.    Defendants have violated and continue to violate the Eighth and Fourteenth Amendments to the United States Constitution. The plaintiffs and the class of similarly situated individuals they seek to represent seek declaratory and injunctive relief to protect them against

4

the risk of future unconstitutional and severely harmful punitive isolation sentences, and the named plaintiffs seek damages for the harms they suffered unnecessarily.

**PARTIES**

11.     Plaintiff LEROY PEOPLES is a 30-year-old African-American man, married, a practicing Muslim, and currently incarcerated at Attica Correctional Facility. Mr. Peoples was sentenced and confined to SHU in Green Haven Correctional Facility, and was later transferred to Upstate Correctional Facility, a dedicated SHU facility. He served a total of approximately 780 consecutive days in extreme isolation. His earliest release date from prison is 2017. When released, Mr. Peoples intends to return to the New York City area to live with his wife.

12.     Plaintiff TONJA FENTON is a 39-year-old African-American woman, mother of two teenage sons, a professional songwriter, and is currently incarcerated in Bedford Hills Correctional Facility. Ms. Fenton was sentenced and confined to SHU at Albion Correctional Facility, and then transferred to the Bedford Hills SHU. She was confined in SHU for approximately 270 days until her release from the Bedford Hills SHU on March 1, 2013, and she continues to face an additional 460 days in SHU in the form of suspended sentences. Her earliest release from prison is August 2013. In this action, Ms. Fenton does not seek any relief related to the loss of good time credits. When released, Ms. Fenton intends to return to her home in Queens, New York, to live with her domestic partner and her two children.

13.     Plaintiff DEWAYNE RICHARDSON is a 40-year-old African-American man from the Bronx, with two children, currently incarcerated in the Special Housing Unit at Mid-State Correctional Facility. Mr. Richardson was sentenced and confined to SHU at Downstate Correctional Facility, and was later transferred to Southport Correctional Facility, a dedicated SHU facility. He spent 425 consecutive days in SHU from 2010-2011, and is currently serving

5

another SHU sentence. His earliest release date is 2015. Mr. Richardson plans to return to New York City to live with his mother after his release from prison.

14. Defendant BRIAN FISCHER is the Commissioner of the New York State Department of Corrections and Community Services ("DOCCS"). Commissioner Fischer has final policy-making and supervisory authority within DOCCS, and is personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by plaintiffs. He is sued in his official capacity for declaratory and injunctive relief.

15. Defendant ALBERT PRACK is the current Director of the Special Housing and Inmate Disciplinary Program. Director Prack has policy-making and supervisory authority with regard to Special Housing Units and DOCCS' disciplinary process, and is personally involved in authorizing, maintaining and enforcing the unconstitutional policies and customs challenged by plaintiffs. He is sued in his official and individual capacity for declaratory, monetary, and injunctive relief.

16. Defendant NORMAN BEZIO was the Director of the Special Housing and Inmate Disciplinary Program at the time of Mr. Peoples' and Mr. Richardson's unconstitutional SHU sentences. At that time, Mr. Bezio had policy-making and supervisory authority with regard to SHU and the DOCCS' disciplinary process, was personally involved in authorizing and maintaining, and enforcing the unconstitutional policies and customs challenged by plaintiffs, and authorized and continued Mr. Peoples' and Mr. Richardson's unconstitutional SHU confinements. He is sued in his individual capacity for monetary relief.

17. Defendant WILLIAM LEE was the Superintendent of Green Haven Correctional Facility at the time of Mr. Peoples' unconstitutional sentence to SHU in 2009. Superintendent Lee had policy-making and supervisory authority with regard to Green Haven, and he authorized

and continued Mr. Peoples' unconstitutional confinement in his facility's SHU. He is sued in his individual capacity for monetary relief.

18.    Defendant DAVID ROCK is the Superintendent of Upstate Correctional Facility. Superintendent Rock has policy-making and supervisory authority with regard to Upstate, and he authorized and continued Mr. Peoples' unconstitutional confinement in his facility's SHU. He is sued in his individual and official capacity for monetary relief.

19.    Defendant CURTIS DROWN, deceased, is a former commissioner's hearing officer. Mr. Drown acted as the hearing officer presiding over Mr. Peoples' October 2009 disciplinary hearing at Green Haven and imposed the unconstitutional SHU sentence on Mr. Peoples. He is sued in his individual capacity for monetary relief.

20.    Defendant WILLIAM POWERS was the Superintendent of Albion Correctional Facility at the time of Ms. Fenton's unconstitutional SHU sentences in 2012. Superintendent Powers had policy-making and supervisory authority with regard to Albion, and he authorized and continued Ms. Fenton's unconstitutional confinement in his facility's SHU. He is sued in his individual capacity for monetary relief.

21.    Defendant SABINA KAPLAN is the Superintendent of Bedford Hills Correctional Facility. Superintendent Powers has policy-making and supervisory authority with regard to Bedford Hills, and she authorized and continued Ms. Fenton's unconstitutional confinement in her facility's SHU. She is sued in her official and individual capacity for declaratory, monetary and injunctive relief.

22.    Defendant L. COLLINS is a corrections officer at Albion Correctional Facility. Captain Collins acted as the hearing officer presiding over two of Ms. Fenton's disciplinary

hearings and imposed unconstitutional SHU sentences on Ms. Fenton in both instances. She is sued in her individual capacity for monetary relief.

23.     Defendant DIANE CATALFU is the Deputy Superintendent of Programs at Albion Correctional Facility. Deputy Superintendent Catalfu acted as the hearing officer presiding over one of Ms. Fenton's disciplinary hearings and imposed an unconstitutional SHU sentence on Ms. Fenton. She is sued in her individual capacity for monetary relief.

24.     Defendant ADA PEREZ is the Superintendent of Downstate Correctional Facility. Superintendent Perez had policy-making and supervisory authority with regard to Downstate, and authorized and continued Mr. Richardson's unconstitutional confinement in her facility's SHU. Superintendent Perez is sued in her individual capacity for monetary relief.

25.     Defendant PATRICK GRIFFIN is the Superintendent of Southport Correctional Facility. Superintendent Griffin had policy-making and supervisory authority with regard to Southport, and he authorized and continued Mr. Richardson's unconstitutional confinement in his facility's SHU in 2010 and 2011. He is sued in his individual capacity for monetary relief.

26.     Defendant JAMES CAVALERI is a corrections officer. Captain Calaveri acted as a hearing officer presiding over Mr. Richardson's February 2010 disciplinary hearing at Downstate Correctional Facility and imposed the unconstitutional SHU sentence on Mr. Richardson in 2010. He is sued in his individual capacity for monetary relief.

## FACTS

### The Severe Risk of Harm Caused by Extreme Isolation

27.     The practice of punishing incarcerated individuals by removing them from the general population and subjecting them to harsh isolation and severe deprivation goes by numerous names—solitary confinement, punitive segregation, disciplinary segregation, extreme

8

isolation. Regardless of the label, the practice has long been shown to cause a risk of severe psychological and physical harm. Subjecting individuals to extreme isolation causes pain, suffering, psychological trauma, physical injury, and, in extreme cases, death.

28.     Documented physical and physiological harms include suicide, self-harm, cardiovascular and genito-urinary problems, tremulousness, gastro-intestinal problems, deterioration of eyesight, heart palpitations, insomnia, migraines, appetite loss, weight loss, sudden excessive sweating, back and joint pain, dizziness, hypersensitivity to external stimuli, and lethargy.

29.     Psychological and neurological harms caused by isolation include hallucinations, severe and chronic depression, depersonalization, social withdrawal, confusion, apathy, anxiety, nervousness, night terrors, panic attacks, irrational anger, rage, loss of impulse control, paranoia, claustrophobia, concentration deficits, difficulties with memory, and perceptual distortions.

30.     For healthy adults these combined effects, referred to by some mental health professionals as "SHU Syndrome," can result in profound harm even after short periods of confinement. The consequences can be particularly devastating, permanent, and even deadly if the length of confinement extends beyond days and into weeks, months or years, particularly for individuals with preexisting physical and mental health conditions.

31.     Precisely because of the risk of harm, the severe pain it causes, and the affront it represents to basic human dignity, almost all states in the country, including New York, have long prohibited the imposition of solitary confinement as punishment for a criminal offense.

32.     Isolation continues to be used, however, by corrections officials. Because of the serious and permanent harm that extreme isolation can cause, correctional authorities in other states, corrections experts, mental health professionals, legal organizations, and human rights

9

bodies have adopted standards intended to ensure it is used only as a last resort. These standards closely govern the circumstances and conditions under which individuals may be separated from the general prison population after they have been incarcerated, the conditions of the isolation confinement, and the maximum length of time a human being should ever be subjected to such conditions.

33. For example, the New York State Bar Association, noting the serious risk of harm posed by extreme isolation, adopted a resolution stating that "solitary confinement, if used at all, should be measured in days, not years, months, or even weeks . . . ." The Bar Association noted that "it is becoming increasingly clear that longterm solitary confinement is not only unnecessary, but counterproductive . . . as such, the continued use thereof constitutes an 'unnecessary infliction of pain' . . . ."

34. The American Bar Association has also promulgated standards to abolish extreme isolation under any circumstances. In order to avoid the unnecessary and unjustified harm caused by the overuse of isolation, the ABA standards require that any isolation of prisoners be for the briefest term and under the least restrictive conditions possible. To ensure prisoners are not unnecessarily subjected to the severe risk of harm caused by isolation, the ABA standards require that prisoners be separated from the general population only after a finding that (1) the individual committed a severe disciplinary infraction in which safety or security was seriously threatened, or (2) the individual presents a credible continuing and serious threat to others or himself.

35. Human rights authorities and bodies have similarly found that minimum safeguards are absolutely necessary to protect against the harms of extreme isolation. For example, the United Nations Special Rapporteur on Torture has concluded that solitary

confinement used specifically for the purpose of punishment can never be justified, given the magnitude of suffering it imposes. Where isolation is absolutely necessary for protecting the safety of the prisoner or staff, the UN Special Rapporteur has held that more than 15 days amounts to torture or cruel, inhuman, or degrading treatment, and recommended that the use of extreme isolation in excess of 15 days be abolished in all cases. Likewise, the UN General Assembly has called for an "absolute abolition" on these types of conditions as punishment, and the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment recommends that extreme isolation only be used as punishment in exceptional cases and for the shortest period of time possible, due to its potentially damaging effects.

