UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

LEROY PEOPLES, et al., on behalf of
themselves and all others similarly situated,

                      Plaintiffs,

       -against-

BRIAN FISCHER, et al.,

                  Defendants.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/23/15

11-CV-2694 (SAS)

## [PROPOSED] ORDER GRANTING THE PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS-ACTION SETTLEMENT

The Court, having considered the parties' Notice of Joint Motion for Preliminary Approval of Class-Action Settlement, the proposed Settlement Agreement, and Plaintiffs' Memorandum and declarations in support of the Joint Motion, including the proposed Notice to the Class, hereby

      **FINDS AND ORDERS:**

      1.     The Court finds for purposes of settlement only that the prerequisites for a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure have been satisfied in that (a) the Class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Class; (c) the plaintiffs' claims are typical of those of the Class; (d) the plaintiffs will fairly and adequately protect the interests of the Class; and (e) the defendants acted or refused to act on grounds that apply generally to the Class so that final relief is appropriate for the Class as a whole.

1

2.      Accordingly, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure the following settlement class ("Class") is certified:

> All DOCCS inmates who are now serving, or will in the future serve, a disciplinary confinement sanction in a SHU or in one of the programs created under or referenced in the Agreement.

3.      The Court finds the New York Civil Liberties Union, Morrison & Foerster LLP, and Alexander A. Reinert have extensive expertise in prosecuting class action cases, and appoints them as Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

4.      The Court grants preliminarily approval to the Settlement Agreement, attached to this order as Exhibit A, as being fair, reasonable and adequate to the Class, subject to further consideration at the Fairness Hearing.

5.      The Court finds the Notice to the Class of the Settlement Agreement ("Notice"), attached to this order as Exhibit B, and the distribution of the Notice in the manner set forth below, are reasonably calculated to apprise the Class members of the proposed Settlement Agreement and their rights to object to any aspect of the Settlement Agreement, and complies with the requirements of Rule 23 of the Federal Rules of Civil Procedure.

6.      The defendants shall distribute the Notice by the following means:

   a. Prior to the Notice Period, posting a copy of the Notice in English and Spanish in all housing units in a prominent location that is visible and accessible to general population inmates on a daily basis, and ensuring that the Notice remains posted and visible during the entire comment period; and

   b. Prior to the Notice Period, delivering a copy of the Notice in English, and upon a request by the inmate in Spanish, to all inmates in SHU, the Correctional Alternative Rehabilitation program, and the Juvenile program; and during the Notice Period, providing the Notice to all inmates newly admitted to SHU, the Correctional Alternative Rehabilitation program, and the Juvenile program.

2

7.     During the Notice Period, Defendants shall maintain at least one copy of the Settlement Agreement in English and in Spanish, the revised Sentencing Guidelines, "PIMS" Chart, Hearing Officer Guidance, and Double-Celling Policy, referenced in the Settlement Agreement (together, the "Settlement Documents"), for review by inmates in all facility libraries, and shall provide a copy of the Settlement Documents for review upon request to an inmate who is not permitted physical access to review them in a library.

8.     Within the first seven days of the Notice Period, defendants shall file with the Court and serve on plaintiffs' counsel a declaration affirming that the Notice was distributed and the Settlement Documents have been made available as required above.

9.     Any Class member shall have the right to submit a written objection to the Court during the Notice Period in advance of the Fairness Hearing, in the manner specified in the Notice. The Notice Period will begin on _Jan 13, 2016_ and end on _March 14, 2016_. An objection postmarked on or before the last day of the Notice Period shall be deemed to be timely submitted, and will be ECF filed for review by counsel. Any Class member who does not submit a written objection or appear to make his or her objection at the Fairness Hearing shall be deemed to have waived such opportunity and shall forever be foreclosed from making an objection to the Settlement Agreement.

10.     A Fairness Hearing will be held before this Court on _MAR 28_, at _4 P._ in Courtroom 15C, at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York, at which time objections and comments on the proposed Settlement Agreement will be considered by the Court and the Court will determine whether the Settlement Agreement should be finally approved as fair, reasonable, and adequate, and whether it shall be entered as the Final Judgment in this action.

3

**SO ORDERED** this 23 day of Dec , 2015

THE HONORABLE SHIRA A. SCHEINDLIN
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

LEROY PEOPLES, TONJA FENTON and :
DEWAYNE RICHARDSON, on behalf of :
themselves and all others similarly :
situated, :
                     :       Docket Number
           Plaintiffs, :       11-CV-2694 (SAS)
                     :
                     :
       -against- :
                     :
                     :
BRIAN FISCHER, et al., :
           Defendants.

----------------------------------------------------------------x

 

**SETTLEMENT AGREEMENT**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.   SHU-ALTERNATIVE PROGRAMS ...................................................................... 4

    A.   Southport Step-Down Program .............................................................. 4

        1.   Program Overview ........................................................ 4

        2.   Physical Layout. ............................................................ 5

        3.   Staffing. ........................................................................ 5

        4.   Program Modules ......................................................... 6

            (a)   Orientation ........................................................ 6

            (b)   Phase 1 ............................................................. 6

                (i)   Programming. .................................. 6

                (ii)   Recreation ....................................... 6

                (iii)   Total Daily Out-of-Cell Time .......... 6

                (iv)   Restraints. ....................................... 7

                (v)   Time Cuts ........................................ 7

            (c)   Phase 2 ............................................................. 7

                (i)   Programming. .................................. 7

                (ii)   Recreation ....................................... 7

                (iii)   Incentives ........................................ 7

                (iv)   Total Daily Out-of-Cell Time ......... 7

                (v)   Restraints. ....................................... 8

                (vi)   Time Cuts ........................................ 8

            (d)   Phase 3 ............................................................. 8

                (i)   Programming. .................................. 8

                (ii)   Recreation ....................................... 8

                (iii)   Incentives ........................................ 8

                (iv)   Total Daily Out-of-Cell Time ......... 8

                (v)   Restraints. ....................................... 9

                (vi)   Time Cuts ........................................ 9

            (e)   Curriculum ....................................................... 9

            (f)   Projected Opening Date .................................... 9

    B.   Mid-State Step-Down and Substance-Abuse Programs ...................... 9

        1.   Physical Layout. ............................................................ 9

        2.   Initial Operation as an SDP. ...................................... 10

            (a)   Recreation ....................................................... 10

            (b)   Congregate Leisure Activities. ....................... 10

            (c)   Total Daily Out-of-Cell Time ......................... 10

        3.   Reassessment on Opening of Southport SDP ............. 11

        4.   Overview of Mid-State Substance Abuse Program ..... 11

        5.   Drug-Free Environment .............................................. 12

        6.   Staffing. ...................................................................... 12

        7.   Orientation ................................................................. 13

        8.   Program Modules ....................................................... 13

        9.   Curriculum ................................................................. 13

|  | 10. | Incentives .................................................................................... 14 |
|  | 11. | Projected Opening of Mid-State Unit ......................................... 14 |
| C. | | Lakeview Substance-Abuse Program .................................................... 14 |
|  | 1. | Program Overview ....................................................................... 15 |
|  | 2. | Drug-Free Environment ............................................................... 15 |
|  | 3. | Physical Layout ........................................................................... 15 |
|  | 4. | Staffing ........................................................................................ 16 |
|  | 5. | Orientation .................................................................................. 17 |
|  | 6. | Programming ................................................................................ 17 |
|  | 7. | Curriculum ................................................................................... 17 |
|  | 8. | Incentives .................................................................................... 18 |
|  | 9. | Projected Opening of Lakeview Substance Abuse Program ...... 18 |
| D. | | Step-Down to the Community Programs ............................................... 18 |
|  | 1. | Program Overview ....................................................................... 19 |
|  | 2. | Physical Layout ........................................................................... 19 |
|  | 3. | Staffing ........................................................................................ 19 |
|  | 4. | Program Modules ......................................................................... 19 |
|  | 5. | Recreation .................................................................................... 20 |
|  | 6. | Incentives .................................................................................... 20 |
|  | 7. | Eligibility .................................................................................... 20 |
|  | 8. | Initial Program Cohort ................................................................ 21 |
|  | 9. | Projected Opening of Step-Down to the Community Programs ... 21 |
| E. | | Programs for Juveniles ......................................................................... 21 |
|  | 1. | Continuation of Programs ............................................................ 21 |
|  | 2. | Limit On Time In Cell ................................................................. 21 |
|  | 3. | Separate Housing For Juveniles .................................................. 21 |
|  | 4. | Shock Incarceration Program ...................................................... 22 |
|  | 5. | Disciplinary Sanctions ................................................................ 22 |
|  | 6. | Relationship to *Cookhorne* ....................................................... 22 |
|  | 7. | Program Contingency .................................................................. 22 |
| F. | | SHU-Alternative Programs for Special Need Inmates ......................... 23 |
|  | 1. | Continuation of Programs ............................................................ 23 |
|  | 2. | Eligibility .................................................................................... 23 |
|  | 3. | Program Overview ....................................................................... 23 |
| II. | | AGREEMENTS APPLICABLE TO ALL SHU-ALTERNATIVE PROGRAMS ......... 24 |
| A. | | Eligibility and Placement ..................................................................... 24 |
| B. | | Program Management Team ................................................................... 24 |
| C. | | Continuation of Programming .............................................................. 24 |
| D. | | Restraints, Privileges, Incentives and Out-of-Cell Time .................... 25 |
| E. | | Out-of-Cell Interviews ......................................................................... 25 |
| F. | | Discipline in SHU-Alternative Programs ............................................. 26 |
| G. | | Discharge Upon Completion of SHU-Alternative Program ................. 27 |
| H. | | Disciplinary Sanction Ends Prior to Program Completion .................. 28 |
| I | | Early Discharge to SHU ....................................................................... 28 |
| J. | | Full Utilization of Capacity.................................................................. 29 |
| K. | | Inmate Orientation Material .................................................................. 29 |
| L. | | Timeframes ........................................................................................... 29 |

III.    PRESUMPTION AGAINST SHU FOR PREGNANT INMATES ................................. 30

IV.    SEPARATE KEEPLOCK UNITS ............................................................................ 30

    A.    Conditions in New Units ............................................................................ 30

        1.    Fishkill ........................................................................................ 30

        2.    Five Points ................................................................................... 31

    B.    Projected Opening of New Keeplock Units ................................................ 31

    C.    Placement Priority ..................................................................................... 31

    D.    Reduction of Certain Keeplock Sanctions ................................................. 32

V.    UNIFORM "PIMS" PROGRAM FOR ALL SHUs ................................................. 32

VI.    CONFINEMENT PROGRAM PLAN ("CPP") ...................................................... 32

    A.    Overview .................................................................................................... 33

        1.    Program Plan ................................................................................ 33

        2.    Program Management Team .......................................................... 33

        3.    Program Overview ....................................................................... 33

        4.    Progress Evaluation ..................................................................... 34

    B.    Programs Offered ....................................................................................... 34

        1.    Behavior Modification/Aggression .............................................. 34

        2.    ASAT Pre-Treatment Workbook ................................................. 35

        3.    Educational Cell Study ................................................................ 36

        4.    Incentives .................................................................................... 36

        5.    Inmate Orientation Manual .......................................................... 37

VII.    UPSTATE ASAT PROGRAM EXPANSION ....................................................... 37

VIII.    SHU CONDITIONS .............................................................................................. 38

    A.    Phone Calls ................................................................................................ 38

    B.    Shower Curtains ......................................................................................... 39

    C.    Library Services ......................................................................................... 39

    D.    Head Phones .............................................................................................. 39

    E.    Double-Celling Assignments ..................................................................... 39

    F.    Correspondence Courses ............................................................................ 40

    G.    Tablet Pilot Program ................................................................................. 40

    H.    Mental Health Contacts ............................................................................. 41

    I.    Additional Changes in Conditions……………………………………….41

IX.    DEPRIVATIONS ORDERS .................................................................................. 41

    A.    Deprivation Order Limitations ................................................................... 41

    B.    Notification to OMH .................................................................................. 42

    C.    Review and Renewal .................................................................................. 42

    D.    Special Management Meal .......................................................................... 42

    E.    Record Keeping ......................................................................................... 42

X.    SENTENCING PRACTICES ................................................................................. 42

    A.    Modifications of Guidelines ...................................................................... 42

    B.    Special Management Meal .......................................................................... 43

    C.    Guidance for Hearing Officers ................................................................... 43

    D.    Time Cuts .................................................................................................. 44

        1.    SHU Sanctions less than 90 days ................................................. 44

        2.    SHU Sanctions of 90 days or more .............................................. 44

    E.    SHMC Calendar ........................................................................................ 45

XI.    TRAINING ........................................................................................................... 45

|  | A. | Training Academy ................................................................... | 45 |
|  | B. | SHU-Alternative Units ............................................................ | 46 |
|  | C. | CPP Staff ................................................................................. | 46 |
|  | D. | SHU Staff ................................................................................. | 46 |
|  |  | 1. Initial Training ............................................................ | 46 |
|  |  | 2. Annual Refresher Course .......................................... | 46 |
|  | E. | SHMC ....................................................................................... | 47 |
|  | F. | Entire DOCCS Staff ............................................................... | 47 |
|  | G. | Annual Peace Officer Training ............................................... | 47 |
|  | H. | Guidance on Transfer Procedures.......................................... | 48 |
|  |  | 1. Advance Notice of Transfer ...................................... | 48 |
|  |  | 2. Electronic Scheduling of Initial Interview ............... | 48 |
|  |  | 3. Memorandum ................................................................ | 48 |
|  | I. | Grant Opportunities............................................................... | 48 |
|  | J. | Training Materials .................................................................. | 49 |
| XII. | POST-SETTLEMENT ACTIVITIES ................................................... | | 49 |
|  | A. | Designation and Role of Experts ........................................... | 49 |
|  | B. | Periodic Tours and Assessments ........................................... | 49 |
|  | C. | Access to Documents .............................................................. | 50 |
|  |  | 1. In Conjunction With Tours ........................................ | 50 |
|  |  | 2. Annual Meeting ........................................................... | 52 |
|  |  | 3. Document Review by Experts .................................... | 53 |
|  |  | 4. Rule-Making ................................................................. | 53 |
|  |  | 5. Quarterly Reporting .................................................... | 53 |
|  |  | 6. Annual Reporting ........................................................ | 55 |
|  | D. | Confidentiality ........................................................................ | 55 |
|  | E. | Consideration of Experts' Recommendations ....................... | 56 |
|  | F. | Public Reporting on DOCCS' Website................................... | 56 |
|  | G. | Policy Structure Review......................................................... | 56 |
| XIII. | ENFORCEMENT POWERS ................................................................. | | 57 |
|  | A. | Notice, Meet and Confer Obligations.................................... | 57 |
|  | B. | Magistrate Judge Nonbinding Mediation............................... | 57 |
|  | C. | Adjudication of Disputes Unresolved by Mediation ............. | 57 |
|  | D. | Substantial Noncompliance Proven ....................................... | 58 |
|  | E. | Agreement as to 18 U.S.C. § 3626 ........................................ | 59 |
|  | F. | No Waiver for Failure to Enforce .......................................... | 59 |
| XIV. | ATTORNEYS' FEES; POST-SETTLEMENT ACTIVITIES ................... | | 59 |
| XV. | DISMISSAL OF COMPLAINT AND CLAIMS CASES, RESERVATON OF JURISDICTION.................................................................................. | | 61 |
| XVI. | MISCELLANEOUS PROVISIONS ...................................................... | | 61 |
| XVII. | TERM .................................................................................................... | | 62 |
| XVIII. | BINDING EFFECT .............................................................................. | | 63 |
| XIX. | DEADLINES AND UNFORESEEN DELAY ........................................ | | 63 |
| XX. | STIPULATION AS TO CLASS CERTIFICATION ................................ | | 63 |
| XXI. | COMMUNICATION WITH AND ACTIONS BY CLASS COUNSEL....... | | 64 |
| XXII. | FUNDING ............................................................................................. | | 64 |
|  | A. | Agreement Terms Contingent on Funding ............................. | 64 |

B. Obligations If Funding Not Appropriated.................................................65

XXIII. STAFFING....................................................................................................66

XXIV. NO ADMISSIONS OR PRECEDENTIAL EFFECT..........................................66

XXV. ENTIRE AGREEMENT .................................................................................66

XXVI. NOTICES......................................................................................................67

XXVII. EXECUTION AND EFFECTIVE DATE .......................................................68

Exhibit 1 – Stipulation of Dismissal of Complaint

Exhibit 2 – Projected Timetable for Implementation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                  :

LEROY PEOPLES, TONJA FENTON and     :
DEWAYNE RICHARDSON, on behalf of     :
themselves and all others similarly situated,  :     SETTLEMENT AGREEMENT
                  :
          Plaintiffs,        :     Docket Number
                  :     11-CV-2694 (SAS)
                  :
        -against-        :
                  :
                  :
BRIAN FISCHER, et al.,         :
                  :
        Defendants.