36.     The recommendations of various experts and organizations reflect the overwhelming consensus that if isolation is to be used at all, sufficient protocols and safeguards are necessary to prevent the severe harms caused by its inadequately constrained use, and to ensure that isolation is used sparingly as a last resort, for short amounts of time, and under tight controls.

### New York's Unconstitutional Policies and Customs

37.     New York, however, uses extreme isolation as a disciplinary tool of first resort with astonishing frequency and length for the violation of any one of over one hundred internal prison regulations. DOCCS maintains 5,000 isolation beds, located in Special Housing Units throughout the state—including two "SHU-only" prisons, Southport and Upstate Correctional Facilities—that are used to separate individuals from the general prison population and subject them to punishing forms of isolation and deprivation. From 2007-2011, DOCCS issued nearly 70,000 sentences to SHU as punishment for the violation of prison rules. On any given day,

approximately 4,300 people are locked down 23 hours a day serving months- or years- long sentences in one of New York's sparse isolation cells.

38.    The frequency with which DOCCS uses extreme isolation as punishment is a direct consequence of system-wide policies and customs governing the conduct and punishment of all individuals incarcerated throughout the New York prison system. In contrast to the clearly-defined standards and criteria discussed above, New York readily permits the use of extreme isolation as punishment for conduct that poses no threat to safety or security, and for extraordinary and disproportionate lengths of time that have no connection to any legitimate penological rationale. Defendants Fischer, Bezio and Prack were and are personally involved in authorizing and continuing the unconstitutional policies and customs described below.

39.    DOCCS has promulgated over 100 internal regulations governing every aspect of the behavior of individuals incarcerated in New York state prisons. These rules cover a wide range of conduct, governing personal grooming, cafeteria policy, and approved reading materials, as well as prohibiting assault, escape, and the possession of weapons.

40.    If corrections staff believe that an individual has violated any one or more of these rules, they may respond to the misbehavior by speaking with the individual or imposing an informal reprimand.    They may also initiate a formal disciplinary process by writing a "misbehavior report." The misbehavior report documents the alleged misbehavior and contains a citation to the regulation or regulations allegedly violated.

41.    A "review officer" at the correctional facility assigns a "tier" rating to the misbehavior report that determines the severity of the suspected infraction and, ultimately, the type of punishment convicted.  A Tier I rating is intended for less serious infractions, and a Tier III rating for the most serious.  A conviction for an infraction given a Tier II or III rating may

result in a sentence to extreme isolation in SHU. Numerous rule violations that are eligible for Tier II or III ratings govern behavior that is nonviolent, non-disruptive, and/or poses little or no threat to the safety of the prisoners or others.

42.     DOCCS' policies provide minimal guidance to corrections staff regarding how to assign tier ratings to alleged misbehavior. DOCCS' policies do not provide incarcerated individuals with an explanation of what types of conduct may result in more or less severe tier ratings. DOCCS' policies do not provide incarcerated individuals with any notice of potential sentencing ranges to SHU if convicted for an infraction.

43.     Individuals facing a Tier III charge are afforded a limited hearing, with minimal process, to adjudicate their guilt. DOCCS' employees themselves act as hearing officers, and many of these employees may have a variety of other primary work responsibilities.

44.     With regard to adjudicating guilt, hearing officers are permitted to credit the testimony of corrections staff over that of a prisoner. The prisoner can be denied the opportunity to present his own evidence. The prisoner can be denied the right to question adverse witnesses. The prisoners can be denied the ability to know the identity of witnesses. Prisoners can be, and frequently are, convicted of infractions based only on the disputed word of a single corrections officer.

45.     The DOCCS disciplinary process almost always secures a conviction. From 2007 to 2011, DOCCS conducted more than 105,500 Tier III disciplinary hearings, with a conviction rate of approximately 95%. If an individual facing a Tier III charge is among the 95% who are convicted, he or she is more likely than not to be punished with time in extreme isolation. Of Tier III disciplinary hearings that resulted in a conviction from 2007 to 2011, a Tier III SHU sanction was imposed as punishment approximately 70% of the time.

46. DOCCS' policies permit and encourage sentences to extreme isolation for behavior that demonstrates no risk of harm, and where there is no showing that the prisoner needs to be removed from the general prison population in order to protect staff or other prisoners. A substantial number of sentences to SHU are for this type of behavior. For example, from 2007-2011, only 16% of sentences to extreme isolation involved infractions that implicated violent conduct or weapons. From 2007-2011 DOCCS staff imposed SHU confinement as a punitive sanction in Tier III hearings that involved the following infractions:

    a. Over 200 SHU sentences in hearings involving "untidy cell or person";

    b. Over 300 SHU sentences in hearings involving "smoking in an unauthorized area";

    c. Nearly 200 SHU sentences in hearings involving "no ID card";

    d. Over 200 SHU sentences in hearings involving "delaying cell count";

    e. Over 2,100 SHU sentences in hearings involving "facility correspondence violations";

    f. Over 100 SHU sentences in hearings involving "littering";

    g. Over 170 SHU sentences in hearings involving "excessive tobacco";

    h. Nearly 100 SHU sentences in hearings involving "unauthorized jewelry";

    i. Over 50 SHU sentences in hearings involving "unauthorized literature";

    j. Over 1,000 SHU sentences in hearings involving "refusing double celling assignments";

    k. Over 600 SHU sentences in hearings involving "unreported illness";

    l. Over 500 SHU sentences in hearings involving "tattooing";

m. Over 480 SHU sentences in hearings involving "messhall serving/seating violations";

n. Over 100 SHU sentences in hearings involving "unauthorized legal assistance."

47.     DOCCS' policies and customs regarding sentencing are a key factor in the arbitrary and inconsistent punishments that result. When it comes to the question of when SHU should or should not be imposed, for how long, and why, DOCCS' written policies are plainly inadequate. These policies and customs fail in numerous and obvious ways to ensure consistent and proportionate disciplinary outcomes.

48.     With regard to sentence length, DOCCS' policies provide no mandatory sentence ranges and no upper limit on the length of any single sentence. DOCCS' policies and customs recommend 90-day *minimum* sentences for types of non-violent misbehavior. DOCCS' policies also do not place any upper limit on the number of consecutive sentences to SHU that a prisoner may be forced to serve. Consequently, even SHU sentences of 30 days may have the practical effect of ensuring the prisoner will spend months or years confined in extreme isolation as the prisoner serves multiple consecutive SHU sentences.

49.     When it comes to the rationale for when SHU is justified as a sanction, DOCCS' policies provide only vague and generic criteria. DOCCS' policies do not require an adequate articulation of the rationale for imposing extreme isolation as a sanction or for the length of the sentence. As reflected in the Plaintiffs' misbehavior reports, discussed below, hearing officers often provide explanations for these sentences that are, on their face, plainly insufficient to justify the severity of the sanction. Such sentences are routinely authorized and enforced as a matter of policy and custom.

50.     Furthermore, DOCCS' policies permit staff to impose extreme isolation as punishment without taking into account factors that might make such confinement particularly painful and harmful, and the punishment particularly disproportionate, for that individual. DOCCS' staff are permitted to impose SHU confinement without restriction on juveniles, the elderly, the disabled (including those with HIV or other serious medical illness) and those with severe substance abuse problems. While New York state law requires DOCCS to divert those with the most severe forms of mental illness from SHU into a residential mental health treatment unit, DOCCS' policies still permit staff to use extreme isolation to punish individuals with less severe, but nevertheless significant, mental health issues (as of January 2012, approximately 14% of the individuals confined in SHU were on DOCCS' mental health caseload; 35% of these individuals had been diagnosed with a serious mental illness). As a result, individuals who may have the least capacity to tolerate the extreme harms of extreme isolation—for whom even a short time in SHU would be a weighty punishment—may nevertheless end up condemned to months or years in SHU suffering terrible consequences.

51.     Once an individual begins serving his or her SHU sentence, DOCCS' policies allow lengthy confinements without any subsequent individualized reviews to determine whether it is still necessary to confine that individual in the SHU. Nor do policies require that officials periodically evaluate whether, as the sentence drags on for weeks, months and years, the punitive confinement may be causing the individual increasingly severe and grave harm.

52.     DOCCS' policies and customs governing the post-sentencing review of SHU sanctions, including the disciplinary appeals process and discretionary review that can be requested by prisoners, fail to ensure any consistent or meaningful relief from grossly disproportionate SHU sanctions. Upon review, and as evidenced by the experience of the

Plaintiffs detailed below, SHU sentences are affirmed, modified or vacated arbitrarily and inconsistently.

53.    All the above policies work in conjunction with customs that have the force of formal policy throughout the DOCCS system, tolerating and encouraging needlessly and purposefully harmful SHU sentences for all forms of misbehavior and for perceived disobedience. Unconstrained by adequate policies and procedures, DOCCS' staff impose unjustified and arbitrary punishments that are customarily authorized, ratified, and enforced system-wide.

54.    In combination, DOCCS' policies and customs result in unjustified, inconsistent, and harmful SHU sentences. Individuals receive lengthy sentences that are grossly disproportionate as compared to the underlying misbehavior. Similarly situated prisoners receive inconsistent, often vastly different, sentences for similar misconduct. African-American prisoners are more likely to receive SHU sentences, and to receive longer SHU sentences, as compared to individuals of other racial and ethnic groups.

55.    Commissioner Fischer has final policy-making and supervisory authority within DOCCS. As commissioner, and pursuant to New York law, he is aware of and has ultimate authority with regard to all of DOCCS' internal rules, regulations, policies, procedures and customs. Commissioner Fischer and his staff periodically review these policies and customs. He reviews data and statistical analyses that reflect the effects of these policies and customs. If he deems it necessary, Commissioner Fischer has the authority to cause DOCCS' policies to be amended, adopted or repealed.