--------------------------------------------------------x

The parties hereto, by their attorneys, hereby stipulate and agree as follows:

WHEREAS, Plaintiffs Leroy Peoples, Dwayne Richardson and Tonja Fenton, inmates in custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at the time this Action was commenced, filed a Third Amended Class Action Complaint (herein, as amended and corrected, referred to as the "Complaint") alleging that the use and length of confinement sanctions and conditions in DOCCS Special Housing Units ("SHU") create an unconstitutional risk of harm, and seeking declaratory and injunctive relief on behalf of a putative class of similarly situated individuals and damages on behalf of the named Plaintiffs;

WHEREAS, DOCCS recognizes that a sound, progressive disciplinary system protects the health, safety and security of both inmates and correctional staff;

WHEREAS, DOCCS recognizes that disciplinary sanctions must never be arbitrary or capricious or overly severe and that a sound disciplinary system relies on certainty and promptness of action rather than severity;

WHEREAS, following the filing by Defendants of a motion to dismiss and before the filing of an answer to the Complaint or a class certification motion, a Stipulation and Order was entered on May 1, 2013, pursuant to which the Defendants' motion to dismiss was withdrawn without prejudice and all scheduling of briefing and discovery in the lawsuit was suspended to permit the parties to conduct settlement negotiations to resolve all remaining claims in the lawsuit and further promote the goal of protecting the health, safety and security of all persons within DOCCS correctional facilities;

WHEREAS, on January 24, 2014, following extensions of the above-referenced stay, the parties entered into an interim settlement (the "Interim Settlement"), entitled "Stipulation for a Stay with Conditions", so ordered by the Court on February 19, 2014, pursuant to which Defendants: (i) created programs providing alternatives to SHU sanctions for juveniles and special needs inmates; (ii) established a presumption against SHU sanctions for pregnant inmates; (iii) increased oversight by DOCCS' Central Office of the disciplinary system throughout the State under a newly created Assistant Commissioner position; (iv) implemented comprehensive guidelines for all disciplinary confinement sanctions; and (v) took certain interim actions with regard to SHU conditions, specifically by increasing outdoor exercise and providing headphones and in-cell study packets to SHU inmates in specified circumstances and locations;

WHEREAS, since February 19, 2014, DOCCS has provided Plaintiffs' counsel with extensive data and reports concerning the implementation and effects of the actions taken pursuant to the Interim Settlement, and the parties have engaged in extensive settlement negotiations, with the assistance of experts in prison operations and segregated housing retained

by the parties to assist in achieving a comprehensive resolution of all claims for injunctive relief raised in the Complaint;

WHEREAS, the parties, without conceding any infirmity in their claims or defenses, have in good faith negotiated the terms of this settlement agreement in order to provide programs and progressive incentives in an effort to change the behaviors leading to disciplinary sanctions and SHU confinement and to address certain aspects of the conditions of SHU confinement, for the purpose of improving institutional safety and enabling inmates to earn time cuts and incentives by changing their behavior, ultimately returning to the general prison population and the community with a diminished likelihood of recidivism;

WHEREAS, the parties share the goal of significantly reducing the use and duration of SHU and reducing isolation and idleness in SHU, consistent with safety and security;

WHEREAS, Defendants have denied the allegations in the complaint that they have violated Plaintiffs' constitutional or statutory rights;

WHEREAS, the parties represent and agree that this Agreement is fair, reasonable and adequate to protect the interests of all parties and the class, and that entering into this Agreement will improve institutional safety for all persons within the State's correctional system;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the parties, as follows:

## I.       SHU-ALTERNATIVE PROGRAMS

### A.       Southport Step-Down Program

DOCCS will create a Step-Down Program ("SDP") in Housing Block C at Southport Correctional Facility ("Southport"). The SDP will have a capacity of 252 inmates. The goal of the SDP is to offer behavioral modification programming to long-term SHU inmates with a violent behavioral history and the capacity to benefit from the SDP with the aim of returning inmates who successfully complete the program back to general population, consistent with achieving overall program success and the safety and security of participants and staff.

1.       Program Overview. The SDP will be a three-phase progressive program for inmates serving a minimum of 9 months of SHU confinement (including consecutive sanctions that total at least 9 months) who would likely benefit from structured programming, including programming based on principles of cognitive behavioral therapy, to improve behavior and reduce future disciplinary infractions. Suitability and selection for the program will be determined in DOCCS' discretion. Inmates will progress through the stages of the SDP, earning fewer restrictions and increased incentives, as they meet benchmarks and individual goals. Inmates will receive the incentives specified below for each phase of the Program, subject to the possibility of losing them for negative behavior. On successful program completion, inmates will be returned to general population, following a review for general population placement and programming to meet individually identified needs and behavioral plans by the Superintendent, who will forward his or her recommendations to the DOCCS Central Office for a final placement decision.

2.     Physical Layout. Participating inmates will be housed in 252 cells on three floors, each floor consisting of four 21-cell housing galleries and five classrooms. Orientation and program phases will be situated as follows:

(a)     Orientation (63 beds): Housing Block C, 1st Floor

(b)     Phase 1 (21 beds): Housing Block C, 1st Floor

(c)     Phase 2 (84 beds): Housing Block C, 2nd Floor

(d)     Phase 3 (84 beds): Housing Block C, 3rd Floor

3.     Staffing.

(a)     The unit will have a projected staff of 54 full-time employees, which includes a Program Management Team consisting of security, counseling, substance abuse and teaching staff who will manage the SDP. The Program Management Team will conduct weekly case conferences, outside of scheduled program time, for staff to evaluate inmates' progress.  The Program Management Team will offer quarterly out-of-cell meetings with each participant to discuss progress and benchmarks with the inmate, and to make any adjustments in the inmate's program plan. In addition, a DOCCS Offender Rehabilitation Coordinator ("ORC") will offer a similar out-of-cell meeting with each participating inmate during orientation and conduct cell-side meetings with participants between Phases 1 and 2.  Unless the Program Management Team requests a participating inmate's presence during the weekly case conferences, such weekly conferences shall be conducted outside the presence of the inmates.

(b)     The Program Management Team will assess participating inmates' achievement of benchmarks and readiness to move to higher phases of the SDP or regress to a lower phase, if necessary, and on completion of the program will provide appropriate discharge planning and make recommendations to the Superintendent of Southport regarding participating inmates' discharge/placement.

4.     Program Modules.

(a)     Orientation. The orientation phase will have a duration of not more than 30 days to assess an inmate's willingness to participate and determine individual program needs. Participants in the orientation phase will be housed in SHU cells in standard SHU conditions and will be in restraints when they are out of cell.

(b)     Phase 1. This phase will have a duration of not less than 30 days and will include the following:

(i)     Programming: Two hours of out-of-cell programming, four days per week (excluding Fridays and holidays) including behavioral programming and orientation for Phases 2 and 3. The Program Management Team will conduct out-of-cell meetings with a sufficient number of inmates on Fridays (excluding holidays), so as to conduct a quarterly out-of-cell meeting with each participant in accordance with § I(A)(3)(a) above.

(ii)     Recreation:  Two hours of individual recreation, seven days per week.

(iii)     Total Daily Out-of-Cell Time: Four hours total out-of-cell time Monday through Thursday (except holidays where the total will be two hours) and two hours total out-of-cell time Friday, Saturday and Sunday.

(iv)     <u>Restraints</u>: Participants will move in restraints. During programming, restart chairs with leg restraints only will be used.

(v)     <u>Time Cuts</u>: Recommendations for time cuts will be made in the discretion of the Program Management Team.

(c)     <u>Phase 2</u>. This phase will have a duration of not less than 90 days and will include the following:

(i)     <u>Programming</u>: Two hours of out-of-cell programming, four days per week (excluding Fridays and holidays). The Program Management Team will conduct out-of-cell meetings with a sufficient number of inmates on Fridays (excluding holidays) so as to conduct a quarterly out-of-cell meeting with each participant as provided in § I(A)(3)(a) above.

(ii)     <u>Recreation</u>: Two hours of congregate recreation will be offered to participants, 7 days per week, in congregate recreation pens.

(iii)     <u>Incentives</u>: All participants will be offered increased access to personal property; at least one phone call every 60 days; extra showers, and commissary purchases.   In addition, a participant has the ability to earn congregate TV/activity in restart chairs.  A participant has the possibility of losing one or more of these incentives for negative behavior.

(iv)     <u>Total Daily Out-of-Cell Time</u>: Minimum four hours out-of-cell time  Monday through Thursday (except holidays where the total will be two hours); minimum two  hours out-of-cell time  Friday, Saturday and Sunday, with the ability to earn congregate leisure time, such as congregate TV/activity in restart chairs.

     (v) <u>Restraints</u>: Participants will move in restraints, and during programming, will use restart chairs with leg restraints only.

     (vi) <u>Time Cuts</u>: Recommendations for time cuts will be made in the discretion of the Program Management Team.

    (d) <u>Phase 3</u>. This phase will continue until participants are discharged and will include the following:

     (i) <u>Programming</u>: Two hours of out-of-cell programming, four days per week. The Program Management Team will conduct out-of-cell meetings with a sufficient number of inmates on Fridays (excluding holidays), so as to conduct a quarterly out-of-cell meeting with each participant in accordance with § I(A)(3)(a) above.

     (ii) <u>Recreation</u>: Two hours of congregate recreation will be offered to participants in Phase 3, seven days per week, in a general confinement recreation yard.

     (iii) <u>Incentives</u>: As incentives for positive behavior, all participants will be offered congregate TV and other congregate activities; increased access to personal property; the opportunity to access the phones in the general confinement recreation yard (extra calls may be earned); extra showers, and commissary purchases, subject to the possibility of losing one or more of these incentives for negative behavior.

     (iv) <u>Total Daily Out-of-Cell Time</u>: Minimum four hours daily out-of-cell time Monday through Thursday (except holidays where the total will be

two hours); minimum two hours daily out-of-cell time Friday, Saturday, and Sunday, with
the ability to earn congregate leisure time.

(v)    Restraints: Participants will move without restraints,
and there will be no restraints during programming.

(vi)    Time Cuts: Recommendations for time cuts will be
made in the discretion of the Program Management Team.

(e)    Curriculum. As appropriate to each Phase, the curriculum
will include aggression replacement training, anger management, emotional regulation
techniques and social skills, with increasing focus in later Phases on applying these skills
and techniques in the general population environment.

(f)    Projected Opening Date. Southport SDP will commence
operations as soon as construction has been completed and trained staff are ready. Based
on DOCCS' estimate that approximately three years will be required to complete
construction needed for Southport SDP, DOCCS' goal is to open Southport SDP with an
initial group of inmates in the Orientation Phase within three years of the enactment of the
Fiscal Year 2016-2017 Budget.

   B.    **Mid-State Step-Down and Substance-Abuse Programs**

DOCCS will convert one-half of the S-Block located at Mid-State
Correctional Facility ("Mid-State") into a SHU-alternative program for up to 75 inmates
selected by DOCCS.

   1.    Physical Layout.

(a)    Program housing will be provided in 50 cells, consisting of
25 single cells and 25 double cells.

(b)      Three classrooms, each with 8 restart chairs, will be constructed in the basement, and two classrooms, each with 10 restart chairs, will be constructed on the second floor.

(c)      A semi-private area with separate seating will be provided for individual meetings with staff.

(d)      One of the basement classrooms will be used for orientation and assessment of inmates newly admitted to the program. Upstairs classrooms will also be available for earned evening congregate leisure activities (*e.g.,* movies, card games).

2.      <u>Initial Operation as an SDP</u>. Until the opening of the Southport SDP, the Mid-State unit will provide a step-down program that will be operated as described above with respect to the Southport SDP, except that congregate recreation cannot be provided at Mid-State. Accordingly, the following program adjustments will be made:

(a)      <u>Recreation:</u>  Each participating inmate will be offered two hours of recreation at the rear of the cell, seven days per week. Program classrooms at Mid-State will be available in the evenings for earned congregate activities.

(b)      <u>Congregate Leisure Activities</u>: Congregate leisure activities may be earned by inmates in Phase 2, and will be offered to inmates in Phase 3.

(c)      <u>Total Daily Out-of-Cell Time</u>: The Program Management Team will make every effort to afford participants in the Mid-State SDP a minimum of two hours daily out-of-cell time in Phase 2 and Phase 3, spent in programming or congregate leisure activities.

3.      <u>Reassessment on Opening of Southport SDP</u>. On or before the

opening of the Southport SDP, the parties will confer as to whether to continue the Mid-

State unit as an SDP, or to convert the unit to a SHU-alternative program for inmates on

the mental health caseload who are subject to confinement sanctions for non-violent

substance abuse-related misbehavior. If the unit is converted to a substance abuse program,

participating inmates will be housed in 25 double and 25 single cells. In determining

whether to continue the Mid-State unit as an SDP or convert the unit to a substance abuse

program, DOCCS will give full consideration to any recommendations by Plaintiffs'

counsel and the parties' experts, but the decision as to the use of the Mid-State unit as

either an SDP or substance abuse program will be made by DOCCS, consistent with the

goals of this Agreement, the needs of the inmate population at the time of the decision,

and its statutory responsibilities. In the event that the Mid-State unit is converted to a

substance abuse SHU-alternative program following the opening of the Southport SDP,

the provisions of §I(B)(4)-(10) et seq. shall apply.