56.    The Director of Special Housing and Inmate Disciplinary Program, a position formerly held by defendant Mr. Bezio and now held by defendant Director Prack, reviews,

develops, implements, amends, and monitors DOCCS' disciplinary policies and procedures and their consequences and reports to the Commissioner. The director evaluates statistical data to analyze trends and patterns in the disciplinary process. The director is responsible for staff training and supervision on disciplinary policies and procedure, and for developing a program of on-site inspections of the conditions of DOCCS' SHU facilities. The director, along with staff under his direct supervision and guidance, reviews all appealed determinations of Tier III hearings and sustains, overturns or amends those dispositions.

57.     Defendants Fischer, Bezio, and Prack were, and Fischer and Prack are, personally involved in authorizing and maintaining the disciplinary policies, procedures and customs detailed in this complaint, and their consequences and effects. They have the responsibility to review and evaluate DOCCS' disciplinary policies and the authority to adopt, amend, or revise them.

58.     Defendants Fischer, Bezio, and Prack are aware of the harm caused by DOCCS' existing disciplinary policies and customs. These defendants are aware that SHU confinement causes pain, suffering, mental deterioration, and physical injury. DOCCS' statistical data demonstrates that, for years, these policies have resulted in arbitrary, inconsistent, and grossly disproportionate sentences to SHU. They are aware sentences are often for infractions that pose no threat to prison safety or security, and for lengths of time that far exceed any legitimate punitive goal and do little more than inflict unnecessary pain and an unjustified risk of harm.

59.     Defendants Fischer, Bezio and Prack are aware of the consequences of their policies and customs as the result of numerous communications to them from outside organizations and entities, which for years have documented systemic deficiencies in the DOCCS' disciplinary process and the consequences of these deficiencies. Defendants are also

18

aware of a pattern of deficiencies through complaints they have received through disciplinary appeals, grievances, civil litigation, and Article 78 petitions challenging the arbitrary and unjustified sentences that result from the disciplinary process.

60. Defendants have long been aware that DOCCS' disciplinary procedures fail to provide many of the minimum safeguards recommended by correctional, legal, mental health, and human rights experts. The certainty that these policies and customs have and will continue to lead to unjustified and harmful SHU sentences is plain from the lack of adequate guidance contained in DOCCS' written policies themselves, and the fact that DOCCS' staff customarily impose SHU penalties far exceeding even the minimal guidance that is provided.

61. The extraordinary length of SHU sentences imposed by New York officials—150 days on average, some five to ten times longer than the *maximum* allowable time recommended by mental health, legal and human rights experts—serves no legitimate penological justification. In fact, the overwhelming evidence from other state corrections systems is that the use of punitive extreme isolation exacerbates physical violence and psychological harms for both incarcerated individuals and corrections staff, and that it is counterproductive to legitimate penological goals such as prison safety, deterrence, and rehabilitation.

62. Implementing procedural safeguards—for example, adopting adequate criteria designed to ensure proportionality and curtail the length of SHU sentences, avoid the risk of harm for vulnerable prisoners, and provide notice to prisoners and staff of the length of SHU punishment that may be imposed for particular misbehavior—would significantly protect against the risk of erroneous deprivations of the most fundamental constitutional rights, and would not unduly interfere with defendants' legitimate interests.

63.     Despite all of the above, Defendants Fischer and Prack—and Defendant Bezio before them—personally authorized these policies and customs although they have the authority, ability, and ultimate responsibility to ensure DOCCS' policies and customs do not inflict unnecessary and avoidable harm on individuals incarcerated in New York prisons. By continuing these policies and practices, these defendants are responsible for the systemic and ongoing violations of the constitutional rights of individuals incarcerated in New York prisons, including the harms suffered by each of the Plaintiffs, as described below.

## **Plaintiff Leroy Peoples**

64.     Leroy Peoples is a 30-year-old African-American and a practicing Muslim. As a juvenile, he struggled with serious mental illness and a tragic and difficult life in an impoverished home. He began serving a 13- to 16-year prison sentence in 2005. Originally from the New York City area, Mr. Peoples, who is married, plans to return to the area to live with his wife after his release from prison.

65.     Mr. Peoples has been sent to SHU on two occasions. In 2005, Mr. Peoples was sentenced to 180 days in SHU for the unauthorized possession of nutritional supplements. The supplements discovered by corrections staff were available in the prison commissary. Mr. Peoples was charged with violating rules against "unauthorized medication" and "smuggling."

66.     In 2009, the defendants' policies and procedures resulted in a second SHU sentence. On October 5, 2009, Mr. Peoples was incarcerated at Green Haven when corrections staff discovered and seized Uniform Commercial Code ("UCC") documents from his cell that were considered contraband under DOCCS regulations. Mr. Peoples was escorted to the SHU unit at Green Haven and subjected to pre-hearing SHU confinement.

67.     On October 6, 2009, Mr. Peoples was served with a misbehavior report alleging that then-Green Haven Superintendent Defendant William Lee received a packet of documents purporting to contain UCC lien instruments filed by Mr. Peoples against prosecutors from the Queens County District Attorney's office. Upon information and belief, Superintendent Lee was informed that Mr. Peoples' misconduct was given the most serious Tier III rating by the "review officer," resulting in a "Superintendent's Hearing," subjecting Mr. Peoples to the possibility of SHU confinement. Superintendent Lee was informed that Mr. Peoples had been transferred to pre-hearing confinement in his facility's SHU unit, and he was aware that the accusations of misconduct posed no threat to the safety of staff or other prisoners. Superintendent Lee personally authorized Mr. Peoples' confinement in his facility's SHU.

68.     On October 13, after eight days of pre-hearing confinement in the Green Haven SHU, the hearing was conducted. Defendant Commissioner's Hearing Officer (C.H.O.) Curtis Drown presided over the hearing. C.H.O. Drown reviewed the misbehavior report and commented that he was surprised a sex offender was intelligent enough to file UCC liens. Mr. Peoples responded that that was irrelevant to the disciplinary hearing at hand. C.H.O. Drown asserted that Mr. Peoples was refusing to participate in the hearing and, over Mr. Peoples' objection, ejected him from the disciplinary hearing. Mr. Peoples was escorted back to his SHU cell.    In Mr. Peoples' absence, C.H.O. Drown heard testimony from three Green Haven employees.

69.     At the conclusion of the hearing, C.H.O. Drown found Mr. Peoples guilty of an unauthorized filing of a document creating a lien against a state official, unauthorized possession of UCC documents, and violation of facility correspondence procedures. C.H.O. Drown sentenced Mr. Peoples to 1,095 days of confinement in the SHU, as well as the loss of

commissary, phone and package privileges for the same amount of time. C.H.O. Drown also recommended that Mr. Peoples lose seventy-two months of accrued credit towards a reduced sentence (known as "good time"). No criminal court in the state of New York would have had authority to impose this extreme isolation sentence as a punishment for Mr. Peoples' alleged misconduct.

70.     In explaining the SHU sentence, C.H.O. Drown said that Mr. Peoples needed to "conform" his behavior, that other prisoners had to be "dissuaded" from following his example, and that public officers needed to be assured that their private lives would not be harassed by prisoners. No accusations of violent behavior were leveled at Mr. Peoples at any time, and no finding was made that Mr. Peoples needed to be removed and isolated from the general prison population for the safety of prisoners or staff.

71.     Upon information and belief, Superintendent Lee reviewed Mr. Peoples' disciplinary disposition and the 1,095-day SHU sentence that followed his "Superintendent's Hearing." Like all DOCCS superintendents, Superintendent Lee had the policy-making and final supervisory authority for his facility, including the specific authority under New York law to reduce or vacate the term of Mr. Peoples' SHU confinement. Superintendent Lee authorized Mr. Peoples' continued confinement in his facility's SHU.

72.     On November 5, 2009, Mr. Peoples was transferred to Upstate Correctional Facility, a dedicated SHU prison. Upstate Superintendent Defendant David Rock, like Superintendent Lee before him, received and reviewed information regarding Mr. Peoples' transfer to Upstate, the underlying misbehavior, and the SHU sentence imposed. Superintendent Rock also had the authority and ability to reduce or vacate Mr. Peoples' penalty of 1,095 days of

SHU confinement. Superintendent Rock authorized the continuation of Mr. Peoples' extraordinarily long SHU sentence in his facility.

73.　　Mr. Peoples exhausted all of his available administrative remedies regarding his 2009 SHU sentence by appealing the disposition and the SHU sentence to Director Bezio. Director Bezio reviewed information related to Mr. Peoples' behavior, the rationales for the SHU sentence, and the length of the punishment imposed. Director Bezio "affirmed and confirmed" Mr. Peoples' full sentence on December 15, 2010, ending the administrative process available to prisoners for challenging a SHU sanction. Director Bezio's actions were consistent with the policies, procedures and customs he had personally authorized and continued in his capacity as SHU director. Mr. Peoples also submitted a grievance challenging the constitutionality of his SHU sentence. Mr. Peoples filed his Section 1983 lawsuit *pro se* while he was in the midst of serving his SHU sentence.

74.　　Mr. Peoples ultimately spent approximately 780 days in extreme isolation as a result of the 2009 SHU sentence. Pursuant to DOCCS' policies and procedures, no evaluation was conducted by Director Bezio or Superintendent Rock to determine whether the extraordinary length of the confinement was causing severe and irreparable harm as the days in extreme isolation turned into weeks, months, and years.

75.　　Mr. Peoples' life in the SHU was drastically and severely different from his life in the general prison population at Green Haven. While in the general prison population, Mr. Peoples was afforded a range of activities and freedoms that he took advantage of to prepare for life after he had finished serving his criminal sentence.

76.　　For example, Mr. Peoples was able to further his religious education and worship, which had become a central part of his life, and had helped him begin the long process of

reckoning with the terrible consequences of his criminal offenses. In the general population, he could take part in religious activities and services, and could freely seek the advice and counsel of Muslim clergy. Mr. Peoples was able to maintain family ties by phone, contact visits, and conjugal visits with his wife.