4.      <u>Overview of Mid-State Substance Abuse Program</u>. If opened, the

Mid-State Substance Abuse SHU-Alternative Program will provide a six-month intensive

alcohol and substance abuse treatment ("I-ASAT") program for inmates at high risk for

continued drug and alcohol abuse who have received individual or combined confinement

sanctions of more than 120 days for substance abuse-related offenses and have an OMH

service level of 1 or higher.  Suitability for placement in the program will be determined in

DOCCS' discretion, however, only inmates who have a substance dependency condition,

as determined by a comprehensive substance dependency assessment conducted by

qualified personnel, shall be eligible for the program. Inmates who have displayed

11

satisfactory program participation and have completed their confinement sanctions in the unit before completing the six-month I-ASAT program will receive expedited placement into ASAT at their next general confinement facility.

    5.  <u>Drug-Free Environment</u>. In order to maintain the drug-free environment essential to recovery, visits will be non-contact and participating inmates may not receive packages from outside the facility.

    6.  <u>Staffing</u>.

    (a)  The unit will have a projected staff of 34 full-time employees and which includes a multi-disciplinary Program Management Team, including an Area Sergeant, a Supervising Offender Rehabilitation Counselor, an Offender Rehabilitation Counselor, a Teacher, an Alcohol and Substance Abuse Treatment ("ASAT") Program Assistant ("PA") staff, and a Recreation Program Leader ("RPL"). The staffing may vary during the period of time that Mid-State is operating as a Step Down Unit as outlined in § I(B)(2).

    (b)  The Program Management Team will oversee the development of individual treatment plans for participating inmates, determine staff and classroom assignment for inmates during orientation and initial assessment, conduct case conferences twice per week to evaluate inmates' progress in meeting treatment plan goals, modify the time required to meet goals, otherwise modify treatment plans as needed, approve earned incentives and, if necessary, make recommendations to the Superintendent at Mid-State for his or her determination regarding discharge of inmates from the program for refusal to participate and lack of progress in programming.

(c)     The Program Management Team will prepare a discharge plan with recommendations for continuing recovery and ongoing treatment for all inmates leaving the program, regardless of whether the reason for discharge is completion of the I-ASAT program, transfer to a general confinement ASAT for completion of the ASAT program, release to the community, or, upon the Superintendent's determination, removal from the program due to misbehavior or refusal to participate.

7.     <u>Orientation</u>. Participating inmates will have one week of orientation and assessment which will include classroom sessions for up to eight participants and individual meetings with inmates' assigned I-ASAT staff in order to review program expectations (the "ASAT contract"), collaboratively develop an initial treatment plan with assigned staff, and identify strengths and problems requiring attention for the particular inmate (*e.g.*, alcohol or substance abuse issues, history of trauma, compulsive behaviors, cognitive distortions, health or family issues).

8.     <u>Program Modules</u>.

(a)     Participating inmates will engage in three hours of morning or afternoon classroom programming per day, five days per week (exclusive of holidays). Programs will be conducted in three-hour AM and PM modules.

(b)     Each participating inmate will be offered 2 hours of recreation at the rear of the cell, 7 days per week, with the ability to earn evening congregate leisure time in the upstairs classroom.

9.     <u>Curriculum</u>. The program will be informed by principles of cognitive behavioral therapy, focusing on withdrawal and craving management, relapse prevention strategies, and developing skills to avoid substance abuse disciplinary

13

infractions and promote positive engagement in general population programming. Educational cell study will be available during non-program hours depending on the inmate's educational needs.

        10.   <u>Incentives</u>. As incentives for positive behavior, all participants will be offered increased access to personal property; at least one phone call in the first 60 days of the program and every 30 days thereafter (extra calls may be earned); additional showers, additional commissary purchases, and recommendation for time cuts.  In addition, participants also have the ability to earn evening congregate leisure activities. Participants have the possibility of losing one or more of these incentives for negative behavior. The availability of these incentives will be based on inmate participation and progress throughout the program, as determined by the Program Management Team.

        11.   <u>Projected Opening of Mid-State Unit</u>. Mid-State SDP will commence operations as soon as construction has been completed and trained staff are ready.  Based on DOCCS' estimate of the time required to complete construction for the Mid-State unit, DOCCS' goal is to open the Mid-State unit, as an SDP, with an initial group of inmates in the Orientation Phase within 1.2 years of the enactment of the Fiscal Year 2016-2017 Budget.

     **C.**     **<u>Lakeview Substance-Abuse Program</u>**

        DOCCS will convert the entire maximum security S-Block (100 double cells) located at Lakeview Correctional Facility ("Lakeview") into a single cell SHU-alternative substance abuse program for 88 inmates selected by DOCCS who are serving confinement sanctions for non-violent substance abuse-related misbehavior.

14

1.      <u>Program Overview</u>.  The Lakeview Substance Abuse SHU-Alternative Program will provide a six-month intensive alcohol and substance abuse treatment ("I-ASAT") program for inmates at high risk for continued drug and alcohol abuse who have received individual or combined confinement sanctions of more than 120 days related to substance abuse-related offenses. Suitability for placement in the program will be determined in DOCCS' discretion, however, only inmates who have a substance dependency condition as determined by a comprehensive substance dependency assessment conducted by qualified personnel shall be eligible for the program. Inmates who have displayed satisfactory program participation and have completed their confinement sanctions in the unit before completing the six-month I-ASAT program will receive expedited placement into ASAT at their next general confinement facility

2.      <u>Drug-Free Environment</u>. In order to maintain the drug-free environment essential to recovery, visits will be non-contact and participating inmates may not receive packages from outside the facility.

3.      <u>Physical Layout</u>.

(a)      Participating inmates will be housed in 88 single cells in four galleries, with the remaining 12 cells of the former S-Block repurposed to provide three dedicated phone booths in each gallery.

(b)      Three classrooms, each with 8 restart chairs, will be constructed in the facility basement, and two classrooms, each with 10 restart chairs, will be constructed on the second floor.

(c)      A semi-private area will be provided with separate seating for individual meetings with staff.

15

(d)      One of the basement classrooms will be used for orientation and assessment of inmates newly admitted to the program.

(e)      Upstairs classrooms will also be available for earned evening congregate leisure activities (movies, card games, etc.).

4.      <u>Staffing</u>.

(a)      The unit will have a projected staff of 30 full-time employees and include a multi-disciplinary Program Management Team including an Area Sergeant, a Supervising Offender Rehabilitation Counselor, an Offender Rehabilitation Counselor, a Teacher, an Alcohol and Substance Abuse Treatment Program Assistant, and a Recreation Program Leader.

(b)      The Program Management Team will oversee the development of individual treatment plans for participating inmates, determine staff and classroom assignments for inmates during orientation and initial assessment, conduct case conferences twice per week to evaluate inmates' progress in meeting treatment plan goals, modify the time required to meet goals, otherwise modify treatment plans as needed, approve earned incentives and, if necessary, make recommendations for determination by the Superintendent regarding discharge of inmates from the program for refusal to participate and lack of progress in programming.

(c)      The Program Management Team will prepare a discharge plan with recommendations for continuing recovery and ongoing treatment for all inmates leaving the program, regardless of whether the reason for discharge is completion of the I-ASAT program, transfer to a general confinement ASAT for completion of the program, release to the community, or, upon the Superintendent's determination, removal from the

16

program due to misbehavior or refusal to participate consistent with the policies in Section II, *infra*.

5.      <u>Orientation</u>. Inmates will have an initial week of orientation and assessment which will include classroom sessions in up to eight-person groups and individual meetings with inmates' assigned I-ASAT staff in order to review program expectations (the "ASAT contract"), collaboratively develop an initial treatment plan with assigned staff and identify strengths and problems requiring attention for the particular inmate (*e.g.*, alcohol or substance abuse issues, history of trauma, compulsive behaviors, cognitive distortions, health or family issues).

6.      <u>Programming</u>

(a)      Each participating inmate will engage in three hours of classroom programming each day, five days per week (excluding holidays).

(b)      Programs will be conducted in three-hour morning and afternoon modules in all five classrooms, allowing the total classroom capacity (44) to provide programming for all 88 participants in either a morning or afternoon session.

(c)      Each participating inmate will be offered two hours of recreation at the rear of the cell, seven days per week, with the ability to earn evening congregate leisure time in the upstairs classrooms.

7.      <u>Curriculum</u>.  The program will be informed by principles of cognitive behavioral therapy, focusing on withdrawal and craving management, relapse prevention strategies, and developing skills to avoid substance abuse disciplinary infractions and promote positive engagement with general population programming.

17

Educational cell study will be available during non-program hours depending on the inmate's educational needs.

8.      <u>Incentives</u>. As incentives for positive behavior, all participants will be offered increased access to personal property; at least one phone call in the first 60 days of the program and every 30 days thereafter (extra calls may be earned); additional showers, additional commissary purchases, and recommendation for time cuts.  In addition, evening congregate leisure activities may be earned.  Participants are subject to the possibility of losing one or more of these incentives for negative behavior. The availability of these incentives will be based on inmate participation and progress throughout the program, as determined by the Program Management Team.

9.      <u>Projected Opening of Lakeview Substance Abuse Program</u>.  The Lakeview Substance Abuse Program will commence operations as soon as construction has been completed and trained staff are ready. Based on DOCCS' estimate of the time required to complete construction relating to the Lakeview Substance Abuse Program, DOCCS anticipates opening the Program within 2.9 years of the enactment of the Fiscal Year 2016-2017 Budget.

**D.      Step-Down to the Community Programs**

SHU Step-down to the Community Programs will be established at Green Haven Correctional Facility ("Green Haven") and Wende Correctional Facility ("Wende") to provide re-entry programming to inmates who have been in a SHU cell for 60 days or more serving a SHU or keeplock sanction and who have a minimum of 45 days and a maximum of 60 days to release.

    1.    <u>Program Overview</u>.

    (a)    A 60-day two-step program will be established at Wende (17 beds) and Green Haven (12 beds) to provide re-entry programming for inmates being released to the community after SHU confinement in excess of 60 days.

    (b)    The program goal is to assist participants with the development of a comprehensive release plan, incorporating social skills practice, relapse prevention, family reintegration and employment readiness. Behavior modification and relapse prevention will be addressed by modalities such as identifying high-risk behaviors, emotional regulation exercises, social skills practice, discussing how to deal with fear and the feelings of others, and how to ask and respond to questions.

    2.    <u>Physical Layout</u>. At both Wende and Green Haven, programs will be provided in a classroom with 6 restart chairs.

    3.    <u>Staffing</u>. Combined, the unit will have a projected staff of 9.5 employees which includes a multi-disciplinary Program Management Team comprised of security and program staff, which will determine participants' readiness to move from Step 1 to Step 2 and, if necessary, removal from the program.

    4.    <u>Program Modules</u>.

    (a)    The program will provide all participants with a three-hour module of programming five days per week (excluding holidays) and will seek to incorporate in-reach services by community-based organizations and Community Supervision staff through video-conferencing.

    (b)    Green Haven will operate 2 modules per day.  Wende will operate 3 modules per day.

(c)      Step 1 programming will be provided to participants using restart chairs. Step 2 programming will be conducted without restraints.

5.      <u>Recreation.</u>

(a)      Wende: Individual exercise for two hours per day, seven days per week.

(b)      Green Haven: Congregate recreation for two hours per day, seven days per week.

6.       <u>Incentives</u>. In Step 2, participants will be eligible to receive, as incentives, additional visits, additional phone calls, and increased commissary.

7.      <u>Eligibility</u>. The Department shall design a system for identifying each month inmates who are expected to qualify for this program.  Placement in the program shall be in the discretion of DOCCS, employing these criteria:

(a)      Prospective participants must have a minimum of 45 days and a maximum of 60 days to release.

(b)      Priority shall be given to inmates who have been in SHU the longest.

(c)      DOCCS will conduct an individualized eligibility review to screen out individuals who would presently pose a serious threat to safety or are likely to be so disruptive to the program that it would disrupt program operations. The parties agree that inmates with violent or disruptive histories may be in the greatest need of step-down programming prior to release and that a history of violence, by itself, will not preclude placement in the program.

20

(d)      Priority will be given to inmates being released to the community in the facility's region.

8.      <u>Initial Program Cohort</u>. At each of the two facilities involved, the initial program will be limited to six participants, until a cohort of inmates is identified by the multi-disciplinary team as ready to progress to Step 2, an anticipated minimum of two weeks after program start-up.

9.      <u>Projected Opening of Step-Down to the Community Programs</u>. The Step Down to the Community Programs will commence operations as soon as the housing blocks and trained staff are available. DOCCS anticipates opening the Program within 6 months of the enactment of the Fiscal Year 2016-2017 Budget.

**E.      Programs for Juveniles**

1.      <u>Continuation of Programs</u>. The programs for juveniles, including SHU-alternative programs, created pursuant to the parties' January 24, 2014 Stipulation, filed February 19, 2014, are hereby continued and incorporated herein, as provided in the following paragraphs.

2.      <u>Limit On Time In Cell</u>.  DOCCS will ensure that even under the most restrictive form of disciplinary housing, 16 and 17 year-old inmates shall, 5 days per week (excluding holidays), be offered out-of-cell programming and outdoor exercise, limiting time in their cells to 19 hours a day, except in exceptional circumstances referred to Central Office.

3.      <u>Separate Housing For Juveniles</u>.  Medium security 16 and 17 year olds will be separately housed in a general population housing unit or units for juveniles at one or more medium security facilities.  Maximum security 16 and 17 year-old inmates

will be housed separately in a general population housing unit for juveniles at a maximum security facility.

4.    <u>Shock Incarceration Program</u>.  DOCCS may continue to admit qualifying 16 and 17 year-old inmates to its Shock Incarceration program.

5.    <u>Disciplinary Sanctions</u>. Aged 16 and 17 year-old inmates with disciplinary confinement sanctions of less than 30 days will remain in the facility in which they are housed at the time the sanction is imposed.  Aged 16 and 17 year-old inmates with SHU confinement sanctions in excess of 30 days will be placed in a separate housing unit, as an alternative to placement in SHU, absent extraordinary circumstances.

6.    <u>Relationship to *Cookhorne*</u>.  Nothing in this Agreement shall be deemed to be inconsistent with, or to diminish, DOCCS' agreements and responsibilities under the settlement agreement in *Cookhorne v. Fischer*, 2012-1791.  DOCCS shall promptly notify Plaintiffs in the event that any developments in *Cookhorne* are expected to impact the provisions of this Agreement.