77.     Mr. Peoples was able to gain valuable experience and skills preparing him for his eventual release by working in the prison industry program making desks and cabinets. In the general population, he was eligible to be placed on the waiting list for mandatory rehabilitative programs related to his criminal offense. He was able to educate himself further through reading and other activities. The availability of these rehabilitative opportunities was particularly important to Mr. Peoples to help him prepare to positively contribute to his family and community upon release.

78.     Mr. Peoples also had access to social interaction and mental stimulation that helped maintain his psychological and emotional health and stability. He was able to exercise outdoors in the recreation yard. He was permitted to eat meals with other prisoners in the cafeteria, move around the prison facility, and visit the law library. He could watch television and stay abreast of current events. He was able to have personal possessions, including a typewriter, numerous books, magazines, pictures, a personal jacket, personal sneakers, and other clothing.

79.     On October 5, 2009, however, Mr. Peoples' access to all of these rehabilitative programs and other freedoms ceased when he was removed from the general prison population and confined to the SHU at Green Haven. Once in SHU, Mr. Peoples became subject to the extreme deprivations of SHU confinement.

80.     Mr. Peoples' SHU cell at Green Haven was a barren space about the size of an average elevator. His cell contained only a toilet, a sink, and a bedframe with a mattress. Mr. Peoples used his personal possessions as a chair and his bed as a desk. He was confined in the SHU cell 23 hours a day, 7 days a week. He was allowed only one hour of exercise daily, alone in a small empty pen on the roof of the facility barely larger than his cell, surrounded by a high metal fencing.

81.     Mr. Peoples was deprived of all meaningful human contact and mental stimulation. He was not permitted to take part in activities, programs, or classes. He was only permitted to shower about twice per week, when he was handcuffed and led to the shower area. He was not permitted to speak on the phone to anyone, including his wife. Meals were delivered through a slot in the door. Personal visits were severely restricted, and took place through a thick glass barrier while Mr. Peoples was fully shackled.

82.     Few personal possessions were permitted: two sets of state-issued uniforms, three T-shirts, three pairs of boxers and socks, two towels, paper and pen, and cups for drinking. Mr. Peoples was not allowed to possess a personal jacket or personal pair of sneakers. He was not permitted personal reading materials. A cart that was periodically wheeled by the cell had only a few outdated books and magazines.

83.     Once in SHU, Mr. Peoples lived under the constant threat of "deprivation orders." Pursuant to DOCCS' policies, corrections staff may impose deprivation orders denying individuals in SHU any item or service as punishment. These orders may deprive prisoners of exercise, showers, clothing, bedding, and even toilet paper. Corrections officers are granted broad discretion to impose deprivation orders as punishment for a wide range of alleged misbehavior.

84.     Mr. Peoples was also subject to the constant threat of being placed on "restricted diet." DOCCS' policy permits staff to place individuals in SHU on a restricted diet depriving them of nourishing, edible food as punishment for rule violations. A restricted diet meal consists of a football-sized brick of baked bread-and-vegetable matter known as "the loaf." The loaf is accompanied by raw cabbage and water. This diet may be imposed for up to seven days prior to a disciplinary hearing and can be reinstated in seven-day periods for an indefinite number of times.

85.     Facing extreme isolation, the constant threat of additional arbitrary deprivations, and with no productive social stimulation or interaction, Mr. Peoples struggled to maintain a semblance of mental and emotional stability in SHU. He planned his day around mundane events such as meals. He attempted to stave off boredom and torpor by doing pushups, daydreaming, or yelling in his cell simply to hear his own voice.

86.     While confined in extreme isolation, Mr. Peoples experienced feelings of dread and fear caused by the isolation and deprivation. He suffered sudden and uncontrollable mood swings. He was alternately anxious, bored, paranoid, and apathetic. He suffered from regular headaches, depression, and lethargy. Mr. Peoples had experienced some of these same effects when he was confined in the SHU in 2005.

87.     On November 5, 2009, Mr. Peoples was transferred from the SHU at Green Haven to Upstate. The conditions Mr. Peoples endured at Upstate were worse still than those at Green Haven. At Upstate, one of two SHU-only facilities run by DOCCS, the harshest punitive treatment of individuals is encouraged and tolerated as a matter of policy and custom. The extreme culture of deprivation at Upstate was the subject of a 2006 report by the Correctional Association, a New York state oversight organization statutorily charged with inspecting New

York's prisons. Upon information and belief, defendants Bezio and Rock are aware of this report.

88.     Deprivation orders and diet restrictions are used frequently at Upstate. In addition, as a matter of unwritten custom, Upstate corrections staff deprive prisoners of food by failing to ensure the delivery of their meal trays—a custom experienced by Mr. Peoples. Defendants are aware of this informal disciplinary practice of food deprivation, which has been the subject of numerous prisoner complaints, and was also discussed in the 2006 report by the Correctional Association.

89.     The occurrence and constant threat of unprovoked assaults on incarcerated individuals by Upstate corrections staff is well-known to all prisoners, including Mr. Peoples. The Correctional Association 2006 report documented that 80 percent of prisoners surveyed felt unsafe, and that reports by incarcerated individuals of physical abuse and abuse of power by staff were consistent and credible.

90.     Mr. Peoples' cell at Upstate did not allow a direct view outdoors, except for the exercise period when he was allowed to enter the barren concrete recreation area attached to his cell. Mr. Peoples could hear other prisoners shout and curse at all hours. Mr. Peoples believed that some of the men he heard were exhibiting obvious signs of mental illness. His cell was lit day and night. Mr. Peoples' attempts to cover the light with his towel while sleeping resulted in staff waking him in the middle of the night demanding that he remove the towel.

91.     Mr. Peoples was double-celled at Upstate. Pursuant to DOCCS' policy, double-celled individuals are subject to all the same harsh rules, regulation, and deprivations of any other SHU prisoner but, in addition, are forced to spend every moment of every day in a cell with a bunkmate. In a single cell approximately 9 x 11 feet there are two bunks, a shower, a toilet and

a writing desk. No partition or curtain provides privacy for an inmate using the shower or toilet. Prisoners must bathe, urinate and defecate in full view and in close proximity with their bunkmate.

92.     Placing two adult men in a single isolation cell with such limited personal floor space, while at the same time restricting or prohibiting all other avenues for normal social interaction, has well-studied and predictable effects. Double-celling has been shown to generate tension, stress and anger between bunkmates. Double-celled bunkmates may become paranoid, hostile and violent toward one another. Assaults and threats of violence between double-celled individuals are commonplace. As a matter of policy and custom, DOCCS refuses to separate bunkmates until after a violent altercation has already occurred. This policy and custom is well-known to individuals in the SHU, and it exacerbates the risk of assaults between bunkmates who may commit an assault in order to be separated from a bunkmate.

93.     Mr. Peoples was in almost constant conflict with various bunkmates. One bunkmate had a long history of violence and mental and emotional instability, making their close proximity all the more stressful and potentially explosive. Mr. Peoples was assaulted by this bunkmate on numerous occasions. Another bunkmate threatened Mr. Peoples with a razor.

94.     Mr. Peoples wrote to the security staff and filed a grievance asking to have a new bunkmate. One Upstate sergeant responded to Mr. Peoples' grievance by questioning him about it in front of his bunkmate, causing even more tension. Mr. Peoples also wrote to a mental health professional at Upstate, requesting assistance. Pursuant to DOCCS' policy and custom, staff refused to transfer Mr. Peoples without evidence of a serious assault.

95.     His relationship with one particular bunkmate, Larry Allen, completely deteriorated into violence. While Mr. Peoples and Mr. Allen were able to maintain a healthy

relationship for a short time when they were first double-celled, the lack of privacy and close quarters created ever-increasing conflict between them. Eventually, Mr. Allen assaulted Mr. Peoples so violently that Mr. Peoples lost a tooth.

96. DOCCS' policies force individuals in the SHU to make a choice between divulging highly personal medical and mental health details that may subject them to abuse or exploitation in order to receive care, or to forego requesting care in order to preserve confidentiality and their personal safety. DOCCS' policies foreseeably force many prisoners to stifle requests for necessary care.

97. Mr. Peoples was afforded practically no confidentiality with regard to requests for necessary medical or mental health care. When Mr. Peoples requested such care, staff would come to the cell door and force Mr. Peoples to articulate his confidential medical or mental health concerns through the flood slot, within earshot of staff and other prisoners, including his bunkmate, despite the confidential nature of his mental health problems and despite the fact that Mr. Peoples' concerns often involved problems with the bunkmate who was standing within earshot of the conversation.

98. As a result of the combined effects of the isolation, deprivations, inadequate mental health care, and the other conditions described above, Mr. Peoples experienced many of well-studied and well-known risks of isolated confinement during the approximately 780 days that he spent in the SHU.

99. Mr. Peoples' experience in SHU was torturous. The SHU left him hopeless and in fear. Days and days on end of isolation and idleness, lack of healthy human interaction, physical assault by bunkmates, the constant threat of assault by staff, the ever-present threat of deprivation orders, stymied access to mental health care and the knowledge of the sheer length of

his SHU sentence were debilitating and destructive. His emotions became capricious, uncontrollable, and extreme. He had thoughts of harming himself and committing suicide. He was certain he would lose his marriage. He suffered from anxiety, panic, apathy, paranoia, lethargy, uncontrollable rage, and depression. He experienced frequent physiological harms such as headaches and debilitating migraines.

100.    Mr. Peoples' time in extreme isolation left him with lasting physical, psychological and emotional effects. To this day, as a result of his lengthy SHU confinement, Mr. Peoples is withdrawn, has difficulty communicating with others, and avoids social situations. He still has trouble sleeping at night. He finds his mind wandering back to the time he spent in the box, and fears the effect that additional SHU confinement may have on him.

### Plaintiff Tonja Fenton

101.    Tonja Fenton is a 39-year-old African American woman and mother of two teenage sons. Ms. Fenton lived in Queens, New York with her domestic partner and children until she was incarcerated in 2011. Ms. Fenton plans to return to her family and to resume her career as a professional songwriter after her release from prison.