7.    <u>Program Contingency</u>. In the event that aged 16 and 17 year old inmates are removed from DOCCS adult facility or facilities and placed into dedicated juvenile facilities operated by DOCCS, paragraphs 2 and 5 of this section shall remain in full effect at the new facility(ies). In the event that aged 16 and 17 year olds are removed system-wide from DOCCS custody during the term of this Agreement, DOCCS will meet and confer with Plaintiffs regarding how it plans to reallocate the facility space and staff previously dedicated to the juvenile program.

F.  **SHU-Alternative Program for Special Needs Inmates**

1.  Continuation of Program. The Correctional Alternative Rehabilitation ("CAR") program at Sullivan Correctional Facility ("Sullivan") for special needs inmates, created pursuant to the parties' January 24, 2014 Stipulation, filed February 19, 2014, is hereby continued and incorporated herein, as provided in the following paragraphs.

2.  Eligibility. The CAR program shall, absent exceptional circumstances referred to the DOCCS' Central Office, and to the extent that space is available in the program, provide an alternative to SHU for certain inmates who have a Beta Wechsler Adult Intelligence Scale ("BETA-WAIS") of 70 or below or who DOCCS otherwise determines have significantly limited intellectual capabilities and/or adaptive functioning and coping skills and have received SHU confinement sanctions exceeding 30 days.

3.  Program Overview.  The CAR program will continue to have three phases: (i) assessment and orientation, (ii) treatment, and (iii) transition to non-disciplinary housing settings.  Two hours per day of out-of-cell group programming will be offered in the orientation phase and four hours per day in the second and third phases, five days a week for each phase.  In addition to programming, the CAR program will use a range of incentives to reward behavioral progress. The incentives will be offered on an individualized basis and will be treatment-plan driven.

II.     **AGREEMENTS APPLICABLE TO ALL SHU-ALTERNATIVE PROGRAMS**

The following agreements shall apply to all SHU–Alternative Programs discussed in Section I, *supra*:

A.      **Eligibility and Placement.** Suitability and selection for SHU-Alternative programs will be determined in DOCCS' discretion in accordance with the criteria stated herein for each program, and will be subject to space availability.

B.      **Program Management Team**. Each SHU-Alternative Program will be managed by a multi-disciplinary team ("Program Management Team"), as described in this Agreement with respect to each such Program.

C.      **Continuation of Programming**.

        1.      Programming and/or recreation offered to an inmate in each SHU-Alternative Program may be denied to an inmate only in exceptional circumstances where it is believed that the inmate presents an unacceptable risk to the safety of staff or other inmates or to the security of the facility, and shall not be denied as punishment.  This limitation does not apply to the revocation of conditions enhancements that are described as "Incentives" for each of the SHU-Alternative Programs set forth herein.

        2.      All denials of programming based upon exceptional circumstances shall be reported to Central Office.  A request for a determination that an inmate should be denied out-of-cell programming and/or recreation because it is believed he or she poses an unacceptable risk to the safety of staff, inmates or  the security of the facility will be submitted for approval to the Deputy Superintendent for Security (or the equivalent) and the Superintendent of the facility, as soon as possible, but no later than the first business day following the suspension of an inmate's out-of-cell programming and/or recreation. If

24

the request is not approved, the inmate shall be restored to his or her regular out-of-cell programming and/or recreation immediately. If the request is approved, programming shall resume as soon as the Program Management Team determines the risk to safety or staff has abated.

      **D.**     **Restraints, Privileges, Incentives and Out-of-Cell Time**. Each SHU-Alternative Program will have a program and operations manual detailing, *inter alia,* the use of restraints, access to privileges, incentives, and out-of-cell time applicable to the needs of the inmates in that program and consistent with this Agreement. With respect to restraints, the goal will be to progressively reduce the use of restraints that an inmate may be subject to at each level, consistent with the need to operate the SHU-Alternative Program in a safe, secure manner, allowing the inmate fewer restraints and a greater simulation of the general population environment prior to release from the SHU-Alternative Program. Inmates will receive the specified incentives for each phase of a particular program as specified in the program and operations manual, subject to the possibility of losing them for negative behavior.

      **E.**     **Out-of-Cell Interviews**. In addition to the specific program commitments in each SHU-Alternative Program described herein, the Program Management Team in Alternative Units will be encouraged to make use of out-of-cell interviews with inmates entering into, and participating in, a SHU-Alternative Program to engage the inmate and review the inmate's progress with program objectives. The decision to offer an out-of-cell interview, however, remains with the Program Management Team. Unless the Program Management Team requests a participating inmate's presence during a case conference, such conferences shall be conducted outside the presence of the inmates.

F.       **Discipline in SHU-Alternative Programs**.

1.       Informational Reports will be utilized in the SHU-Alternative programs to convey information (whether positive or negative) to the Program Management Team to consider for program assessment and security decisions.  The Program Management Team will use this information to determine if an increase or decrease in incentives is indicated or to determine other programmatic or security needs (*e.g.,* need for individual session, program review).

2.       The Informational Report will be used as a tool to implement progressive discipline short of the formal disciplinary process and will allow staff to document less serious inmate misconduct and bring it to the attention of the Program Management Team. The Program Management Team and facility administration will collaborate to determine which approach or action should be employed in specific instances.

3.       De-escalation, intervention, Informational Reports and the withdrawal of incentives shall be the preferred methods of responding to less serious negative behavior in the SHU-Alternative programs.

4.       Misbehavior reports can only be issued in circumstances where the inmate is accused of serious offenses, the alleged behavior demonstrates a threat to safety, and/or the inmate has engaged in repeated acts of disruptive misbehavior despite prior alternative interventions.

5.       Hearing officers will be instructed by hearing officer guidance that they should avoid imposing additional SHU sanctions on persons in SHU Alternative Units and should instead consider non-confinement and/or progressive sanctions,

26

consistent with the need to maintain safety and security.  SHU sanctions may be appropriate, however, where the inmates have been found guilty of a serious offense, the misbehavior demonstrates a threat to safety, and/or the inmate has engaged in repeated acts of disruptive misbehavior despite prior alternative interventions.

6.      Even when additional SHU sanctions are issued, in the discretion of the Program Management Team, additional SHU sanctions may result in extending the inmate's time in the SHU Alternative Program, rather than result in removal from the Program.

7.      Before a SHU or Keeplock confinement sanction imposed by a Hearing Officer on an inmate already in a SHU Alternative Unit is served by the inmate, the Superintendent shall review the sanction and either approve or disapprove it.

8.      All SHU sanctions imposed on persons who are already in a SHU Alternative Unit shall be reported every quarter to Central Office.

**G.      Discharge Upon Completion of SHU-Alternative Program**. Upon successful completion of a SHU-Alternative Program, an inmate will be moved into a general population environment.  The remainder of the inmate's SHU sanction, if any, will be suspended upon the inmate's release from the SHU-Alternative Program.  If the inmate does not engage in any sanctionable conduct during the duration of the suspended SHU confinement sanction, that disciplinary sanction will expire on the earlier of the sanction end-date or 6 months from the date of release to general confinement. Service of suspended SHU confinement penalties may be imposed as a sanction, based on an individualized assessment, only for serious misbehavior or for committing the same or similar violation as that leading to the suspended sanction.

**H.**    **Disciplinary Sanction Ends Prior to Program Completion.** In the event that an inmate's disciplinary sanction expires prior to the completion of the SHU-Alternative Program, such inmates will return to general confinement, where DOCCS will make efforts to continue programming and treatment.  Nothing in this section precludes the continued selective use of Protective Custody or Administrative Segregation in accordance with established procedures.

**I.**    **Early Discharge to SHU**.

1.      An inmate serving a disciplinary sanction in a SHU-Alternative Program will only be discharged to SHU under the following specific, limited circumstances:

(a)      When it is determined by the Program Management Team that an inmate has been chronically failing to comply with the program objectives, the Program Management Team will first attempt to obtain program compliance.  All efforts to obtain compliance will be fully documented by the Program Management Team.  Absent compliance, a recommendation may be made for alternate program placement or discharge to SHU.  The recommendation by the Program Management Team shall be forwarded to the Superintendent for determination.  The Superintendent's determination will be forwarded to Central Office for review, and if necessary, transfer action.

(b)      When it is determined that an inmate poses an immediate or continuing unacceptable threat to the safety of staff or other inmates or to the security of the facility, the Deputy Superintendent for Security will consult with the Program Management Team and make a recommendation.  The recommendation by the Deputy Superintendent for Security will be forwarded to the Superintendent for determination.

The Superintendent's determination will in turn be forwarded to Central Office for review, and if necessary, transfer action.

**J.**     **Full Utilization of Capacity.** The parties agree on the goal of full utilization of the capacity of the SHU-Alternative Programs created under this Agreement. In the event that any SHU-Alternative Program, after being open for at least one year, shall be operating at less than 75% of capacity for two quarters in a row, DOCCS agrees to meet and confer with Plaintiffs' counsel and the parties' experts to discuss any such underuse of a SHU-Alternative Program, and to consider potential modification of eligibility criteria as well as whether a particular SHU-Alternative Program should be terminated, if the parties agree that there is no longer a need for the Program.  This provision shall also apply to capacity questions regarding new Separate Keeplock Units and the Confined Program Plan, discussed *infra.*

**K.**     **Inmate Orientation Material**. Upon admission to a SHU-Alternative program, inmates shall be provided with information, in the form of orientation materials and meetings with the Program Management Team, to make them aware of the program mission, phase levels and incentives, and expectations in order to assist them in successfully completing the program and earning release back to general population.

**L.**     **Timeframes**. The agreements in this section will be implemented in conjunction with the opening of any new SHU-Alternative Unit.  With regard to CAR and the juvenile program, these agreements will be implemented within 6 months of the Effective Date.

III.   **PRESUMPTION AGAINST SHU FOR PREGNANT INMATES**

DOCCS will maintain a written policy in the form of a memorandum by the Deputy Commissioner for Correctional Facilities continuing the presumption against placement of a pregnant inmate in SHU for disciplinary purposes, except in exceptional circumstances as determined by the DOCCS Central Office.

IV.   **SEPARATE KEEPLOCK UNITS**

DOCCS will create two new Keeplock Units with a combined capacity of 175 inmates at Fishkill Correctional Facility ("Fishkill") (75 beds) and Five Points Correctional Facility ("Five Points") (100 beds) intended for inmates serving Keeplock sanctions in excess of 45 days. The target population is 175 inmates statewide.

A.   **Conditions in New Units.**

DOCCS will remove inmates selected by DOCCS who are serving Keeplock sanctions in excess of 45 days from more restrictive SHU cells and place them in new Keeplock Units with the following conditions of confinement:

1.   <u>Fishkill</u>. 75 medium security cells in Housing Units O, P and Q. All Inmates in these units will have access to the following privileges, subject to the possible loss of one or more of these privileges for a specified time, consistent with the principles of progressive discipline:

(a)   One hour of daily congregate recreation, seven days per week, including chin-up bars and basketball.

(b)   Access to phone calls in yard during daily congregate recreation.

       (c)      Access to the same personal property as available in general population.

       (d)      Visits as permitted in general population.

      2.      <u>Five Points</u>. 50 maximum security double cells as Keeplock cells with a total capacity of 100 inmates. Inmates in these units will have access to the following privileges, subject to the possible loss of one or more of these privileges for a specified time, consistent with the principles of progressive discipline:

       (a)      Two hours of congregate recreation twice weekly on alternate days, including chin-up bars and basketball.

       (b)      Access to phone calls in yard during twice a week congregate recreation.

       (c)      Access to the same personal property as in general population.

       (d)      In-cell showers 5 days per week.

       (e)      Visits the same as those in general population.

**B.**      <u>**Projected Opening of New Keeplock Units**</u>.

      The parties agree that the Keeplock Units will be opened as soon as construction has been completed. Based on DOCCS' estimate of the time required to complete construction relating to the Keeplock Units, DOCCS' goal is to open the Keeplock Units during the fiscal year of April 1, 2016 to March 31, 2017.

**C.**      <u>**Placement Priority**</u>.

      DOCCS will give priority to inmates with longer Keeplock sanctions for placement in the new Keeplock Units.

**D.** **Reduction of Certain Keeplock Sanctions**.

When a Keeplock sanction is imposed and is served in a SHU cell, service of the sanction will be credited at the rate of three days for every two days served in the SHU cell.

## V.   UNIFORM "PIMS" PROGRAM FOR ALL SHUs

A uniform behavioral incentive program – Progressive Inmate Movement System ("PIMS") – shall be established for all SHUs with progressive increases in privileges in accordance with the PIMS level table provided to Plaintiffs' counsel (document Bates stamped S048163).[1] Upon admission to SHU, all inmates will begin at PIMS I, and their time in PIMS I shall be calculated as of the date their SHU sanction begins. Hearing officers will be instructed to give credit for pre-hearing confinement in a SHU cell when assigning the SHU sanction start date.  The new PIMS system, except for congregate recreation, will be implemented within 6 months of the Effective Date. The Department shall implement the new PIMS system in a way that maintains or improves the conditions of confinement for SHU inmates (e.g., an inmate at PIMS II under the old PIMS system will be maintained at PIMS II or higher upon implementation of the new PIMS system).

## VI.   CONFINEMENT PROGRAM PLAN ("CPP")

A total of 84 single cell beds at Southport Correctional Facility and 150 double cells at Upstate Correctional Facility, for up to 84 inmates and 300 inmates, respectively, will be used to house inmates selected by DOCCS who are confined to SHU with a sanction or combined sanctions in excess of 6 months and who do not qualify for one of

---

[1] Documents referenced in this Agreement by Bates number, until disclosed to DOCCS' staff and the inmate population,  shall be and remain subject to the parties' May 15, 2013 confidentiality agreement, which is incorporated herein by reference (the "2013 Confidentiality Agreement").

the  SHU-Alternative Programs. These inmates, upon reaching PIMS Level IV, will be eligible for additional time cuts and other privileges as a result of continued good behavior and positive programming.

A. **Overview.**

1. Program Plan. The assigned ORC will develop an individualized Confinement Program Plan ("CPP") for inmates in this program during an out-of-cell initial interview. The CPP will provide each inmate with a plan through which positive behavior and programming participation can lead to additional reductions of disciplinary sanctions. The plan will be individualized to the inmate, and appropriate and achievable for that inmate taking into account any limitations, such as a low literacy level.

2. Program Management Team. The program will be supervised by a Program Management Team that will include a Teacher, an ORC, an ASAT ORC, and a SHU Sergeant.

3. Program Overview. The program will incorporate cell study for inmates identified with an educational need or desire to continue with post-secondary education, such as correspondence courses.  Inmates at PIMS Level II or higher will also be eligible for workbook programs to address errors in thinking, aggression and substance abuse, where applicable. Once an inmate begins CPP programming, programming may be denied only (1) in exceptional circumstances consistent with Section II(C), or; (2) where an inmate regresses from a higher PIMS level to PIMS I and adequate CPP program staff are not available to continue programming at PIMS I, programming may be temporarily interrupted provided that such programming shall resume as soon as CPP staff become available.  An inmate may be removed from CPP for chronic failure to comply

33

with program objectives in accordance with the policies in Section II(I)(1)(a), except that the recommendation to remove an inmate will be made by the ORC instead of the Program Management Team.