102.    Ms. Fenton received three SHU sentences in 2012 totaling approximately 730 days. Ms. Fenton's first SHU sentence of 365 days arose from allegations that she facilitated the purchase of personal hair care appliances and sneakers for another prisoner. A second SHU sentence of six months was imposed for Ms. Fenton reporting a sexual assault that DOCCS later deemed unsubstantiated. A third SHU sentence of six months arose from Ms. Fenton's act of sending a sample of food she was served in SHU to the Western District of New York in support of her *pro se* lawsuit alleging retaliation and food tampering by corrections officers.

103.    The first SHU sentence of 365 days arose from allegations that Ms. Fenton gave her domestic partner's credit card information to another prisoner. This other prisoner allegedly used the credit card information to purchase a hair dryer, curling iron, and a pair of sneakers. Ms. Fenton was served with a misbehavior report for this alleged misconduct on May 22, 2012. At a Tier III hearing that concluded on June 6, 2012, Commissioner's Hearing Officer Defendant Captain L. Collins found Ms. Fenton guilty of the infractions of "soliciting," "money/authorized property," "phone program violation," and "facility correspondence violations," and sentenced her to 365 days in SHU. In addition, Ms. Fenton was penalized with twelve months loss of recreation, packages, commissary, phone privileges, and recommended loss of twelve months of good time credit.

104.    Ms. Fenton's second SHU sentence arose from an incident on September 11, 2012, when Ms. Fenton reported to corrections officials that a male corrections officer had sexually assaulted her as he escorted her outside her SHU cell. During the escort, the corrections officer forced his hand under her undergarments and threatened Ms. Fenton by saying "Don't eyeball me."

105.    Sexual misconduct by Albion corrections staff has been well-documented in the last decade in news reports, trial judgments against corrections staff, and reports by prison monitors. In 2005, more women at Albion reported fear of sexual misconduct than at any other women's prison in the state, according to a report by the Correctional Association of New York. Furthermore, the Correctional Association documented the consistency of women's reports about retaliation for filing grievances and, for women in SHU, the consistency of reports about staff harassment.

106. Ms. Fenton reported the sexual assault to a social worker during a scheduled phone call. Later the same day, Ms. Fenton was seen by Albion medical staff and taken to Medina Hospital for an examination. Ms. Fenton was questioned by corrections officials about her allegation. During interviews, corrections officials discouraged the complaint and stated that there would be negative consequences if her complaint could not be substantiated.

107. On September 25, 2012, Ms. Fenton was served with a misbehavior report alleging that neither videotape footage nor interviews with anonymous and unidentified colleagues of the accused corrections officer could substantiate the sexual assault allegation. At a Tier III hearing that concluded on October 16, 2012, Deputy Superintendent Defendant Diane Catalfu, who presided over the hearing, found Ms. Fenton guilty of "false statements" and sentenced Ms. Fenton to 180 days of SHU, with 90 days of that sentence suspended and deferred for a period of 180 days. Ms. Fenton also was penalized with six months loss of phone privileges with three months suspended and deferred for a period of six months; six months loss of package privileges; and three months loss of personal property privileges.

108. Ms. Fenton's third SHU sentence arose from a *pro se* Section 1983 case she filed in the Western District of New York. In July 2012, Ms. Fenton filed a lawsuit alleging that corrections staff were retaliating against her and failing to protect her from harm. She sought injunctive relief alleging that staff were tampering with the food that she was served in SHU. Shortly after filing the case, Ms. Fenton sent the court a food sample as evidence in support of her allegations. Then in mid-September 2012, Ms. Fenton mailed the Western District a second sample of food, along with a cover letter identifying the food sample as evidence, and other papers to be filed in the litigation. In both the cover letter and legal papers, Ms. Fenton stated that she was a recent victim of sexual assault.

109.     Notwithstanding that it was the second time she had sent the court a food sample as evidence, and that she had clearly identified the food sample in her cover letter to the court, the second food sample caused alarm for the Western District court personnel, who were worried that it was a hazardous substance. On September 27, 2012, Ms. Fenton was given a misbehavior report. Ms. Fenton's cover letter to the court and documents she filed in her litigation alleging violations of her constitutional rights were made part of the Tier III hearing record. The misbehavior report observed that no language in Ms. Fenton's letter to the court identifying the food sample was threatening in nature and the hearing officer, Captain Collins, affirmed that "I believe no threat was intended by you."

110.     Captain Collins found Ms. Fenton guilty of "threats" and sentenced her to 180 days of SHU, with 90 days suspended and deferred for a period of 180 days. She also was penalized with six months loss of recreation, packages, commissary, and phone privileges, with three months suspended and deferred for a period of six months.

111.     In explaining the first lengthy SHU sentence—punishment for facilitating the purchase of hair care appliances and sneakers—Captain Collins noted the "seriousness of this case," the "overwhelming" evidence, and that Ms. Fenton, who vigorously disputed the charges, refused to take responsibility. Similarly, when imposing the second SHU sentence in response to Ms. Fenton's allegation of sexual assault, Deputy Superintendent Catalfu stated that SHU confinement was intended to impress upon Ms. Fenton and others that making false sexual allegations is "extremely damaging and dangerous and will not be tolerated." As justification for the third SHU sentence regarding the food sample sent by Ms. Fenton to the court, Captain Collins stated that Ms. Fenton's actions caused considerable alarm to court personnel, and the

SHU sentence was necessary to deter her from acting similarly in the future, even though all agreed Ms. Fenton's actions were taken in good faith.

112. When imposing the three SHU sentences, Captain Collins and Deputy Superintendent Catalfu did not find that Ms. Fenton's conduct posed a threat to the physical safety and security of staff and other prisoners, or that it demonstrated any need to remove and isolate Ms. Fenton from the general prison population.

113. Albion Superintendent Defendant Williams Powers was aware of Ms. Fenton's disciplinary dispositions and the resulting SHU sentences. Ms. Fenton also separately wrote to Superintendent Powers asking that he review the penalties. Superintendent Powers had the authority and ability to vacate or reduce Ms. Fenton's SHU sentences. He authorized the continued confinement of Ms. Fenton in his facility's SHU.

114. On November 6, 2012, Ms. Fenton was transferred to Bedford Hills Correctional Facility. Bedford Hills Superintendent Defendant Kaplan received and reviewed information regarding Ms. Fenton's transfer to the Bedford Hills SHU and has spoken with Ms. Fenton about her SHU confinement. Superintendent Kaplan was aware that Ms. Fenton was serving a lengthy SHU sentence for misbehavior that demonstrated no risk of violence, and that she was facing additional sentences imposed for similarly non-violent misbehavior.

115. Upon information and belief, Superintendent Kaplan suspended the remaining 97 days of Ms. Fenton's first SHU sentence, and Ms. Fenton was removed from SHU on March 1, 2013, after approximately 270 consecutive days in extreme isolation. Superintendent Kaplan converted Ms. Fenton's second and third SHU sentences to "suspended" time. Consequently, approximately 460 days of pending SHU confinement may be enforced against Ms. Fenton at a moment's notice if she is found to commit even a minor infraction. If forced to serve this

suspended SHU time, Ms. Fenton may be held in SHU until she is released from prison. Superintendent Kaplan and Director Prack continue to have the authority and ability to enforce or vacate Ms. Fenton's suspended SHU sentences for non-violent misconduct.

116.    Ms. Fenton fully exhausted all her available administrative remedies. Ms. Fenton filed timely disciplinary appeals of all three dispositions and SHU sentences. Director Prack reviewed information related to her misbehavior and the punishments imposed. Director Prack "reviewed and affirmed" the first hearing decision on July 20, 2012 and again on January 23, 2013. Director Prack "reviewed and affirmed" the second and third hearing decisions on December 10, 2012. Director Prack's actions were consistent with the policies, procedures and customs he has personally authorized in his capacity as director and that caused Ms. Fenton's unconstitutional disciplinary sentence. Ms. Fenton also filed grievances challenging her SHU confinement through the Inmate Grievance Program.

117.    Ms. Fenton has a serious medical illness requiring intensive treatment and monitoring. These defendants knew or should have known of Ms. Fenton's illness. Pursuant to DOCCS' policy and custom, however, whether Ms. Fenton's serious medical condition would make SHU confinement particularly harmful for her was not considered or evaluated at the time that staff imposed the sentences to SHU.

118.    For approximately 270 days, Ms. Fenton was subjected to the extreme deprivations of twenty-three-hour SHU confinement. After her removal from the general population and during her confinement to SHU, her ability to maintain her family ties and to plan for her imminent release from prison was severely disrupted. As a result of being placed in SHU, Ms. Fenton's physical, emotional, and psychological health suffered severely, and she continues to deal with these effects and the constant stress of knowing that the lengthy SHU time hanging

over her head could be summarily enforced against her for any sustained accusation of breaking a prison rule.

119.    Ms. Fenton's life in general population was vastly different than the extreme isolation and deprivations she experienced in SHU. In the general population, Ms. Fenton maintained strong ties with the three most important people in her life: her domestic partner and her two sons. Above all, the most important privileges available to Ms. Fenton in the general population were the ability to telephone her children each day and have regular visits with her family.

120.    While in the general population, Ms. Fenton would begin each day by watching the morning news and calling home at seven o'clock in the morning to speak with her sons before they left for school. In the afternoon or early evening, Ms. Fenton called home again to check on her sons. This routine enabled Ms. Fenton to continue to parent and communicate with her children. Ms. Fenton also spoke frequently throughout the day to her domestic partner by phone, and together they talked about Ms. Fenton's upcoming release from prison. Ms. Fenton also received frequent visits from her domestic partner and her sons.

121.    In the general population, Ms. Fenton prepared for her release from prison by participating in both required and elective rehabilitative programming, including women's health programming, AIDS awareness programming, and money addiction programming. Ms. Fenton also focused on resuming her professional songwriting career and wrote many songs while in general population. Ms. Fenton interacted with fellow prisoners every day. Each morning, Ms. Fenton sat down in the same spot and sang, and women in her unit would listen and talk to her.