4.    <u>Progress Evaluation</u>. CPP updates and evaluations of progress will be reviewed with each inmate quarterly out-of-cell, except that in PIMS IV, evaluation of progress will be reviewed with each inmate monthly out-of-cell. One of these reviews may be conducted with the Program Management Team and/or the ORC in conjunction with the inmate's regularly scheduled case plan review.

**B.**    **<u>Programs Offered</u>**.

1.    <u>Behavior Modification/Aggression</u>.

(a)    Inmates at PIMS Level II or higher who have an identified aggression management need will be enrolled in a workbook program conducted by an ASAT ORC/ORC. Program workbooks will be provided at no cost to the inmate.

(b)    The program will assist inmates in identifying personal behaviors that may have led to acts of aggression and/or violence.

(c)    The program length will be approximately 180 days (six months) in duration. During this time, the inmate will be seen by the ASAT ORC or ORC cell-side a minimum of twice per week in order to provide direct cell-side instruction, give assignments, correct all inmate work, provide feedback, and review the inmate's status within the program.

(d)    Inmates who participate in cell-side ART in CPP for the full program length of 180 days shall receive full credit for completing two out of six ART modules, shall not be required to retake those two modules upon enrollment in ART in

34

general population, and shall be considered for expedited placement into general population ART upon release from SHU.  Participation in cell-side ART programming shall be duly considered by the Time Allowance Committee.

        2.     <u>ASAT Pre-Treatment Workbook</u>.

        (a)     Inmates at PIMS Level II or higher, and with an identified substance abuse problem will be enrolled in a workbook program conducted by an ASAT ORC.

        (b)     The  ASAT Pre-Treatment Workbook is designed to provide inmates with a substance abuse disorder an opportunity to examine the effects of alcohol and substance abuse on their lives and  to increase the probability of a positive treatment outcome when the inmate is released from SHU confinement and is able to participate in DOCCS substance abuse treatment. Program workbooks will be provided at no cost to the inmate.

        (c)     Participating inmates will be seen by the program's coordinator cell-side a minimum of twice per week in order to provide direct cell-side instruction, give assignments, correct all inmate work, provide feedback, and review the inmate's status within the program. Satisfactory completion will generally occur within 6 months.

        (d)     Inmates who participate in cell-side ASAT in CPP shall receive credit for at least 25% program completion and up to 50% program completion, based upon the instructor's assessment, and shall be considered for expedited placement into general population ASAT upon release from SHU. Participation in cell-side ASAT programming shall be duly considered by the Time Allowance Committee.

35

3.      Educational Cell Study.

(a)      The Educational Cell Study program will be conducted by a teacher.

(b)      Each Cell Study Teacher will evaluate each inmate's needs and write an academic plan for each inmate enrolled in Cell Study. The teacher will be responsible for determining each inmate's academic level and developing an academic plan. The teacher will obtain each inmate's previous standardized test scores.  The teacher will be expected to provide direct cell-side instruction, give assignments, correct all inmate work and provide feedback.

(c)      Each participating inmate will be seen by the teacher cell-side at least once a week.

(d)      Any inmate who participates in Cell Study at Adult Basic Education,  Pre-High School Equivalency, High School Equivalency, or Bilingual/English as a Second Language levels will be eligible to take standardized academic tests. All inmates enrolled in Cell Study will receive standardized testing on a schedule that coincides with the general population. Testing available will include the English oral proficiency test known as BEST Plus, and TABE, TABE Español, SABE, the Readiness Exam, and the TASC™.

4.      Incentives.

(a)      Two hours of congregate recreation will be offered at PIMS Level III, one day per week on a rotating basis, and at PIMS Level IV, three days per week. Congregate recreation shall be made available as soon as construction has been

36

completed. Based on DOCCS' estimate that approximately three years will be required to complete construction needed for congregate recreation at Upstate and Southport Correctional Facilities, DOCCS' goal is to make congregate recreation available within three years of the enactment of the Fiscal Year 2016-2017 Budget.

(b)     Once the inmate reaches PIMS Level IV, an inmate's record of participation in CPP programming will weigh in favor of granting time cuts and other privileges.  As long as an inmate demonstrates positive participation in programming, the inmate's lack of progress in the programming shall be irrelevant in determining if the inmate is to receive time cuts and other privileges.

5.     <u>Inmate Orientation Manual.</u> Upon admission to a CPP program, inmates shall be provided with information, in the form of orientation materials and meetings with the ORC, to make them aware of the program mission, PIMS levels, and expectations in order to earn Time Cuts.

## VII.   <u>UPSTATE ASAT PROGRAM EXPANSION</u>

The ASAT program currently operated by Upstate Correctional Facility two days a week, with two modules a day, with up to six inmates in each module, for a total of up to 12 inmates per week, will be expanded so that the program will operate  four days per week, with two modules a day, with up to six inmates in each module, for a total of up to 24 inmates per week. Suitability for placement in the program will be determined in DOCCS' discretion, however, only inmates who have a substance abuse disorder will be placed into the program, as determined by an admission and comprehensive evaluation procedure to be conducted by DOCCS substance abuse personnel. In order to support the Upstate ASAT program expansion, there will be a projected staff increase of six full-time

employees.  The program expansion will commence operations after the enactment of the budget in Fiscal Year 2018 -2019.

## VIII.   **SHU CONDITIONS**

Without limiting the agreements set forth herein with respect to conditions in particular programs, the parties agree to the following with respect to SHU conditions:

A.   **Phone Calls**. Absent a court order or exceptional circumstances where there is a threat to the safety and security of staff, inmates, the public or state property, DOCCS will offer at least the following:

1.   For the purposes of this Agreement, a "phone call" in SHU, a SHU Alternative Unit or the Separate Keeplock Unit means at least 15 minutes of phone use time, exclusive of the time needed to escort the inmate to or from the phone and without limitation to the number of calls an inmate may make within that 15 minutes. Such phone access will be presumed during such times as an inmate is offered access to a yard containing operating inmate telephones;

2.   One phone call while the inmate is in PIMS Level II;

3.   One phone call every 30 days to every inmate in PIMS Level III and Level IV;

4.   Conduct a pilot program in the Mid-State Step-Down/Drug Treatment unit using a rolling phone cart to provide access to telephone calls. The pilot will begin when the unit opens, and within 3 months of initiating the pilot the parties will meet to discuss whether rolling carts are a feasible method of increasing phone access in SHUs and, if not, other possible alternatives that could be considered.

5.      Greater access to phones may be provided in particular programs or at particular facilities, as provided in this Agreement.

**B.      <u>Shower Curtains</u>**. Shower curtains will be provided in all SHU 200s, and at Upstate Correctional Facility.

**C.      <u>Library Services</u>**.

1.      An inmate is currently allowed to have two books and one magazine at a time in his or her SHU cell, and to make new selections of reading materials one time per week. DOCCS agrees that inmates who have finished with their books and/or magazine in less than a week may request two new books and a new magazine on an exchange basis;

2.      DOCCS will increase library cart re-stocking and rotation from every 60 to every 30 days.

**D.      <u>Head Phones</u>**. A wall jack for headphones will be provided in all SHU cells that are not currently equipped.

**E.      <u>Double-Celling Assignments</u>**.

1.      A policy similar to the double-celling criteria currently in place in the Fishkill facility, Bates-stamped S048181-S048186, will be implemented in all double occupancy SHU units;

2.      Double-cell assignments will be immediately reassessed following a fight between cellmates reported to or observed by DOCCS staff;

3.      The final decision on any double-cell assignment will be made by the Deputy Superintendent for Security.

4.      DOCCS will ensure that all inmates are advised in the SHU orientation manual that they may request an OMH review of a double cell assignment on mental health grounds and instructed on how to make such a request; provided, however, that it is in OMH's sole discretion to decide whether or not to conduct such a review and to what extent.

**F.      Correspondence Courses**. All SHU inmates will be permitted to enroll in approved correspondence courses at their own expense. DOCCS will give full consideration to requests to approve correspondence courses offered by accredited institutions of higher education that seek to provide SHU inmates with no-cost or low-cost post-secondary correspondence courses.

**G.      Tablet Pilot Program**. DOCCS will establish a pilot program deploying 30 tablet style computers (without internet access) to inmates in traditional SHU units and is considering three potential sites for the pilot. The tablets will have educational and recreational software pre-loaded and otherwise will be configured in such a way as to satisfy security concerns and ease of use by the inmate.  DOCCS will issue an RFI for a pilot of at least 30 such tablets within two months after the Effective Date of this Agreement.  After the tablets have been in use for six months, DOCCS will share the results of the pilot program with the Plaintiffs' counsel and will discuss with Plaintiffs' counsel the feasibility of expanding and making the pilot program permanent, giving consideration to any recommendations made by the experts. The pilot program outcome will be measured by the tablets' durability, utility, user feedback and security considerations.

**H.**    **Mental Health Contacts**. DOCCS shall ensure that meetings between inmates and mental health professionals occur out-of-cell in a confidential setting whenever approved by OMH. The following advisement shall be prominently displayed in orientation materials provided to all inmates upon admission to SHUs located in facilities that are OMH Level 1-4:

> In this Special Housing Unit, OMH will offer a confidential meeting with a mental health professional within ___ days of admission to SHU and every ____ days thereafter. You may submit a confidential request for a private consultation with an OMH mental health clinician at any time as follows: ____.

The following advisement shall be prominently displayed in orientation materials provided to all inmates upon admission to SHUs located in non-OMH facilities:

> In this Special Housing Unit you may submit a confidential request for a private consultation with an OMH mental health clinician as follows: _____.

**I.**    **Additional Changes in Conditions**. The parties agree that the changes in SHU conditions set forth in this §VIII are the minimum to be achieved and that DOCCS may make further changes, if deemed practicable, to improve conditions. DOCCS' efforts to make changes exceeding the minimum requirements under this Agreement shall not create enforceable obligations on the part of DOCCS and any such additional changes shall be in DOCCS' sole discretion, consistent with the goals of this Agreement and DOCCS' statutory responsibilities.

**IX.**    **DEPRIVATION ORDERS**

**A.**    **Deprivation Order Limitations**. Deprivation orders will not be imposed as punishment, but only where there is a threat to the safety and security of staff, inmates or state property. Deprivation orders will be terminated when threat has abated, as determined by security staff.

41

B.     **Notification to OMH**. DOCCS will notify OMH of the issuance, renewal and termination of all deprivation orders issued to inmates on the OMH caseload.

C.     **Review and Renewal**. After 7 days, deprivation orders will be reviewed, and can be renewed, by the Superintendent.

D.     **Special Management Meal**. DOCCS will replace the Loaf within three months of the Effective Date of this Agreement with a nutritious, calorie-sufficient, and palatable alternative meal composed of regular food items that can be safely delivered to and eaten by inmates.  For example,  a sack lunch consisting of fruit, cheese, cold cuts, sandwich bread, and coleslaw would meet the requirements of this subsection.

E.     **Record Keeping**. DOCCS will hire an additional staff member to support the Assistant Commissioner for Special Housing/Inmate Disciplinary Programs in order to establish a system of electronic record keeping and reporting of deprivation orders, and any such other tasks deemed appropriate by the Assistant Commissioner.

X.     **SENTENCING PRACTICES**

A.     **Modifications of Guidelines**. DOCCS will implement revised guidelines (the "Revised Guidelines") for disciplinary confinement sanctions (document Bates-stamped S048164 to S048180), in certain respects modifying the guidelines  implemented pursuant to the terms of the Interim Settlement (Bates-stamped S3682 to S3705). As shown in the Revised Guidelines, sanction ranges for certain charges are broken down based upon different levels of seriousness ("disaggregated") in order to promote progressive discipline. Disaggregation will not result in additional numbered charges under DOCCS disciplinary rules, and previous offenses relating to the same numbered charge, regardless of disaggregation, will be considered "prior charges" for the purpose of

determining whether a particular violation is a "first," "second," or "third" offense.  Staff and inmates shall be notified of the revised guidelines by means of a memorandum issued by the Deputy Commissioner for Correctional Facilities.

**B.**      **Special Management Meal**

1.      Effective within three months after the signing of this Agreement, DOCCS will, by a memorandum to all Superintendents, cease and desist from using the Special Management Meal as a disciplinary sanction for acts of inmate misbehavior.

2.      The imposition of the Special Management Meal shall comply with all the policies in § IX above.  In addition, a Special Management Meal may only be ordered by the Superintendent or his or her designee (the OD or higher ranking authority) in connection with one of the following behaviors:

(a)      Throwing food while assigned to the SHU;

(b)      Committing unhygienic acts in the SHU, such as spitting at staff or other inmates or throwing feces or urine;

(c)      Refusing to obey a direct order at the time of meal distribution or refusing to obey a direct order to return a food container or utensil at the conclusion of a meal while assigned to SHU.

**C.**      **Guidance for Hearing Officers**. Hearing officers will receive a memorandum (document Bates stamped S048157 to S148162) providing guidance regarding the proper exercise of their discretion with regard to the issuance of inmate sanctions. After issuance of the memorandum the Department will review data to assess general adherence by hearing officers with the guidance provided, and provide additional counseling and/or training to hearing officers as necessary.

43

D.      **Time Cuts.**

1.      SHU Sanctions less than 90 days. Inmates serving individual

sanctions of less than 90 days for infractions which do not involve certain infractions

related to escape, violent conduct, or unhygienic acts[2] will, in the absence of a

subsequently issued Tier II or III misbehavior report, earn a time-cut of 7 days from the

original sanction after serving 30 days of the sanction and a further 7 day time cut after

serving 60 days.  The time cuts provided herein will be computed electronically and

automatically reported to the inmate's facility.

2.      SHU Sanctions of 90 days or more. Inmates who are serving

individual sanctions of 90 days or more will receive time cuts reducing the original

sanction in accordance with the following procedures:

(a)      If the inmate exhibits good behavior, has positive

interactions with staff, and shows progress and achievement in cell study (where

applicable), the inmate will be presumptively awarded a time cut of 25% of the original

sanction by the Special Housing Management Committee ("SHMC") after the inmate has

served one-half of his or her SHU confinement sanction. The SHMC may exceed the

presumptive 25% time cut, which is not a cap, up to and including release from SHU. If

the SHMC finds that the inmate should receive less than the presumptive 25% time cut,

the SHMC will articulate a specific reason why the inmate should get less time based on

his or her behavior during service of the sanction. Issuance of additional Tier 2 or Tier 3

misbehavior reports while the inmate is serving a sanction may justify the denial of a

time cut, but is not an automatic bar precluding the SHMC from granting time cuts if the

---

[2] Disciplinary infractions numbered 108.10, 108.13, 100.10, 100.11, 100.12, 101.11, 113.10, 100.13, 104.10, 117.10, 118.10, 118.22, 101.10 and 104.11.

inmate has otherwise demonstrated progress. Half-way through the inmate's initial sanction, the computer will electronically add the respective inmate to the queue of inmates to be reviewed at the next SHMC meeting. The SHMC will promptly report the results of its deliberations in writing to the Superintendent. The Superintendent will have responsibility for review and decision.