122.    These meaningful rehabilitative and life-affirming activities came to an abrupt end when Ms. Fenton was placed in SHU. Ms. Fenton has been confined, first in Albion and then

36

in Bedford Hills, in a small cell for 23 hours a day, 7 days a week without mental stimulation or social interaction. At Bedford Hills, Ms. Fenton spent her day in a grimy cell that contained only a desk, toilet, and sink and that was frequently infested with insects. The door to her cell had a slot for a food tray and a plexiglass window. When Ms. Fenton looked through the window, all she could see was a concrete wall. Her cell lacked sufficient ventilation, and the stench of toilet backups on the SHU block permeated her cell on a weekly basis.

123. While in the SHU, Ms. Fenton was permitted used state-issued property and was given used linen stained with what appeared to be blood. In addition to being handcuffed to and from showers and recreation, Ms. Fenton was also handcuffed while seeing medical staff, even while her blood pressure was taken.

124. Once in SHU, Ms. Fenton was denied any meaningful confidentiality for her medical and mental health care. For example, staff outside Ms. Fenton's cell asked in a loud voice—that other prisoners and staff could hear—if Ms. Fenton wished to take psychotropic drugs that had been prescribed to her. In addition, corrections officers were present during Ms. Fenton's highly personal and very intimate medical exams, and were also present when a rape kit was performed following the sexual assault that Ms. Fenton reported in September 2012.

125. Ms. Fenton was deprived of all meaningful social interaction while in SHU. She was permitted only one non-legal visit per week. Ms. Fenton's family was occasionally arbitrarily turned away from visits.

126. Showers or recreation provided the rare opportunity for Ms. Fenton to exit her cell and interact with other human beings, but corrections practices and customs restricted Ms. Fenton's ability to meaningfully exercise these few opportunities. For example, Ms. Fenton's required one hour of recreation tended to be far shorter because the "hour" ran from the moment

corrections officers began the slow process of gathering prisoners to escort them from SHU to their recreation cages.

127. In addition, from mid-September to early November 2012, DOCCS assigned a "supervisor escort" to Ms. Fenton and, because the escort was rarely available, Ms. Fenton seldom was permitted to take recreation at all. Furthermore, Ms. Fenton was deprived of recreation when corrections officers would announce "go around" (when prisoners must verbally confirm their desire to take recreation) so quietly in the early morning that none of the women received notice that they were to announce their requests. If Ms. Fenton or the other women called out to alert each other that "go around" was happening, they were immediately threatened with discipline for talking.

128. Ms. Fenton was informally deprived of food and her weight fell significantly after her placement in SHU. For example, a corrections officer refused to give Ms. Fenton her meal after announcing falsely that Ms. Fenton was not at her door to receive her food tray. On another occasion, a corrections officer announced to Ms. Fenton and another prisoner, "One of you is not going to eat," because there was one meal tray remaining and two prisoners left to be served. At Bedford Hills, Ms. Fenton, who is allergic to wheat gluten, was denied her gluten-free meals. Pained by hunger, Ms. Fenton eventually ate a bit of bread and rashes broke out over her body, including her mouth and her tongue.

129. Ms. Fenton was warned to keep her fingernails short or else face disciplinary sanctions. Because nurses fail to bring nail clippers to the women in SHU, however, Ms. Fenton had to resort to filing her nails on the cell walls.

130. Ms. Fenton pleaded with mental health staff for a puzzle book or some other activity to provide stimulation and maintain her mental health. To cope with the forced idleness

and monotony of SHU, Ms. Fenton invented a game for herself that involved poking small holes in a paper folder. Corrections staff told her the paper game was "contraband."

131. While in SHU, Ms. Fenton was exposed to other women's psychological deterioration, exacerbating her own. For example, a prisoner in a neighboring SHU cell with serious mental illness spent hour after hour compulsively and inexplicably screaming Ms. Fenton's name. Ms. Fenton complained to corrections staff about her distress in listening to this prisoner's calls. Corrections staff made jokes about the prisoner and occasionally turned on loud fans that simply masked the anguished cries.

132. Ms. Fenton's physical health deteriorated after being placed in SHU. Deprived of regular meaningful physical activity, Ms. Fenton developed pain and stiffness in her back and experienced overwhelming lethargy. She lost weight. The physical environment of her cell—the combination of tint of the windows, the metal bars, and the fluorescent light which is on 24 hours a day—affected Ms. Fenton's eyesight. Ms. Fenton had severe dizziness after being confined in SHU. In January 2013, Ms. Fenton experienced an episode in which her vision went blurry and she was overcome by an inability to speak. Ms. Fenton was deeply distressed by this episode and feared that she had suffered a stroke.

133. Forced to focus on nothing but the same four walls day after day and with no meaningful mental stimulation, Ms. Fenton's psychological health deteriorated significantly after being placed in SHU. Ms. Fenton experienced loss of motivation, anxiety, nervousness, panic attacks, irrational anger, rage, loss of impulse control, paranoia, severe and chronic depression, concentration deficits, difficulties with memory, social withdrawal, and confusion.

134. SHU has altered Ms. Fenton's way of thinking and has made her prone to fixation. Ms. Fenton fears these changes are permanent. Her family has recognized changes in

Ms. Fenton: she speaks differently, is less focused when she speaks, does not complete one thought before jumping to the next and snaps impatiently. After hours of forced idleness, Ms. Fenton would be overcome by sudden impulses to scream. Ms. Fenton talked to herself just to hear a human voice.

135.    For Ms. Fenton, SHU was hell. She struggled to maintain her sanity in extreme conditions of deprivation. Prior to her incarceration, Ms. Fenton had no mental health history. Once placed in SHU, doctors diagnosed her with depression and prescribed psychotropic drugs. SHU caused Ms. Fenton to contemplate suicide, which she never contemplated prior to being in SHU. She lives in fear that her suspended sentences will be enforced, and that she will receive yet another unjustified and harmful SHU sentence.

### Plaintiff Dewayne Richardson

136.    Dewayne Richardson is a 40-year-old African-American father of two. He suffered from mental illness prior to being sent to prison for a seven-year sentence in 2010. He is from the Bronx originally and plans to return to that area to live with his mother after his release from prison.

137.    Mr. Richardson is currently serving a term of confinement in SHU, and has previously served several other SHU sentences, including a sentence of 1,095 days, served over 2010 and 2011, for non-violent misbehavior.

138.    On February 19, 2010, Mr. Richardson was incarcerated at Downstate Correctional Facility when corrections staff discovered and seized UCC documents from his cell that were considered contraband under DOCCS regulations. Mr. Richardson removed from general population and confined in SHU at Downstate.

139.    Upon information and belief, Downstate Superintendent Defendant Ada Perez was informed that Mr. Richardson's misconduct was given the most serious Tier III rating by the "review officer," resulting in a "Superintendent's Hearing," subjecting Mr. Richardson to the possibility of SHU confinement. Upon information and belief, Superintendent Perez was informed that Mr. Richardson had been transferred to pre-hearing confinement in the facility's SHU unit. She was aware of the accusations of misconduct and that they posed no threat to the safety of staff or other prisoners. Superintendent Perez authorized Mr. Richardson's placement and continued confinement in the facility's SHU.

140.    After pre-hearing confinement in Downstate SHU, a Tier III Superintendent's Hearing concluded on March 5, 2010. Defendant Captain James Cavaleri, acting as a hearing officer, found Mr. Richardson guilty of unauthorized possession of UCC documents and unauthorized filing of a document creating a lien. Captain Cavaleri sentenced Mr. Richardson to 1,095 days confinement in the SHU, as well as the loss of recreation, commissary, phone, and package privileges for the same amount of time. Captain Cavaleri also recommended that Mr. Richardson lose six months of accrued good time credit. No state court in New York would have had authority to impose this sentence of SHU confinement as a criminal punishment for Mr. Richardson's alleged conduct. Neither Mr. Richardson nor anyone else had any prior notice of the range of SHU confinement he would face for this misbehavior.

141.    In explaining the SHU sentence, Captain Cavaleri wrote: "Inmate Richardson's blatant disregard for the Department's rules and regulations, as well as for state and federal law can not and will not be tolerated. This disposition is intended to not only discourage inmate Richardson from repeating his conduct, but to also discourage others from acting likewise." No accusations of violent behavior were leveled at Mr. Richardson at any time, nor was there any

finding that Mr. Richardson needed to be removed and isolated from the general prison population for the safety of himself or others. The existence and severity of Mr. Richardson's mental illness, and whether it made him particularly vulnerable to the well-known harms of SHU confinement and the punishment particularly severe, was not adequately evaluated.

142. Upon information and belief, after the SHU sentence was imposed Superintendent Perez again considered Mr. Richardson's misbehavior, this time reviewing Mr. Richardson's disciplinary disposition and the 1,095-day SHU sentence. Superintendent Perez had the authority and ability to reduce or vacate Mr. Richardson's SHU confinement penalty. Superintendent Perez did not do so, and instead authorized the continued confinement of Mr. Richardson in her facility's SHU.

143. Mr. Richardson exhausted all available administrative remedies regarding his 1,095-day SHU sentence. He appealed his disciplinary disposition and the SHU sentence to then-Director Bezio. Director Bezio reviewed information related to Mr. Richardson's behavior, the rationales for the SHU sentence, and the length of the punishment imposed. On April 12, 2010, in an order signed by Director Bezio, DOCCS adjudicated the appeal and determined that Mr. Richardson should serve 540 days in SHU. Director Bezio's acts were consistent with the policies, procedures and customs he had personally authorized in his capacity as director and that caused Mr. Richardson's unconstitutional disciplinary sentence. Upon information and belief, Director Prack, as acting SHU director and then as SHU director, also reviewed and affirmed Mr. Richardson's SHU sentence. Mr. Richardson also submitted grievances challenging the constitutionality of his SHU confinement. Mr. Richardson filed a Section 1983 lawsuit, *pro se*, while he was in the midst of serving his SHU sentence.