(b)     Any inmate serving a sanction of 90 days or more for infractions which do not involve the referenced infractions involving escape or violent conduct or unhygienic acts who does not earn a time cut through the above-described SHMC process  will receive an automatic time-cut of 10% of the original sanction, provided he or she has not been issued a Tier 2 or Tier 3 misbehavior report.

3.  Nothing regarding time-cuts provided in this Agreement shall be construed to create a liberty or due process interest on the part of inmates in the issuance of time-cuts.

E.     **SHMC Calendar.** The calendar for SHMC meetings shall include the OMH Level of all inmates in SHU. In determining whether a time cut is warranted, the SHMC shall consider whether an inmate's OMH level weighs in favor of granting a time cut, for example, whether a time cut above the presumptive 25% should be granted to an OMH caseload inmate to permit that inmate an earlier return to a general population environment.

XI.   **TRAINING**

In order to carry out the goals of this Agreement, DOCCS will provide training as follows:

A.     **Training Academy**. The training program for recruits will include:

1.      Incorporating principles of motivational interviewing into existing interpersonal communication training;

2.      Incorporating principles of de-escalation into existing three-day training relating to mental health issues; and

3.      Incorporating principles of de-escalation into existing use of force training.

**B.**      **SHU-Alternative Units**. At the SHU-Alternative Units at Southport, Mid-State, Lakeview, Wende and Green Haven Correctional Facilities, a one-week training will be provided to the staff of those units regarding the context of this Agreement, the SHU environment and principles of de-escalation.

**C.**      **CPP Staff**. For all staff assigned to Southport and Upstate CPP programming, a one-day training program will be provided as to the context of this Agreement, the SHU environment and principles of de-escalation. For all teachers and ORCs assigned to these CPP programs, a second day of training will be provided including active case management principles and practices.

**D.**      **SHU Staff**. For all security staff and ORCs assigned to SHU blocks:

1.      Initial Training. A one-day training program will be provided with respect to the context of this Agreement, the SHU environment and principles of de-escalation.

2.      Annual Refresher Course.

(a)      At OMH Level 1 and 2 facilities, principles of de-escalation will be emphasized during the next annual 4-hour mental health refresher course;

46

(b)      At all facilities other than OMH Level 1 and 2 facilities, a refresher course will be provided by supervisory staff through training bulletins discussed in informal meetings with staff concerning the following progressive alternatives to misbehavior reports for less serious incidents of misbehavior by inmates already housed in SHU:

(c)      De-escalation and intervention as the preferred method of responding to negative behavior in SHU.

(d)      If de-escalation and intervention do not achieve the desired effect, PIMS regression should be utilized prior to the issuance of a misbehavior report for less serious offenses.

(e)      Misbehavior reports may be issued for serious offenses, or if the above alternatives do not attain the desired effect.

E.      **SHMC**. In the course of its annual audits of SHU facilities the Office of Special Housing and Inmate Discipline will carry out training for SHMCs on new SHMC protocols and guidelines under this Agreement.

F.      **Entire DOCCS Staff**. DOCCS Commissioner will ensure the delivery of a four-hour mandatory training program to the entire DOCCS staff during the first quarter of 2017, including the context of this Agreement, the SHU environment, and de-escalation principles and techniques.

G.      **Annual Peace Officer Training**. Principles and techniques of de-escalation will be emphasized during the regular four hours of use of force training.

47

**H.** **Guidance on Transfer Procedures**. The Department shall augment and reinforce existing policies and procedures to ensure the continuity of case oversight for an inmate returning to general population from a SHU or Alternative Unit, as follows:

1. _Advance Notice of Transfer._ Inmates moving to general confinement in another facility will be submitted for transfer consideration by the assigned ORC within two (2) weeks prior to transfer. Programming completed while an inmate has been in a SHU-Alternative Program or confined in SHU, along with the inmate's continuing program needs, will be included in the transfer referral by the ORC.

2. _Electronic Scheduling of Initial Interview._  Upon arrival at the general confinement facility, the inmate will be electronically scheduled for an out-of-cell interview with the assigned ORC in the general confinement facility within five business days of arrival. The assigned ORC at the receiving facility will review the entire guidance file, including information provided by the ORC at the transferring facility, and will prepare appropriate and necessary program referrals. Inmates returned to general confinement in the same facility where they served a SHU sanction or were in a SHU-Alternative Program will have continuity of case oversight by the assigned ORC in that facility.

3. _Memorandum._  A policy memo issued by DOCCS Central Office to ORCs in all facilities will reinforce the above procedures.

**I.** **Grant Opportunities**. DOCCS will explore grant opportunities available through the Office of Justice Programs ("OJP"), United States Department of Justice, for resources, staff training or other technical assistance in furtherance of the goals of this Agreement.

48

   **J.**   **Training Materials**. The parties' designated experts will be afforded an opportunity, prior to the use of training materials and/or training bulletins required under this Agreement, to review and comment on all such training materials. DOCCS will give full consideration to all such comments received within 15 days after the proposed training materials are provided to the parties' experts. The final version of all training materials shall be approved by DOCCS in its discretion and shall be shared with Plaintiffs' counsel and the experts.

## XII.   POST-SETTLEMENT ACTIVITIES

   **A.**   **Designation and Role of Experts**. Plaintiffs and Defendants will each designate an expert in prison operations. No designated expert will be a monitor, but will advise and consult with the parties as provided in this Agreement.

   **B.**   **Periodic Tours and Assessments**. Based on an agreed schedule of specified tours, each party's expert will report to the retaining party concerning his or her assessment of Defendants' compliance with the terms of this Agreement.  In the first quarter of 2016, the experts will conduct a tour of CAR and the juvenile program, as provided under the Interim Settlement.  In the Fall of 2016, the experts will be permitted to conduct an initial consecutive four-day tour at mutually agreed correctional facilities in which programs under this Agreement are located or to be located. The parties' experts, according to a schedule to be determined, will be permitted to conduct further consecutive four-day tours at mutually agreed correctional facilities twice each calendar year thereafter. Tours will include SHU-Alternative Programs, the new separate Keeplock Units at Fishkill C.F. and Five Points C.F., and any other locations of concern to the experts in assessing compliance with this Agreement. During tours, the parties' experts will be

permitted to conduct both cell-side and confidential out-of-cell interviews of up to twelve (12) inmates per facility, per tour, and shall be afforded a reasonable opportunity to speak with the related Program Management Teams.

C.   **Access to Documents**.

1.   <u>In Conjunction With Tours</u>. The parties' counsel will be provided with the following documents reasonably related to the tours.  In instances where the documents are to be provided in advance of a tour, they shall be delivered to the parties' counsel no later than 14 days prior, assuming the parties have finalized the tour dates and locations at least 60 days in advance of the tours.  In instances in which the documents are to be inspected by the experts on-site during the tour, the experts or parties' counsel may request copies of those documents during the tour.   Such copies shall be provided to experts or parties' counsel within 30 days of a request, provided the request is not unduly burdensome, and also provided that in no case will such request be denied where it is agreed between the parties' counsel that the documents are related to an issue of substantial breach under Section XIII. This section shall not preclude the experts from making requests to review specific additional documents as they deem necessary and relevant to a tour, and such requests shall not be unreasonably denied by DOCCS unless not relevant to the terms of this Agreement, unduly burdensome, or privileged.

(a)   The most recent Operations Manual for that SHU or SHU-Alternative Program, to the extent not previously provided to the expert;

(b)   On-site inspection of the disciplinary files for up to 6 inmates pre-identified in advance of the tour by Plaintiffs' expert, and up to 6 additional files as requested on-site by Plaintiffs' expert;

(c)     For the most recent six-month period prior to the tour, records of any SHU double-celling reviews, and the outcomes;

(d)     For the most recent six-month period prior to the tour, on site access to records of cases reviewed for time cuts, including who was considered for time cuts, how much time those considered were eligible to receive, how much they did receive and the reasons for the actions taken, to the extent that such records are created and maintained in the ordinary course of business;

(e)     For the most recent six-month period prior to the tour, on-site access to records, such as logbooks, tracking phone access;

(f)     For the most recent six-month period prior to the tour, on-site access to records/logbooks showing recreation access, including congregate recreation;

(g)     For the most recent six-month period prior to the tour, on-site access to records, such as logbooks, showing whether mental health contacts occurred out-of-cell;

(h)     In addition to the above, for the most recent six-month period prior to the tour of a SHU-Alternative Program, (a) the number of inmates admitted and inmates rejected for the program, including reasons for rejection; (b) the number of inmates who have completed the program (including length of time in the program) and the number of inmates who were discharged (including how long they were in the program and the reasons for discharge); (c) general outlines or lesson plans of classes and programs offered; (d) a snapshot of the number of inmates in the different program levels; and (e) the number of hours of out-of-cell time offered in the program and recreation by phase level (if not reflected in the Operations Manual), to the extent that records of the

information referred to in (a) through (e) above are made and maintained in the ordinary course of business.

(i)     With regard to a tour including a CPP, for the most recent six-month period prior to the tour, (a) samples of individual Confinement Program Plans and (b) summary notes of meetings of the CPP Program Management Team.

(j)     During tours Plaintiffs' expert will be permitted to meet with the local grievance coordinator and, if DOCCS chooses, the Superintendent or their designee, for a discussion of grievance trends in the SHU unit(s). Plaintiffs' expert may receive copies of grievances filed by an individual inmate (the original grievance filed and the written reasoned response from each level of review) if the inmate filing the grievance consents. Central Office staff will accompany the experts on the tour and may attend all such discussions.

2.     <u>Annual Meeting</u>. The parties will meet annually in either New York City or Albany to discuss implementation of this Agreement, any compliance issues hereunder, and the Agreement's effect to date on reducing the use and duration of SHU. The parties' experts may be available by telephone during the meetings. The initial annual meeting shall occur no later than one year after the effective date of this Agreement. Approximately 30 days before each such scheduled annual meeting, DOCCS will provide an annual report as to the construction progress relating to all programs to be established pursuant to this Agreement. In addition to information concerning construction progress, the annual report will include updates on the timeliness of implementation of the terms of this Agreement, such as the scheduling or completion of training components hereunder and the phasing in of programs and policies hereunder.

3.    Document Review by Experts.  DOCCS will provide the parties' experts, 30 days in advance of finalization, documents created to comply with provisions of this Agreement, including training materials and memoranda. DOCCS will give full consideration to comments, if any, provided by the experts within 15 days. The final version of all materials shall be approved by DOCCS in its discretion and shall be shared with Plaintiffs' counsel.

4.    Rule-Making.  If DOCCS initiates a rule-making process to add or amend regulations affecting the terms of this Agreement, DOCCS will provide Plaintiffs' counsel with the draft proposed non-emergency regulations no later than 15 days in advance of the initiation of rule-making and will give full consideration to any comments by Plaintiffs' counsel, provided that the final determination as to the contents of any such proposed regulations shall be in the discretion of DOCCS. This Section shall not preclude DOCCS from undertaking emergency rulemaking, if required in DOCCS' sole judgment, without notice to Plaintiffs' counsel.

5.    Quarterly Reporting.

(a)    The following reports and spreadsheets will be produced on the 15th of the month in January, April, July, and September (or the next business day if the 15th of the month falls on a weekend or holiday) and will cover the prior 3-month period.

| Topic | Description | Type |
|---|---|---|
| Inmates in SHU Cells - Demographics | Demographic and Sanction Status Start and End Dates for inmates housed in SHU cells | File |
| Inmates in SHU Cells - Charges | Disciplinary charges of the inmates housed in SHU cells serving SHU or Keeplock sanctions | File |
| Disciplinary Incidents | Inmate demographic information, disciplinary incident and hearing sanction information for all tier 2 and tier 3 incidents. | File |
| Inmates in Alternative Programs, including CAR | Population Statistics, including the beginning population, the number of arrivals and releases, and the population at the end of the quarter. | Report |
| PIMS Level | Counts of PIMS Levels at each facility | Report |
| Deprivation/Control Orders | Demographics, dates, reasons | Excel Spreadsheet |
| Special Management Meal Orders | Demographics, dates, reasons | Excel Spreadsheet |
| Exceptional Circumstances | Juveniles in SHU | Report |
| Exceptional Circumstances | Pregnant Inmates | Report |
| Exceptional Circumstances | Tier Level Departures | Report |
| Exceptional Circumstances | Guideline Departures | Report |
| Exceptional Circumstances | Alternate Program Removals | Report |
| Exceptional Circumstances | Alternate Program Denials | Report |

(b)  The Excel spreadsheets for restricted diets and deprivation orders referred to in the table set forth in (a) above shall contain the same fields as the "Dep Report" and "Res Diet Report" spreadsheets produced to Plaintiffs on a monthly basis during the course of the stay period under the Interim Settlement.

(c)  The "Exceptional Circumstances" reports referred to in the table set forth in (a) above shall contain at least the same level of detail as the "Monthly Exceptional Circumstances Reports" produced to Plaintiffs monthly since January 1, 2015.

(d)      The "Inmates in SHU Cells-Demographics" file referenced in (a) above shall contain the same data fields as the "SHUCELLS.DETAILS" dataset that has been produced monthly by the Department since April 3, 2014, and was most recently produced to Plaintiffs by email on November 3, 2015.

(e)      The "Inmates in SHU Cells-Charges" file referenced in (a) above shall contain the same data fields as the "SHUCELLS.CHARGES" dataset that has been produced monthly by the Department since April 3, 2014, and was most recently produced to Plaintiffs by email on November 3, 2015.

(f)      The "Disciplinary Incidents" file referenced in (a) above shall contain the same data fields as the "Disciplinary.Incidents" dataset that was produced by the Department on May 28, 2015 and September 1, 2015.

6.      <u>Annual Reporting</u>.  In addition to being provided quarterly as discussed above, the "Disciplinary Incidents" dataset will also be provided annually on April 15th containing data for the prior calendar year.

**D.      Confidentiality**. Upon initial production, materials provided to Plaintiffs' expert and counsel are automatically designated as confidential and for use only in conjunction with tasks specified in this Agreement and its enforcement, regardless of whether the material is marked "confidential" by Defendants' counsel.  If Plaintiffs' counsel raise no objection to the confidentiality designation within sixty (60) days of receipt, the materials shall be deemed confidential.  If Plaintiffs' counsel raise such an objection, they shall send by email attachments the specific materials at issue and state the reasons the designation should be withdrawn in whole or in part.  Defendants' counsel shall respond in writing within thirty (30) days to substantiate the designation and state the

reasons therefore, or to withdraw the designation. Defendants' counsel shall withdraw the designation for material that would be obtainable under the Freedom of Information Law ("FOIL").