144. On March 19, 2010, Mr. Richardson was transferred to Southport Correctional Facility, a dedicated SHU prison. Defendant Patrick Griffin, the Superintendent of Southport, received and reviewed information regarding Mr. Richardson's transfer to Southport, the underlying misbehavior, and the SHU sentence imposed. Superintendent Griffin had the authority under New York law to reduce Mr. Richardson's SHU sentence. Upon information and belief, Superintendent Griffin did not do so, and instead authorized the continuation of Mr. Richardson's extraordinarily long SHU sentence in his facility.

145. Mr. Richardson ultimately served approximately 425 days in extreme isolation as a result of the March 2010 SHU sentence. No adequate evaluation was conducted by then Director Bezio or Superintendent Griffin to determine whether Mr. Richardson's continued lengthy confinement in SHU was causing severe and irreparable harm as the days in extreme isolation turned into weeks, months, and years.

146. Mr. Richardson's life in the SHU was drastically and severely different from his life in the general population. While in the general population, Mr. Richardson was afforded a range of activities and freedoms that he took advantage of to prepare for life after his release. Mr. Richardson was eligible to gain valuable experience and skills preparing him for his eventual release through vocational and rehabilitation programs. While in the general population, he enrolled for a vocational program in custodial maintenance and a mandatory anger management program related to his criminal offense.

147. While in the general population, Mr. Richardson also had access to social interaction and mental stimulation that helped maintain his psychological and emotional health and stability, particularly important in light of his mental illness. Mr. Richardson maintained family ties through regular phone calls. He exercised daily in the outdoor recreation yard and the

43

gym. He prepared food for himself nearly every day. He ate meals and socialized with other prisoners in the cafeteria, moved around the prison facility, and visited the law library, where he could use computers and obtain assistance from other prisoners. He watched the news virtually every day. He was able to have personal possessions, including a cassette player, music cassettes, and food from the commissary.

148.    Mr. Richardson's access to all of these rehabilitative programs and other freedoms ceased when he was removed from the general prison population on February 9, 2010, and confined to the SHU. Once in SHU, Mr. Richardson became subject to the policies and practices that create the extreme deprivations of SHU confinement. He was deprived of all meaningful human contact and mental stimulation. Several months into his SHU confinement, Mr. Richardson considered suicide for the first time in his life.

149.    Facing extreme isolation, the constant threat of additional deprivations, and with no productive social stimulation or interaction, Mr. Richardson experienced many of well-studied and well-known risks of isolated confinement during the approximately 425 consecutive days that he spent in the SHU. He alternately felt bored, nervous, lonely, apathetic, lethargic, and depressed. He started talking to himself, pacing his cell, and subconsciously rubbing his arms and legs. He spent much of his time reading magazines or legal documents, but often felt stagnated and unable to concentrate and just stared at the walls in his cell.

150.    Mr. Richardson lost weight and suffered from frequent gastro-intestinal problems and loss of appetite. He has suffered from insomnia, in part because his SHU cells have a light on 24 hours a day that makes it difficult to sleep. He has experienced painful headaches that only subside once he falls asleep. He frequently sweats due to nervousness as well as the

44

uncomfortable temperatures in his SHU cells. He has suffered from pain in his lower back caused by lying in bed for long periods of time.

151.    While in SHU, Mr. Richardson often felt immense and overwhelming anger. He was verbally and physically mistreated by corrections staff on numerous occasions, and he wrote many grievances complaining about that mistreatment. Corrections officers threatened to assault him while he was handcuffed.

152.    The conditions Mr. Richardson faced while confined in SHU at Southport were particularly harsh. A 2003 report by the Correctional Association about disciplinary confinement in New York prisons described the shocking and dangerous conditions at Southport. The report noted numerous instances of inmates throwing feces and urine. The report said that "the level of chaos was striking" when visiting Southport, that "[a]t times the noise level was so extreme that we had to terminate interviews," and that staff at Southport described the conditions as "out of control." The report quoted a civilian employee at Southport who said that corrections officers "screw with the inmates" by harassing them and denying them recreation, showers, and meals because "[t]he bad officers know they can get away with anything because it's sanctioned at the top." Upon information and belief, Defendant Griffin knew of the report's findings about the conditions of confinement at Southport.

153.    The conditions described above still hold true today and reflect Mr. Richardson's experience while confined alone in his SHU cell at Southport, a barren space about the size of an average elevator. His cell contained only a toilet, a sink, a locker, a desk, a small chair, and a bedframe with a mattress. Mr. Richardson was confined in the SHU cell 23 hours a day, 7 days a week.

154. He was allowed only one hour of exercise daily alone in a small empty pen outdoors, surrounded by a high metal fencing. Corrections officers discouraged Mr. Richardson from going to the permitted hour of recreation, and inmates were not permitted to wear boots outside, even when snow covered the ground. As a result, Mr. Richardson almost never went to recreation. The 2003 Correctional Association report found that in a survey of 88 prisoners with mental health issues at Southport, 39% reported that they "never or rarely" attended recreation. The most common reason they cited was fear of harassment by correction officers, around whom prisoners feel particularly vulnerable while wearing restraints.

155. During his time in SHU, Mr. Richardson was not permitted to take part in activities, programs, or classes. He was permitted to shower only about three times per week, when he was handcuffed and led to the shower area. Cold or lukewarm meals were delivered through a slot in the door. He was only permitted one six-minute phone call with family members per month, and on several occasions corrections staff arbitrarily denied him that phone call as punishment for Mr. Richardson not taking recreation. His access to legal materials was largely limited to books or cases that he could request by name, which he often did not know. His human contact was often limited to seeing inmates deliver meals to him through the cell door three times per day and seeing corrections officers walk by to count the inmates twice a day. He was only able to see a mental health counselor approximately once a month. In January 2011, Mr. Richardson told a nurse at Southport that he was allergic to a tuberculosis test. He was told that he had to submit to the test or face additional SHU time for lying if the allergy was not already indicated on his medical record. Mr. Richardson submitted to the test, and it resulted in bumps on his arms and legs that continue to this day.

156. Mr. Richardson's time in extreme isolation has left him with lasting physical, psychological and emotional effects. As a result of his past and current confinement in SHU, Mr. Richardson suffers from a profound anger that he had not previously felt. Mr. Richardson's long time in SHU has changed him permanently, and recently he has avoided calling his family members, even while in the general prison population. He is short-tempered and less able to control himself. Mr. Richardson is less able to respond appropriately to corrections officers, and the additional SHU time he has received since, as detailed below, is partially a result of the ongoing effects of his approximately 425 consecutive days spent in solitary confinement.

157. In September 2012, while incarcerated at Greene Correctional Facility, Mr. Richardson was sentenced to 90 days in SHU for allegedly threatening to spit at corrections staff and possessing unauthorized UCC materials.

158. In January 2013, while confined at Mid-State, Mr. Richardson told corrections staff that he did not want to work in the mess hall, in part because of discomfort he now feels in social environments after enduring his 425-day solitary SHU sentence. He was sentenced to 30 days in SHU for the infractions of creating a disturbance and failing to comply with a direct order.

159. In early February 2013, while incarcerated at Mid-State, Mr. Richardson was sentenced to 30 days in SHU, after allegedly arguing with corrections officers about whether he was carrying tobacco in a location where it was prohibited. For the bulk of this SHU sentence, from approximately February 2 to February 22, Mr. Richardson was denied recreation.

160. On February 22, 2013, while at Mid-State, Mr. Richardson was sentenced to 60 days in SHU for alleged possession of synthetic marijuana. At Mid-State SHU, Mr. Richardson has no right to make any phone calls and has been double-celled with several inmates with

mental illness and histories of violence. The frequent arguments he has experienced underscore the constant threat of violence that exists between double-celled prisoners. Mr. Richardson is currently confined in SHU at Mid-State as a result of the February 22, 2013, sentence, and is scheduled to remain in SHU until approximately April 23, 2013.

161.    With regard to the SHU conditions experienced by Mr. Richardson, Ms. Fenton, and Mr. Peoples as described in this complaint, Commissioner Fischer, Director Bezio, Director Prack, and all facility superintendents named as defendants in this action were personally responsible for authorizing and maintaining the policies and customs that resulted in the SHU conditions described above. Commissioner Fischer was personally involved in authorizing and continuing the policies and customs that govern the general conditions and deprivations in all SHUs. As SHU directors, Mr. Bezio and Director Prack were and are personally aware of and responsible for inspecting, reviewing and authorizing the SHU conditions maintained by the superintendents at their various facilities. In particular, Directors Bezio and Prack and Superintendent Rock, were and are aware that the policies and customs regarding double-celling placed prisoners' physical safety at risk. The superintendents were personally responsible for the management of the day-to-day conditions of SHU confinement at their respective facilities, and authorized and continued policies and customs that resulted in the SHU conditions experienced by Mr. Richardson, Ms. Fenton and Mr. Peoples as described above.

162.    A reasonable official would know the SHU sentences imposed on the Plaintiffs were not supported by any legitimate interest, including those identified in the misbehavior reports, and that the grossly disproportionate length of these SHU sentences would simply inflict unnecessary pain on Mr. Peoples, Ms. Fenton and Mr. Richardson, and place them at an unjustified risk of harm, in violation of their clearly established constitutional rights. Despite

48

this, however, the sentences were imposed by the hearing officers, and authorized and enforced by the SHU directors and the facility superintendents named as defendants in this action. The system-wide policies and customs detailed in this complaint permitted and caused these defendants' unconstitutional acts and omissions.

### Risk of Ongoing Harm to Named Plaintiffs and the Class

163.    The plaintiffs and class members are incarcerated twenty-four hours a day in prison facilities governed by uniform disciplinary polices and customs and come into constant contact with corrections officers charged with enforcing a list of over 100 rules and prohibitions, including vague rules enforceable and interpretable at the discretion of corrections officers. Plaintiffs and class members may be charged, convicted and sentenced to SHU for an infraction for any reason, or for no legitimate reason at all. Approximately 8% of the prison population is confined in SHU at any given time. From 2007-2011, over 70,000 SHU sentences were imposed, compared to a prison population that has averaged about 57,000 individuals over the same time period.