      **E.**    **Consideration of Experts' Recommendations**. The experts' reports may include, in addition to an assessment of Defendants' compliance with the terms of this Agreement, suggestions or proposals relating to implementation of the settlement as the experts deem appropriate. Although the Defendants will give full consideration to advice, suggestions and proposals offered by the experts, all decisions concerning the DOCCS correctional system will be made by Defendants, in accordance with DOCCS' statutory responsibilities.

      **F.**    **Public Reporting on DOCCS' Website.** DOCCS will add information to its existing quarterly Fact Sheet, posted on DOCCS' website, reflecting information on the size and composition of inmates in segregated confinement and any changes since the prior quarter. During the first quarter of each calendar year, DOCCS will post on its website a brief annual update on the status of efforts completed under this Agreement.

      **G.**    **Policy Structure Review.** DOCCS will conduct a comprehensive review of its rules and regulations governing the disciplinary process and conditions of confinement in SHU and initiate any additional rule-making it may deem necessary to carry out the terms of this Agreement and will provide any additional guidance to staff through directives, memoranda, post orders, manuals, orientation materials and other similar guidance it may deem necessary to carry out the terms hereof.

## XIII.   ENFORCEMENT POWERS

**A.   Notice, Meet and Confer Obligations**. In the event that Plaintiffs believe that Defendants have committed a substantial breach of a material term of this Agreement, Plaintiffs' counsel may provide Defendants with a written statement describing the alleged breach ("Notice of Substantial Breach"). Defendants shall provide a written statement responding to the Notice of Substantial Breach within thirty (30) calendar days from receipt of the Notice of Substantial Breach and, within thirty (30) calendar days of receipt of Defendants' written response, counsel for the parties shall meet and confer in a good faith effort to resolve their dispute informally. In no instance shall the Plaintiffs be permitted to seek mediation or file an enforcement motion as permitted in §§ XIII(B) and XIII(C) without first having provided the defendants with a Notice of Substantial Breach.

**B.   Magistrate Judge Nonbinding Mediation**. In the event that a Notice of Substantial Breach pursuant to § XIII(A) of this Agreement cannot be resolved informally, counsel for the parties may notify the District Court of the dispute, in which case the Court will appoint a Magistrate Judge to mediate the dispute. The parties agree to make a good faith effort to resolve any dispute in mediation.

**C.   Adjudication of Disputes Unresolved by Mediation**. If the dispute has not been resolved through mediation in conformity with this Agreement within seventy-five (75) days of such appointment of a Magistrate Judge and the issue is a substantial breach of a material term of this Agreement, Plaintiffs may file a motion with the Court seeking specific enforcement of the terms of this Agreement, reinstatement of the claims for prospective relief in the lawsuit, or an extension of the duration of this Agreement by up to one additional year. It shall be Plaintiffs' burden in making such a motion to

demonstrate there has been a substantial breach of a material term.  A substantial breach must be either (i) sufficiently frequent and widespread so as to be pervasive or (ii) a breach that deviates from a material provision in a way that denies an essential benefit of this Agreement to class members. Minimal or isolated failures, noncompliance with mere technicalities, failure to give "full consideration" to the experts' or plaintiffs' input, or temporary failure to comply during a period of otherwise sustained compliance will not constitute a substantial breach of a material term.

**D.** **Substantial Noncompliance Proven**. In the event the Court finds that Defendants have not substantially complied with a material term of this Agreement in accordance with the standards of C above, the Court shall have the power to order specific performance of the material terms in the Agreement, including ordering that the duration of this Agreement be extended for one additional year, provided that there may be no more than a single one-year extension of the term of this Agreement, or reinstatement of the claims for prospective relief in the lawsuit. In a remedial order directing specific performance, the Court shall not impose any additional or different terms from those set forth in this Agreement provided, however, that the Court may set new deadlines for specific performance consistent with the Agreement's term under § XVII. Should the defendants fail to comply with an order of the Court directing specific performance, nothing in this Agreement shall prevent Plaintiffs' counsel from making a motion seeking a finding of contempt, which motion may be granted or denied in accordance with controlling standards for such a finding. Any contempt finding shall be without prejudice to Defendants' rights of appellate review of such a finding as a final order under 28 U.S.C. § 1291.

**E.** **Agreement as to 18 U.S.C. § 3626.** Solely for the purposes of settlement, the parties agree and jointly request that the Court find that this Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A).

**F.** **No Waiver for Failure to Enforce**: Failure by Plaintiffs to enforce this entire Agreement or any provision thereof with respect to any deadline or other provision herein shall not be construed as a waiver of Plaintiffs' right to seek enforcement of any provisions of this Agreement.

**XIV.** **ATTORNEYS' FEES; POST-SETTLEMENT ACTIVITIES**

**A.** Defendants shall pay the sum of $1,100,000 for attorneys' fees, costs and disbursements, including incentive payments, in full satisfaction of any and all claims in the lawsuit. Costs and disbursements shall be substantiated by documentation satisfactory to Defendants' counsel. In the event that payment of the amounts referred to in § XIV(A) is not made within 120 days after the receipt by Defendants' counsel of a copy of this fully executed Agreement, approved by the Court as provided on page 68 below, interest shall accrue on the outstanding balance at the rate set forth in 28 U.S.C. § 1961, beginning on the 121st day after receipt by Defendants' counsel of a copy of this fully executed and court-approved Agreement.

**B.** During the term of this Agreement, as provided in § XVII, it is anticipated that Plaintiffs will incur certain legal fees, expert and other costs and disbursements with respect to §§ XII and XIII. Plaintiffs and Plaintiffs' counsel agree to limit all such attorneys' and experts' fees, costs and disbursements to what is directly and reasonably necessary up to a combined total, which shall not exceed $100,000 per year, calculated on the basis of a 365 day year, beginning on the effective date of this Agreement under §

XXVII and ending on the date this Agreement terminates pursuant to the provisions of §

XVII. During the term of this Agreement, as the same may be extended, Plaintiffs'

counsel agree to submit vouchers to Defendants' counsel on a semi-annual basis

documenting any such attorneys' fees, costs and disbursements and Defendants agree to

reimburse Plaintiffs' counsel within 90 days of receipt of such vouchers. If payment is

delayed beyond 90 days, Defendants will also pay interest at the rate set forth in 28 U.S.C.

§ 1961, which shall accrue beginning on the 91st day. If Plaintiffs prevail on a motion

asserting a substantial breach of a material term pursuant to §XIII, the cap provided in this

Section for fees, costs and disbursements shall not apply to fees, costs and disbursements

in connection with such motion.

     **C.**     Processing payment of each of the amounts referred to in § XIV is subject

to the approval of all appropriate New York State officials in accordance with the

provisions of § 17 of the New York Public Officers Law.  In the event that payment of

such fees and costs is delayed more than 60 days beyond the time for payment provided in

§ XIV (A) or (B), Plaintiffs' counsel may, on 20 days' written notice to Defendants'

counsel, make a motion for appropriate relief to the Court. If such a motion is made,

Defendants may respond, including based on any failure by Plaintiffs' counsel to submit

documentation necessary to process such a payment under § 17 of the New York Public

Officers Law, but will not contest that Plaintiffs are entitled to an award of fees and costs

in accordance with § XIV. In the event of such motion practice relating to payments under

§ XIV, the remainder of the Agreement shall remain in full force and effect.

## XV.   DISMISSAL OF COMPLAINT AND CLAIMS CASES, RESERVATION OF JURISDICTION

Upon approval of this Agreement by the Court, Plaintiffs shall execute, deliver and file a stipulation of dismissal with prejudice of the Complaint, substantially in the form attached hereto as Exhibit 1.  Plaintiffs agree that they will not file any Notice of Intention to file a Claim based on SHU confinements identified in paragraphs 178 and 181 of the Complaint  and further agree that if any such Notice of Intention has been filed, that they will not file a Claim based thereon. The parties agree that after the Court orders said Stipulation of Dismissal, the Court shall retain jurisdiction subject to the limitations of § XIII of this Agreement and the termination provisions of § XVII.

## XVI.   MISCELLANEOUS PROVISIONS

This Agreement shall not constitute a consent decree or an adjudication on the merits. Neither this Agreement, nor any policies or procedures established thereunder, shall define any state or federal constitutional rights or be deemed an admission or a waiver of sovereign immunity or Eleventh Amendment protection. Moreover, none of the parties will contend that any of the provisions, policies, procedures, and goals stated herein define clearly established constitutional rights of inmates or create any private right of action against the State of New York, its agents, employees or representatives. This Agreement in no way waives or otherwise affects, limits or modifies the obligations of inmates to comply with the exhaustion requirements of the Prison Litigation Reform Act, DOCCS directives and regulations, or any current or future state or federal law governing the rights and obligations of incarcerated persons, except that the parties agree that exhaustion shall not be required for noncompliance actions arising under § XIII of this

Agreement. Nothing in this Agreement shall be deemed to limit any existing authority of DOCCS to transfer inmates to other state or federal jurisdictions. Moreover, nothing in this Agreement shall be deemed to require or permit Defendants to violate the laws of the State of New York or the United States, or to violate any terms or conditions of any collective bargaining agreement to which DOCCS or the State of New York is a party, nor shall Defendants agree to any terms in a future collective bargaining agreement that would be in conflict with the terms of the Agreement. Defendants are not aware of any conflict between any of the provisions of this Agreement and any such law or collective bargaining agreement referred to in this Section. If at any future time a conflict becomes apparent, Defendants shall promptly notify Plaintiffs' counsel.  Defendants know of no reason why the payments referred to in § XIV may not be approved and processed in accordance with the provisions of § XIV of this Agreement and § 17 of the New York Public Officers Law and will use their best efforts to obtain such approvals.

## XVII. **TERM**

Without further action by the parties or the Court, this Agreement shall expire two years from the commencement of operation of the Southport SDP to be created under § I(A) of this Agreement. There may be a single one year extension of the term of this Agreement either by direction of the Court pursuant to § XIII or in the event that DOCCS shall have failed to achieve a sustained and significant reduction in the use and duration of SHU by the expiration of this Agreement under § XVII.  The failure to achieve a significant reduction in SHU shall not, however, constitute a violation of this Agreement.

## XVIII.  BINDING EFFECT

This Agreement is binding upon Plaintiffs and the class, the Defendants named in this lawsuit in their individual and official capacities, and on Defendants' successors in office, employees and agents.

## XIX.  DEADLINES AND UNFORESEEN DELAY

The timeframes reflected in Exhibit 2 to this Agreement memorialize the projected timetable for implementation reflected throughout this Agreement. In the event an unforeseen circumstance occurs that causes DOCCS to fail to timely fulfill any material requirement of this Agreement,  Defendants shall notify Plaintiffs' counsel in writing within twenty (20) days after Defendants become aware of the unforeseen circumstance, its anticipated impact on Defendants' ability to perform the material terms of this Agreement and the measures taken to prevent or minimize the failure, and, as appropriate, a proposed new timeline for completion. Requests by Defendants to amend deadlines due to unforeseen circumstances shall not be unreasonably withheld by Plaintiffs.

## XX.  STIPULATION AS TO CLASS CERTIFICATION

The parties agree that this matter is appropriate for certification as a class action pursuant to Fed. R. Civ. P. 23(b)(2).  The class is defined as all DOCCS inmates who are now serving or will in the future serve a disciplinary confinement sanction in a SHU or in one of the programs created under or referenced in this agreement.  The parties agree that the class is so numerous that joinder of all members is impracticable, there are questions of law and fact common to the class, the claims of the named plaintiffs are typical of the claims of the class, and the plaintiffs and their counsel will fairly and adequately protect

the interests of the class.  The parties agree that the confinement policies that are the

subject of this action apply generally to the class, making relief appropriate for the class as

a whole.  The parties agree that, in the event that the Court denies Plaintiffs' unopposed

motion for class certification, filed separately with the Court, this Agreement shall be void.

Defendants agree that they shall not move to decertify the class for the duration of this

Agreement, and shall not unreasonably oppose the designation by Plaintiffs of new class

representatives if necessary.

## XXI.  <u>COMMUNICATIONS WITH AND ACTIONS BY CLASS COUNSEL</u>

Legal mail, legal visits and telephone calls by inmates shall be permitted with

class counsel regarding any aspect of this Agreement or the litigation settled hereby

without adverse consequences, subject to generally applicable DOCCS' rules relating to

legal visits, mail and the use of telephones. Any complaints or concerns by any member

of the class relating to this Agreement shall be referred to class counsel, who shall

determine whether action, if any, is permitted or warranted under § XIII. The

enforcement provisions of § XIII are exclusive and only class counsel may seek

enforcement of any of the terms and conditions of this Agreement. Except for motions by

class counsel pursuant to § XIII, no person, including any member of the class, may serve

or file any contempt motion for alleged non-compliance with a term of this Agreement or

to bring any separate action or proceeding based upon this Agreement.

## XXII. <u>FUNDING</u>

A.    <u>Agreement Terms Contingent on Funding</u>.  Defendants will use their best

efforts to seek approval of the funding necessary to implement activities described in §§

I(A)(3)(a), I(A)(4)(f), I(B)(6)(a), I(B)(11), I(C)(4)(a), I(C)(9), I(D)(2), I(D)(3), IV(B),

VI(A)(2), VI(B)(2), VI(B)(4)(a), VII, VIII(B), VIII(D), VIII(G), IX(E), XI(B), XI(C),

XI(D), and XI(E) under this Agreement, including seeking sufficient appropriation

authority in the Executive budget appropriation bill to be submitted to the Legislature for

State fiscal year 2016-2017, and in each fiscal year for the term of the Agreement.

Funding for activities described in the sections enumerated above are subject to approvals

and budgetary processes and contingent upon legislative appropriations therefor.  The

failure of the Legislature to provide funding, notwithstanding Defendants' best efforts, for

the activities enumerated in this section shall not be deemed a violation of a federal right

by Defendants or a breach of the Agreement by Defendants.

      B.    <u>Obligations if Funding Not Appropriated</u>.  If at any time Defendants

believe that they cannot fully implement one or more of the material provisions of this

Agreement in light of the Legislature's failure to provide adequate funding for one or more

of the Sections enumerated above, Defendants shall promptly notify Plaintiffs in writing,

and the parties shall meet and confer to discuss whether the affected terms can

nevertheless be implemented with modifications agreed upon by the parties. If an

agreement is reached, the parties shall modify this Agreement accordingly in writing.  If

agreement is not reached, the affected settlement term(s) shall become null and void and

Defendants shall have no further obligations to fulfill the affected term(s) except as

otherwise stated below. Defendants shall continue to fulfill all of their other obligations

under this Agreement that are not impacted by the Legislature's failure to provide

adequate funding.  Without limiting the foregoing, in the event the Legislature fails to

provide adequate funding in a fiscal year, Defendants shall continue to use best efforts to

retain the needed appropriation in all subsequent fiscal years under the Agreement Term.