164.    DOCCS' policies and customs put Plaintiffs and class members at risk of a SHU sentence for a simple misunderstanding between a prisoner and a corrections officer. These policies put prisoners at risk of a lengthy SHU sentence for a good-faith mistake in complying with one of DOCCS' many regulations. Prisoners can, and are, sent to SHU for a momentary hesitation in immediately obeying a correction officer's order—a significant risk for prisoners with mental health diagnoses, like Mr. Richardson, whose illness makes it more difficult for him to comply with corrections officers' demands. Given DOCCS' policies and customs permitting a disciplinary conviction and SHU sentence based on the contested testimony of a single corrections officer, prisoners are at risk of SHU confinement for doing nothing culpable at all.

Once a prisoner is accused of committing a Tier III infraction, it is almost a certainty that the prisoner will be convicted, and far more likely than not that SHU will be imposed as punishment.

165. Prisoners who spend any time in SHU—as an astounding percentage have—are at particular risk of additional SHU sanctions. DOCCS' policies and customs encourage SHU sanctions when the prisoner's disciplinary hearing includes prior misbehavior reports and SHU sentences.

166. In addition, for many prisoners SHU confinement will cause psychological and neurological harms resulting, among other things, loss of impulse control, depersonalization, and rage. These effects may lead to acts that DOCCS' staff will respond to with additional SHU sanctions. For others, severe depression and lethargy may result in punishment for failing to promptly obey orders.

167. The substantial and real risk of future SHU confinement for all individuals as a result of DOCCS' policies and customs is illustrated by the statements of corrections staff threatening Plaintiffs with additional SHU time. For example, corrections staff threatened Mr. Peoples with additional SHU time after Mr. Peoples' stated his intention to complain about restrictions on his religious practices. Similarly, at every facility he has been housed in, corrections officers have threatened Mr. Richardson with SHU time if he does not do exactly as they say. Furthermore, both Ms. Fenton and Mr. Richardson face additional time in "suspended" SHU sentences that they may be forced to serve at an officer's discretion for any future misbehavior, no matter how minor.

168. The policies and customs detailed in this complaint are uniformly applicable to the Plaintiffs and the class, cause ongoing and systemic violations of constitutional rights, and put all current and future prisoners at a risk of future unjustified SHU confinement.

# CLASS ACTION ALLEGATIONS

169.    Pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), the plaintiffs will seek to certify a class of all current and future prisoners seeking declaratory and injunctive relief. All class members face a substantial risk of receiving unconstitutionally arbitrary, disproportionate, harmful and unjustified SHU sentences as a result of DOCCS' policies and customs.

170.    All four requirements of Rule 23(a) are satisfied:

    a.  *Numerosity:* Joinder of all class members is impracticable because of the size of the class. There are approximately 56,000 individuals currently held in DOCCS' facilities—with approximately 4,300 confined in SHU at any given time—and all face a substantial risk of an unconstitutional SHU sentence as a result of the defendants' system-wide policies and customs.

    b.  *Commonality:* There are questions of law and fact common to all members of the class, including, but not limited to, whether the defendants' policies and procedures have resulted in and continue to result in unconstitutional SHU sentences in violation of the class members' Eighth and Fourteenth Amendment rights.

    c.  *Typicality:* The claims of the class representatives are typical of those of the class. All plaintiffs are currently held in DOCCS facilities. All face substantial risk of receiving unconstitutional SHU sentences as a result of the challenged policies and procedures.

    d.  *Adequacy of Representation:* The class representatives and class counsel will fairly and adequately represent the interests of the class. The named plaintiffs are

committed to obtaining declaratory and injunctive relief that will benefit the entire class by abating the risk of constitutional harm caused by defendants' current policies and customs, and their interests in this matter are not antagonistic to other class members. Class counsel has many years of experience in civil rights and class action litigation.

171.     Class-wide declaratory and injunctive relief is appropriate under Rule 23(b)(2) because the defendants have acted and refused to act on grounds generally applicable to the class as a whole.

## JURISDICTION AND VENUE

172.     This action is brought pursuant to Title 42 U.S.C. § 1983. Subject matter jurisdiction is conferred by Title 28 U.S.C. §§ 1331 and 1343(a)(3).

173.     Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief. This Court has authority to award costs and attorneys' fees under 42 U.S.C. 1988.

174.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because defendants named in this action have their official residence in this district, and because substantial events and omissions giving rise to the claims in this action occurred in this district.

## CLAIMS FOR RELIEF

### First Cause of Action:

Declaratory and Injunctive Relief for the Named Plaintiffs and the Class
Against Defendants Fischer and Prack for
Violation of the Eighth Amendment

175.   As a result of the unconstitutional policies and customs authorized and maintained by defendants Commissioner Fischer and Director Prack, the named plaintiffs and members of the putative class have suffered and continue to suffer SHU sentences that violate the Eighth Amendment's protection against cruel and unusual punishment. The named plaintiffs and members of the putative class seek declaratory and injunctive relief remedying these ongoing and systemic constitutional violations.

### Second Cause of Action:

Declaratory and Injunctive Relief for Named Plaintiffs and the Class
Against Defendants Fischer and Prack for
Violation of the Fourteenth Amendment Due Process Clause

176.   As a result of the unconstitutional policies and customs authorized and maintained by defendants Commissioner Fischer and Director Prack, the named plaintiffs and members of the class have suffered and continue to suffer SHU sentences that violate the Due Process Clause of the Fourteenth Amendment. The named plaintiffs and members of the putative class seek declaratory and injunctive relief remedying these ongoing and systemic constitutional violations.

## Third Cause of Action:

Monetary Relief for Individual Plaintiffs
Against Defendant Superintendents, Hearing Officers and SHU Director for
Violations of the Eighth Amendment

177. The defendant hearing officers, superintendents and SHU directors violated the named plaintiffs' clearly established constitutional rights when they personally imposed, authorized and enforced SHU sentences that violated the Eighth Amendment.

178. The named plaintiffs seek monetary relief for the violation of their Eighth Amendment rights against the following defendant hearing officers and superintendents: Mr. Peoples against defendants Director Bezio, Superintendent Lee, Superintendent Rock, and C.H.O. Drowns for the 780 days he spent in SHU beginning in October 2009; Ms. Fenton against Director Prack, Superintendent Kaplan, Superintendent Powers, Deputy Superintendent Catalfu and Captain Collins for the 270 days she spent in SHU from 2012 to 2013; and Mr. Richardson against defendants Director Bezio, Superintendent Perez, Superintendent Griffin, and Captain Cavaleri for the 425 days he spent in SHU from 2010 to 2011.

179. Through their Third Cause of Action, Mr. Peoples, Ms. Fenton, and Mr. Richardson seek monetary relief solely in their capacity as individual plaintiffs, and not as named plaintiffs on behalf of a class.

## Fourth Cause of Action:

Monetary Relief for Individual Plaintiffs
Against Defendant Superintendents, Hearing Officers and SHU Directors for
Violations of the Fourteenth Amendment Due Process Clause

180. The defendant hearing officers, superintendents and SHU directors violated Plaintiffs' clearly established constitutional rights when they personally imposed, authorized and enforced SHU sentences that violated the Due Process Clause of the Fourteenth Amendment.

181.    Plaintiffs seek monetary relief for the violation of their Due Process rights against the following defendant hearing officers and superintendents: Mr. Peoples against defendants Director Bezio, Superintendent Lee, Superintendent Rock, and C.H.O. Drowns for the 780 days he spent in SHU beginning in October 2009; Ms. Fenton against Director Prack, Superintendent Kaplan, Superintendent Powers, Deputy Superintendent Catalfu and Captain Collins for the 270 days she spent in SHU from 2012 to 2013; and Mr. Richardson against defendants Director Bezio, Director Prack, Superintendent Perez, Superintendent Griffin, and Captain Cavaleri for the 425 days he spent in SHU from 2010 to 2011.

182.    Through their Fourth Cause of Action, Mr. Peoples, Ms. Fenton, and Mr. Richardson seek monetary relief solely in their capacity as individual plaintiffs, and not as named plaintiffs on behalf of a class.

## REQUESTS FOR RELIEF

WHEREFORE the plaintiffs respectfully request that the Court:

    a. Declare that Defendants' acts and omissions violated the plaintiffs and class members' rights under the Eighth and Fourteenth Amendments to the United States Constitution and that these acts and omissions continue to cause ongoing violations of these rights;

    b. Enter permanent injunctive relief, in the form of policies, procedures, training, supervision and monitoring, requiring defendants Fischer and Prack to end the ongoing constitutional violations;

    c. Enter permanent injunctive relief prohibiting the suspended SHU sentences from being enforced against Ms. Fenton;

    d. Award compensatory and punitive damages for all injuries sustained by the individual named plaintiffs, including the loss of liberty, economic loss, loss of familial contact, and the loss of all other privileges except for good time credits, as a result of the violations of their constitutional rights;

    e. Award the plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. 1988; and;

    f. Grant any other relief the Court deems necessary and proper.

Dated: March 06, 2013
New York, New York

Taylor Pendergrass (TP-3608)
Christopher Dunn (CD-3991)
Daniel Mullkoff (DM-5557)
Gabriel Hopkins*
William Swearingen*
Kyle Valenti*
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3344
Fax: (212) 607-3318
tpendergrass@nyclu.org

David J. Fioccola (DF-1622)
Jennifer K. Brown (JB-4222)
Kayvan B. Sadeghi (KS-7463)
Daniel Matza-Brown (DM-1106)
Adam J. Hunt (AH-0627)
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 468-8000
Fax: (212) 468-7900
dfioccola@mofo.com

Alexander A. Reinert (AR-1740)
55 Fifth Avenue, Room 938
New York, New York 10003
Tel: (212) 790-040
Fax: (212) 790-0805
areinert@yu.edu

*Counsel for Plaintiffs*

*New York University Civil Rights Clinic
students admitted under the student practice
act.

RECEIVED
CITY CLERKET UNIT

2013 MAR 26  A 12: 09