If a previously denied appropriation is later made by the Legislature, the Defendants shall then be obligated to implement the Settlement term in accordance with timeframes in Exhibit 2, measured from the date the appropriation is made.

## XXIII. <u>STAFFING</u>

To the extent that specific sections of this Agreement reference a corresponding staffing number or specific title to be utilized, the parties recognize that this staffing number represents the number of positions or titles that are funded for the specific program, that positions may become vacant through staff attrition and may remain vacant through the recruitment process. Such vacancies shall not be deemed a breach of this Agreement.

## XXIV.  <u>NO ADMISSIONS OR PRECEDENTIAL EFFECT</u>

Nothing in this Agreement shall be construed as an admission or acknowledgment of liability whatsoever by any of the Defendants or DOCCS regarding any of the allegations made by Plaintiffs in the Complaint. It is the parties' intention that this Agreement shall have no precedential value or effect whatsoever and shall not be  used by the parties as evidence or for any other purpose, except in an action or proceeding to enforce this Agreement.

## XXV.  <u>ENTIRE AGREEMENT</u>

This Agreement embodies the entire agreement of the parties in this matter and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Agreement regarding the subject matter of the instant proceedings, shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein. Captions are included herein solely for convenience of reference, are not

part of this Agreement, and shall not be used to limit or otherwise interpret the terms hereof.

**XXVI. <u>NOTICES</u>**

All notices under this Agreement shall be in writing and shall be sent by both U.S. Mail and electronic mail to the recipient or recipients at the address or addresses specified in the signature pages of this Agreement. Copies of any notice to a party shall also be mailed in the manner provided above to the below-listed counsel to the parties at the addresses specified for such counsel.

## XXVII. EXECUTION AND EFFECTIVE DATE

This Agreement may be executed in multiple counterparts, and faxed and/or

emailed signatures will be valid and enforceable, each of which shall be deemed an

original, and all of which shall constitute one and the same document. This Agreement

shall be effective upon the approval of this Settlement Agreement by the Court.

Dated: New York, New York
December _15_, 2015

NEW YORK CIVIL LIBERTIES UNION
Attorneys for Plaintiffs

By _____
         Taylor Pendergrass

_____
Alexander A. Reinert
Attorney for Plaintiffs

MORRISON & FOERSTER LLP
Attorneys for Plaintiffs

By _____
         David Fioccola

ERIC T. SCHNEIDERMAN
Attorney General of the State of New
York Attorneys for Defendants

By _____
         Richard W. Brewster
Assistant Attorney General


NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND
COMMUNITY SUPERVISION

By _____
         Kevin P. Bruen
Deputy Commissioner and Counsel


So Ordered: _____, 2015


_____
Shira A. Scheindlin
United States District Judge

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
LEROY PEOPLES, et al.,                                    :
                                    Plaintiffs,           :     **STIPULATION OF DISMISSAL**
                                                         :
                      -against-                           :     Docket Number
                                                         :     11-CV-2694 (SAS)
BRIAN FISCHER, et al.,                                    :
                                    Defendants.           :
-------------------------------------------------------- x

      IT IS HEREBY STIPULATED AND AGREED by and between the parties, by their

respective counsel, that, pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, this

Action be and hereby is dismissed and discontinued with prejudice. The Court retains

jurisdiction to enforce the Settlement Agreement entered into on _____, as set forth in, and

subject to § XIII of the Agreement, until its termination as set forth in § XVII of the Agreement.


Dated: New York, New York
December _____, 2015

**NEW YORK CIVIL LIBERTIES UNION**
Counsel to Plaintiffs


By_____
    Taylor Pendergrass


_____
    Alexander A. Reinert
    Counsel to Plaintiffs

**MORRISON & FOERSTER LLP**
Attorneys for Plaintiffs


By_____
    David Fioccola

**ERIC T. SCHNEIDERMAN**
**Attorney General of the State of New York**
Attorneys for Defendants


By_____
    Richard W. Brewster
    Assistant Attorney General


**NEW YORK STATE DEPARTMENT OF**
**CORRECTIONS AND COMMUNITY**
**SUPERVISION**


By_____
    Kevin P. Bruen
    Deputy Commissioner and Counsel

EXHIBIT 2

**Settlement Agreement Implementation Timetable**

| Action Item | Section | | Implementation Date as measured from: | |
|---|---|---|---|---|
| | | | **Agreement Effective Date** | **FY 2016-17 Budget Enactment** |
| **SHU ALTERNATIVE PROGRAMS** | | | | |
| Southport Step-Down Program | I(A)(4)(f) | | | 36 months |
| Mid-State Step-Down Unit | I(B)(11) | | | 14 months |
| Lakeview Substance Abuse Program | I(C)(9) | | | 33 months |
| Step-Down to the Community Programs | I(D)(9) | | | 6 months |
| **AGREEMENTS APPLICABLE TO ALL SHU-ALTERNATIVE PROGRAMS** | | | | |
| As applied to juvenile program and CAR | I(E) & (F) | | 6 months | |
| As applied to all other SHU-Alternative Programs | II(A)-(L) | | See above program implementation dates | |
| **SEPARATE KEEPLOCK UNITS** | | | | |
| Separate Keeplock Units | IV(B) | | | 15 months |
| Reduction of Certain Keeplock Sanctions | IV(D) | | 3 months | |
| **UNIFORM "PIMS" PROGRAM FOR ALL SHUS** | | | | |
| New PIMS implemented, excepting congregate recreation. See SHU conditions timeline for specific incentive implementation. | V | | 6 months | |
| **CONFINEMENT PROGRAM PLAN** | | | | |
| CPP Begins | VI | | | 36 Months |
| **UPSTATE ASAT EXPANSION** | | | | |
| ASAT Program Expansion | VII | | | 24 Months |
| **SHU CONDITIONS** | | | | |
| Phone calls | VIII(A) | | | 6 months |
| Library services | VIII(C) | | 6 months | |

| Action Item | Section | | Implementation Date as measured from: | |
|---|---|---|---|---|
| | | | Agreement Effective Date | FY 2016-17 Budget Enactment |
| Shower curtains | VIII(B) | | | 3 months |
| Head phones/ Additional Phones installed in all SHUs | VIII(D) | | | 48 Months |
| Double-celling assignment policy – Issuance of Memo | VIII(E) | | 3 months | |
| Double-celling assignment policy – Updating Facility Operations Manuals and Review with Staff | VIII(E) | | 6 months | |
| Correspondence courses | VIII(F) | | 3 months | |
| Tablet Pilot Program Issuance of RFI | VIII(G) | | 2 months | |
| Tablet Pilot Program evaluation period | VIII(G) | | 6 months after tablets available | |
| Mental Health Contact Policy – Issuance of Memo and template | VIII(H) | | 3 months | |
| Mental Health Contact – Updating Facility Operations Manuals and Review with Staff | VIII (H) | | 6 months | |
| **DEPRIVATIONS** | | | | |
| Deprivation Order policies | IX(A)-(C) | | 3 months | |
| Special Management Meal | IX(D) & X(B) | | 3 months | |
| Hire additional staff member | IX(E) | | | 6 months |
| **SENTENCING PRACTICES** | | | | |
| Modification of guidelines | X(A) | | 12 months | |
| Guidance for hearing officers | X(C) | | 2 months | |
| Time Cuts | X(D)(1)&(2) | | 12 months | |
| Notice to SHMC of OMH Levels | X(E) | | 6 months | |
| **TRAINING** | | | | |
| Training Academy | XI(A) | | | Starting with FY 2016/2017 Recruit Classes |
| SHU-Alternative Units one-week training | XI(B) | | | See above program implementation dates |
| CPP staff training | XI(C) | | | See above CPP |

2

| Action Item | Section | | Implementation Date as measured from: | |
|---|---|---|---|---|
| | | | **Agreement Effective Date** | **FY 2016-17 Budget Enactment** |
| | | | | implementation date |
| SHU Staff one-day training | XI(D)(1) | | | 12 months |
| SHU Staff refresher at OMH 1 and 2 facilities | XI(D)(2)(a) | | 12 months | |
| Issuance of training bulletin | XI(D)(2)(b) | | 12 months | |
| SHMC Training | XI(E) | | 12 months | |
| All staff training | XI(F) | | First quarter 2017 | |
| Peace officer training | XI(G) | | Start with FY 2016/2017 annual training | |
| **GUIDANCE ON TRANSFER PROCEDURES** | | | | |
| Electronic Scheduling | XI(H)(2) | | 3 months | |
| Issuance of memorandum | XI(H)(3) | | 4 months | |

**EXHIBIT B**

# IMPORTANT NOTICE TO DOCCS PRISONERS
## ABOUT PROPOSED SETTLEMENT OF CLASS ACTION
## AFFECTING SPECIAL HOUSING UNIT POLICIES AND PROCEDURES

A proposed settlement has been reached in a federal civil-rights class-action lawsuit filed against the New York State Department of Corrections and Community Supervision ("DOCCS") and other defendants, entitled *Peoples, et al. v. Fischer, et al.*, Case No. 11-CV-2694. This lawsuit challenges the constitutionality of disciplinary confinement sanctions and conditions of Special Housing Units ("SHU") in the New York State prison system.

DOCCS and the lawyers for the proposed class of inmates have reached a settlement agreement regarding SHU policies and procedures that they believe is fair to both sides. This case did not seek monetary damages on behalf of the class and no money damages will be awarded to class members. If you are an inmate who is now serving, or will in the future serve, a disciplinary confinement sanction in SHU or in one of the "SHU Alternative Units" described below, then you are a member of the class. This notice explains the proposed settlement agreement, how you can read it, and how you can tell the Court whether you think it is fair. The settlement agreement is lengthy and its terms are complex.  Set forth below is only a brief summary of key provisions of the settlement agreement.  A copy of the settlement agreement and relevant attachments is available in the law library.  Inmates who cannot access the library can request a copy for review from their assigned Offender Rehabilitation Coordinator.

In brief summary, the key provisions of the settlement agreement require DOCCS to do the following over the next three years:

1. Implement policies ensuring SHU sanctions are imposed in a narrower range of circumstances, for shorter durations, and more consistently.

2. Implement policies ensuring incarcerated individuals can more consistently earn time cuts reducing their SHU sanctions for good behavior and program participation.

3. Modify the policies in SHU, with substantial changes for individuals expected to spend more than 180 days in SHU:

   a. Provide access to telephone calls for prisoners in SHU;
   b. Permit prisoners in SHU to enroll in correspondence courses;
   c. Increase access to reading materials within SHU;
   d. Increase access to commissary and personal property within SHU;
   e. Raise the number of in-person visits permitted for prisoners in SHU;
   f. Install shower curtains in all double-celled SHU cells;
   g. Ensure all SHU cells have access to audio programming;
   h. For inmates expected to spend 180 days or more in a SHU and deemed appropriate by DOCCS, provide access to congregate recreation and instructor-led cell-side rehabilitative programming;
   i. End use of the "loaf" and replace it with a sack lunch of regular food items;
   j. Implement policies limiting the issuance of "deprivation orders"; and
   k. Provide clear written notice upon admission to SHU of the prisoner's ability to request an out-of-cell, confidential interview with mental health staff.

4. Create and continue "Alternative Units" providing rehabilitative programming for individuals deemed appropriate by DOCCS who would otherwise be serving long confinement sanctions in SHU and provide more congregate interaction, more out-of-cell time and more privileges as compared to SHU:

   a. A "Step-Down" program to allow individuals with SHU sanctions of 9 months or longer the opportunity to earn their way back to general population by participating in congregate rehabilitative programming;
   b. A substance abuse program to provide intensive drug treatment programming for substance dependent individuals who would otherwise be serving a long sanction for a drug-related infraction in SHU;
   c. A "Step Down to the Community" program to provide re-entry programming to individuals who would otherwise be released directly from SHU to the community;
   d.  "Separate Keeplock Units" with less restrictive conditions of confinement as compared to SHU for a substantial number of the inmates who would otherwise be confined to SHU for Keeplock;
   e. Continue the "Correctional Alternative Rehabilitation" program to provide programming for individuals with developmental disabilities and intellectual impairments in less restrictive conditions of confinement who would otherwise be in SHU;
   f. Continue the juvenile unit to provide rehabilitative programming targeted to individuals aged 16 and 17 in less restrictive conditions of confinement than SHU.

5. The Department will conduct a system-wide training for all DOCCS's staff, with a focus on staff working in SHU and Alternative Units. The training will support the above policies and alter daily interactions between staff and inmates in SHU.

6. The Agreement will allow plaintiffs' class counsel to receive data and documents, and conduct up to 40 days of expert tours over the expected five-year term of the agreement, that will permit plaintiffs' class counsel to review compliance with the Agreement.

7. The parties agree to a two-year review period following the completion of the largest construction project, the Southport Step-Down Program, which is expected to take 36 months. If that project is completed on schedule and there is no cause for extending the Settlement Term, the Agreement would terminate in 5 years.

The lawyers representing the class have spent thousands of hours working on the case and, because it is a civil rights case, the lawyers would be entitled to an award of legal fees if the case was won in court.  In order to settle the case, DOCCS will pay $1,100,000 for attorneys' fees, costs and disbursements, including incentive payments to the three named plaintiffs to compensate them for their role as class representatives in the lawsuit.

THIS CASE DID NOT SEEK ANY MONEY DAMAGES FOR THE CLASS, AND THE SETTLEMENT WILL NOT AFFECT THE RIGHT OF ANY INDIVIDUAL TO SEEK DAMAGES FOR SIMILAR CLAIMS.  THE SETTLEMENT DOES NOT ADDRESS THE CASES OF ANY SPECIFIC INDIVIDUALS EXCEPT FOR THE THREE NAMED PLAINTIFFS, AND ATTORNEYS FOR THE CLASS CANNOT OFFER AN OPINION ABOUT YOUR ABILITY TO PURSUE A CLAIM FOR MONEY DAMAGES AGAINST DOCCS.

The Judge in this case will hold a hearing to determine whether the settlement agreement is fair and reasonable on _____, at _____ in Courtroom 15C, at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York.

Inmates can write to the Court about the settlement's fairness.  Comments MUST include the name of this case, *Peoples v. Fischer*, and the docket number 11-CV-2694 (SAS), at the top of the first page.  Please note that the Court can only approve or deny the settlement; it cannot change the terms of the settlement agreement.  Comments must be postmarked no later than _____.  They can be sent to the following address:

> Clerk of the Court
> Attn:  Solitary Confinement Settlement, 11-CV-2694 (SAS)
> United States District Court, Southern District of New York
> Daniel Patrick Moynihan United States Courthouse
> 500 Pearl Street
> New York, NY 10007-1312

If you have any questions or want more information about the case, please write to the lawyers for the class at the following address:

> New York Civil Liberties Union
> Attn:  Solitary Confinement Settlement
> 125 Broad Street, 19th Floor
> New York, NY 10004