UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

LEROY PEOPLES, DEWAYNE
RICHARDSON, and TONJA FENTON, on
behalf of themselves and all others similarly
situated,

               **Plaintiffs,**

       - against -

ANTHONY ANNUCCI,[1] Acting
Commissioner of the New York State
Department of Corrections and Community
Supervision, et al.,

               **Defendants.**

-------------------------------------------------------- X

**OPINION AND ORDER**

**11-cv-2694 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:[2]

## I.    INTRODUCTION

In April, 2011, Leroy Peoples, appearing *pro se,* sued DOCCS,

---

[1]    In April, 2013, Brian Fischer stepped down as Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"). Anthony Annucci currently serves as the Acting Commissioner of DOCCS.

[2]    The Opinion and Order issued March 31, 2016 is hereby withdrawn and replaced with this Amended Opinion and Order, issued April 14, 2016. This Amended Opinion contains edits — which do not alter any of the rulings herein — on pages 28 and 29 only.

claiming that his designation to solitary confinement for a three-year term for improperly maintaining certain legal documents in his cell and related conduct was unconstitutional.  Two years later, in March, 2013, an action previously filed by Dewayne Richardson, also appearing *pro se*, was joined with Peoples' case. Similarly to Peoples, Richardson was sentenced to three years' solitary confinement for maintaining documents in his cell that were designated as contraband and related conduct.  Also in March, 2013, a *pro se* complaint previously filed by Tonja Fenton was joined with Peoples' case.[3]  Fenton had sued DOCCS after being sentenced to two years' solitary confinement for three infractions:  (1) helping another inmate purchase personal hair care appliances and sneakers; (2) reporting a sexual assault that was later deemed unsubstantiated; and (3) sending a food sample to a court in support of a lawsuit she filed alleging that corrections officers had retaliated against her by tampering with her food.

Five years after Peoples filed his initial complaint, an historic settlement was reached on behalf of thousands of prisoners, in this class action lawsuit challenging solitary confinement practices across the New York State

---

[3]      Fenton, who was released from custody in March, 2014, attended the March 28, 2016 Fairness Hearing in this case.

prison system.[4]  This settlement, which I approve today, will greatly reduce the frequency, duration, and severity of solitary confinement in New York State prisons.  While there is undoubtedly more work to be done, both with respect to solitary confinement and with the conditions of prisons in general, this settlement should end the use and conditions of solitary confinement in New York as they have existed for decades.  It is also my hope that the contours of this Settlement Agreement, and the collaborative process by which it was reached, will serve as a model for other states that are addressing issues of prison reform.

The path to reaching this settlement bears special mention.[5]  *Pro bono* counsel agreed to represent Peoples as of August, 2012.  After filing a Second Amended Complaint on his behalf, counsel consolidated Peoples' case with those of Richardson and Fenton, and filed a Third Amended Class Action Complaint ("TAC") — now the operative Complaint — on March 6, 2013.  The TAC

---

[4]     *See* Proposed Settlement Agreement ("Settlement Agreement"), Ex. 1 to Plaintiffs' Memorandum of Law in Support of Joint Motion for Preliminary Approval of Class-Action Settlement, Conditional Certification of the Settlement Class, Approval and Distribution of the Notice of Settlement, and Appointment of Plaintiffs' Counsel as Class Counsel ("Pl. Preliminary Mem.").

[5]     I wish to publicly express my deep gratitude to all of the attorneys who have been involved in this case.  These attorneys, and their offices, have worked with great devotion to craft a settlement that will significantly reduce the use of solitary confinement in New York State prisons and improve the conditions of such confinement.

challenged New York State's solitary confinement practices under the Eighth and Fourteenth Amendments.

The parties entered into an Interim Stipulation in February, 2014, prior to any dispositive rulings by the Court.  After two years of further arms-length discovery and negotiation — which incorporated, *inter alia*, expert analysis and input from class members — a global Settlement Agreement providing for systemic relief over a five-year period was reached.

This Court preliminarily approved the Settlement Agreement in December, 2015, conditionally certifying — under Rule 23(b)(2) of the Federal Rules of Civil Procedure — a class of all inmates in DOCCS custody who are currently serving, or will in the future serve, a disciplinary confinement sanction in a special housing unit ("SHU"), New York State's term for solitary confinement, or one of the alternative programs referenced in the Settlement Agreement (the "Class").

As of February, 2016, approximately 3,700 individuals were incarcerated in disciplinary SHUs across New York State.[6,7]  Solitary confinement

---

[6]     *See* 3/28/16 Transcript of Fairness Hearing ("3/28/16 Tr.") at 13:4-5. *See also* 3/21/16 Declaration of Plaintiffs' Counsel Taylor Pendergrass ¶ 6.

[7]     Disciplinary solitary confinement is a punitive designation imposed in response to inmate behavior.  By contrast, administrative solitary confinement or "Administrative Segregation" — which is not addressed in this case — is imposed

is a drastic and punitive designation, one that should be used only as a last resort and for the shortest possible time to serve the penal purposes for which it is designed.  It is well known that such confinement causes deterioration of the mental and physical condition of inmates.  This Settlement Agreement is a critical step in addressing the problems caused by the excessive use of solitary confinement and the conditions of that confinement.  Now that this Settlement Agreement has been finalized and is about to be implemented, enforced, and monitored, the conditions of those currently assigned to solitary confinement — and of those who will be so assigned in the future — will be more humane and more just.

## II.  BACKGROUND ON SOLITARY CONFINEMENT

### A.  Use of Solitary Confinement in the United States

Solitary confinement, generally speaking, is the practice of socially isolating a prisoner from the general inmate population and depriving him or her of most environmental stimuli.  In 2013, the Department of Justice defined the

---

to protect vulnerable inmates from other prisoners.  Although individuals in Administrative Segregation are not class members in this suit, they will benefit from at least some of the reforms achieved by the Settlement Agreement.  *See* 3/28/16 Tr. at 21:15-24 (Assistant Attorney General ("AAG") Richard Brewster). However, because Administrative Segregation is not a punitive designation, other reforms in this Settlement Agreement would not apply to Administrative Segregation inmates.  *See id.*

practice as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, . . . [with] limit[ed] contact with others."[8]  Prisoners live in concrete cells measuring between sixty and eighty square feet that contain a bunk, toilet, and sink, and have extremely limited window visibility.  Prisoners spend virtually all of their time in these cells, where they "sleep, eat, and defecate . . . in spaces that are no more than a few feet apart from one another."[9]  Limited exercise time — in an enclosed pen, as opposed to a recreation yard — may also be provided.[10]

        While a national census of prisoners in solitary confinement is difficult due to the fluctuating nature of inmate populations, the American Civil Liberties Union estimates that on any given day, up to 80,000 prisoners across state and federal corrections systems are held in isolated confinement conditions.[11]  The

---

[8]     United States Department of Justice, Letter to the Honorable Tom Corbett, Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, May 31, 2013, at 5 (emphasis in original), http://justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf.

[9]     Reassessing Solitary Confinement:  The Human Rights, Fiscal, and Public Safety Consequences:  Hearing Before the Subcomm. on the Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary, 112th Cong. 75 (2012).

[10]     *Id.* at 77.

[11]     *See* American Civil Liberties Union, *The Dangerous Overuse of Solitary Confinement in the United States* (2014) at 2.

practice has also been on the rise: once a relatively rare component of the American prison experience, forty-four states and the federal system now employ some form of segregated or isolated housing.[12]  It is estimated that between 1995 and 2005, the number of inmates consigned to solitary confinement in the United States increased by approximately forty-two percent.[13]

### B.   Effects of Solitary Confinement

This widespread use of solitary confinement is especially troubling given that the deletrious effects of isolated housing on inmates — especially to those assigned to long-term solitary confinement — are well-known and amply documented.  Indeed, the literature "is virtually unanimous in its conclusion: prolonged supermax solitary confinement can and does lead to significant psychological harm."[14]  This harm takes myriad forms.  After even relatively brief periods of solitary confinement, inmates have exhibited symptoms such as hypersensitivity to stimuli, perceptual distortions and hallucinations, increased

---

[12]     *See id.*

[13]     *See* Alison Shames, *et al.*, Vera Institute of Justice, *Solitary Confinement: Common Misconceptions and Emerging Safe Alternatives* (2015) at 6.

[14]     Thomas L. Hafemeister & Jeff George, *The Ninth Circle of Hell: An Eighth Amendment Analysis of Imposing Prolonged Supermax Solitary Confinement on Inmates with a Mental Illness*, 90 Denv. U. L. Rev. 1, 35 (2012).

anxiety, lack of impulse control, severe and chronic depression, appetite and weight loss, heart palpitations, sleep problems, and depressed brain functioning.[15] As one expert in the field noted, "[t]he restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning" — even causing "confusional psychosis" in some inmates.[16]

A 2014 study of the New York State prison population found that inmates in solitary confinement were approximately seven times more likely to harm themselves than prisoners in the general population.[17]  The consequences of long-term solitary confinement are so well-known that numerous medical associations, including the American Psychiatric Association, the American Public Health Association, the National Alliance on Mental Illness, the Society of Correctional Physicians, and Mental Health America, have all issued formal policy statements opposing the practice — especially with regard to mentally ill inmates,

---

[15]     *See The Dangerous Overuse of Solitary Confinement in the United States* at 4 (collecting research).

[16]     Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 354 (2006).

[17]     *See* Homer Venters, *et al.*, *Solitary Confinement and Risk of Self–Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442 (Mar. 2014).

on whom the effects of solitary confinement are particularly pronounced.[18]

The global community also has recognized the threat that solitary confinement poses to the health of inmates — and taken decisive measures to curtail its use.  In fact, in September, 2015, the United Nations General Assembly revised its Standard Minimum Rules for the Treatment of Prisoners to state that "[s]olitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review."[19]  The practice of solitary confinement has already been largely eliminated in Europe.  In Germany, for example, solitary confinement is rarely imposed and generally does not exceed a few days — four weeks, in extreme cases.[20]  There are more prisoners in solitary confinement in the state of Maine than there are in the entire United Kingdom.[21]

---

[18]     *See, e.g.*, American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012); American Public Health Association, *Solitary Confinement as a Public Health Issue, Policy No. 201310* (2013); National Alliance on Mental Illness, *Public Policy Platform Section 9.8*;Society of Correctional Physicians, *Position Statement, Restricted Housing of Mentally Ill Inmates* (2013); Mental Health America, *Seclusion and Restraints, Policy Position Statement 24* (2011).

[19]     Economic and Social Council Res. 2015/20, at 19 (Sept. 29, 2015), www.un.org/ga/search/view_doc.asp?symbol=A/C.3/70/L.3.

[20]     *See* Nicholas Turner & Jeremy Travis, Op. Ed., *What We Learned From German Prisons*, N.Y. Times (Aug. 6, 2015).

[21]     *See* Atul Gawande, *Hellhole*, The New Yorker (Mar. 30, 2009).

The understanding that solitary confinement harms prisoners is not new.  More than 125 years ago, the Supreme Court observed that:

> [Prisoners subjected to solitary confinement] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.[22]

Supreme Court Justice Anthony Kennedy recently revisited this precise concern in *Davis v. Ayala*, commenting that "despite scholarly discussion and some commentary from other sources" on the effects of solitary confinement, "the condition in which prisoners are kept simply has not been a matter of sufficient public inquiry or interest."[23]  Justice Kennedy noted, however, that "[t]here are indications of a new and growing awareness in the broader public of the subject of corrections and of solitary confinement in particular."[24]

## III.    OVERVIEW OF THE SETTLEMENT AGREEMENT

### A.    Notice

When the Court preliminarily approved the Settlement Agreement in

---

[22]    *In re Medley*, 134 U.S. 160, 168 (1890).

[23]    135 S. Ct. 2187, 2209-10 (2015) (Kennedy, J., concurring).

[24]    *Id.*

-10-

December, 2015, it also approved a plan for providing notice to the Class.  By

January 15, 2016, the Settlement Agreement Notice (the "Notice") was posted in

both English and Spanish within all of DOCCS' general population housing units,

and hand-delivered to all inmates in SHU, the Correctional Alternative

Rehabilitation program, and the Juvenile Program.  The Notice was also distributed

to all inmates who were newly admitted to these programs during the Notice period

(January 15, 2016 through March 14, 2016), and was posted online.

   The Notice apprised the Class of the key settlement terms, the manner

in which class members could review the full Settlement Agreement (which was

made available in law libraries and through Assigned Rehabilitation Officers), the

date and location of the Fairness Hearing, and the contact information for

plaintiffs' counsel (from whom additional information about the settlement could

be requested).  The Notice also explained the process for submitting class member

objections, which were due to the Court by March 14, 2016.[25]

---

[25]  Two class members submitted letters stating that they had been unable to review the Notice at the Sing Sing and Upstate Correctional Facilities.  *See* 3/11/16 Letter from Kirkland Smith (Dkt. No. 312); 3/18/16 Letter from John Smolen (Dkt. No. 294).  However, as set forth in an affidavit by an Associate Counsel for DOCCS, both facilities were in compliance with the Notice Plan.  *See* 3/23/16 Affidavit of Thomas Goetz ¶¶ 4-10.  In both facilities, the Notice had been posted, distribution to inmates had been effectuated, and settlement documents were placed in facility libraries.  *See id.*  Additionally, prison administrators confirmed that both inmates requested, and received, a copy of the settlement documents for their review.  *See id.* ¶¶ 9-11.

### B.     Key Provisions

As described in plaintiffs' March 21, 2016 Memorandum of Law in

Support of Joint Motion for Final Approval:

> [A]t the core of the [TAC's] claims were allegations that
> disciplinary segregation was used too frequently, for time periods
> that were too long, and with conditions of confinement that were
> unnecessarily severe.   The Settlement Agreement provides
> substantial relief for all class members in each of these areas.  The
> Department will implement new policies to ensure that SHU
> sanctions are imposed in a narrower range of circumstances, for
> shorter durations, and more consistently.[26]

In other words, the Settlement Agreement provides for three broad

categories of reform:  (1) reduction in the frequency and duration of SHU

sentences; (2) improvements to the conditions of SHU incarceration; and (3)

mechanisms for implementation and enforcement of the agreed-upon measures.

To achieve these reforms, the Settlement Agreement details a

comprehensive overhaul of SHU sentencing and incarceration — spanning

seventy-eight pages as well as exhibits and other supporting documents.  Although

it is impossible to summarize the entire agreement here, this Opinion highlights

certain key provisions.[27]

---

[26]     Plaintiffs' Memorandum of Law in Support of Joint Motion for Final
Approval of Class Action Settlement ("Pl. Final Mem.") at 2.

[27]     I note, however, that some of the measures memorialized in the
Settlement Agreement simply continue policies and procedures that were

### 1.    Provisions Reducing the Frequency and Duration of SHU Sentences

The Settlement Agreement contains a number of reforms to limit the frequency and duration of solitary confinement altogether.  Significantly, the parties have agreed to a detailed modification of DOCCS' guidelines for SHU sentencing which, among other guidance, caps the length of SHU sentences for enumerated offenses.[28]  Under this new scheme, for example, possession of certain documents prohibited by prison regulations — conduct that formed a basis of Peoples and Richardson's original three-year SHU sentences — would be punishable by no more than thirty days of confinement to one's own cell, not a SHU.[29]  For all of the incidents on which Fenton's two-year SHU sentence was based, under the new scheme, she would have received no more than ninety days'

---

implemented by DOCCS pursuant to the Interim Agreement.

[28]    *See* Settlement Agreement at 42-43.  *See also* 12/8/15 DOCCS Revised Guidelines (Bates Nos. S048164-S048180).

[29]    *See* 3/28/16 Tr. at 9:4-6; *id.* at 9:20-25 ("Prior to this litigation, [DOCCS] had no comprehensive [SHU] sentencing guidelines on an infraction-by-infraction basis; and, as a result of both the Interim Agreement and . . . [the final Settlement Agreement], a comprehensive set of sentencing guidelines for every infraction [is now in place].") (Plaintiffs' Counsel Taylor Pendergrass); 12/8/15 DOCCS Revised Guidelines at Bates Nos. S048168, S048175.  Peoples' three-year SHU sentence was also based on a violation of facility correspondence procedures. Under the new scheme, he would have received no more than ninety days' SHU for this conduct.  *See* 12/8/15 DOCCS Revised Guidelines at Bates Nos. S048179.

SHU and 150 days' confinement to her own cell.[30]

Additionally, the Settlement Agreement provides for SHU-Alternative Programs designed to address the underlying causes of an inmate's disciplinary issues, including programs for special needs inmates, juvenile inmates, and inmates in need of substance abuse treatment.[31]  Other key provisions include a continued presumption against SHU for pregnant inmates[32] and increased opportunities for SHU inmates to earn a sentence reduction and lesser SHU sanctions.[33]

### 2.     Provisions Improving the Conditions of SHU Incarceration

The Settlement Agreement also mandates a number of improvements to the conditions of confinement in SHU.  Among these reforms is a stipulation that within three months of the Settlement Agreement's effective date, DOCCS will abolish its use of the "Loaf" — an unpalatable form of food — as a punishment and will instead provide a "nutritious, calorie-sufficient, and palatable alternative meal composed of regular food items."[34]

---

[30]     *See* 12/8/15 DOCCS Revised Guidelines at Bates Nos. S048166, S048168, S048172, S048178, S048179.

[31]     *See* 3/28/16 Tr. at 8:16-21.  *See also* Settlement Agreement at 4-29.

[32]     *See* Settlement Agreement at 30.

[33]     *See* 3/28/16 Tr. at 10:19-25.  *See also* Settlement Agreement at 44-45.

[34]     Settlement Agreement at 42.

Further, SHU inmates will be eligible for the Progressive Inmate Movement System, which permits increased movement privileges based on good behavior.[35]  SHU inmates also will benefit from other reforms such as:

- Ability to place telephone calls to family and friends on a regular basis;

- Provision of shower curtains;

- Improved library services;

- Installation of headphone jacks in cells;

- Modifications to the double-celling assignment policy;

- Access to correspondence courses and radio programming;

- Roll-out of the "Tablet Computer Pilot Program"; and

- Increased access to mental health consultations and treatment.[36]

### 3.     Provisions for Ensuring Implementation and Enforcement of the Settlement Agreement

Further, the Settlement Agreement creates a detailed framework for implementing and enforcing its terms over the next five years.[37]  This framework includes a timetable for implementing the various Settlement Agreement

---

[35]     *See id.* at 32-33.

[36]     *See id.* at 39-41.

[37]     *See id.* at 49-59.

provisions, designation of experts for each side, periodic prison tours, regular data production and analysis, an annual progress meeting between the parties, and notice and meet and confer obligations if a dispute arises.[38]  In the event that the dispute cannot be resolved informally, the Settlement Agreement also provides for mediation and, if necessary, judicial review.[39]  The Settlement Agreement also mandates initial and annual refresher training for DOCCS staff, which will emphasize methods for de-escalating disciplinary concerns without resorting to SHU sanctions.[40]

## C.   Attorneys' Fees and Costs and Incentive Awards to Representative Plaintiffs

The Settlement Agreement also addresses attorneys' fees and costs, as well as incentive awards to representative plaintiffs.  Importantly, these monetary payments cannot reduce the value of the settlement as this Class is certified for injunctive relief only, and not for monetary damages.

Defendants have agreed to a one-time payment of $1.1 million, in full satisfaction of the fees and costs incurred by plaintiffs' counsel during the course

---

[38]     *See id.* at 57.

[39]     *See id.*

[40]     *See id.* at 45-47; 3/28/16 Tr. at 12:1-8.

-16-

of the litigation.[41]  Defendants have further agreed to pay plaintiffs' counsel up to

$100,000 per year over the course of the five-year settlement term for fees and

costs incurred in monitoring compliance with the Settlement Agreement.[42]

The $1.1 million will also be used to pay the incentive awards to the

three representative plaintiffs in this lawsuit.[43]  The representative plaintiffs

assisted in the litigation and risked retaliation for serving as the faces of this action.

Accordingly, plaintiffs' counsel has determined that the representative plaintiffs

should receive the following incentive awards:  (1) $80,000 for Dewayne

Richardson; (2) $40,000 for Tonja Fenton; and (3) $9,900 for Leroy Peoples.[44]

Plaintiffs' counsel explains that Fenton was released from custody in March, 2014,

and that Peoples and Richardson — who are both still incarcerated — would be

entitled to similar incentive awards for their participation in the litigation, but that

Peoples voluntarily requested a smaller award.[45]  Defendants played no role in

negotiating or determining the individual or aggregate amounts of these incentive

---

[41]     *See* Settlement Agreement at 59.

[42]     *See id.*

[43]     *See* Pl. Final Mem. at 18.

[44]     *See* Pl. Preliminary Mem. at 17.

[45]     *See id.*

awards.

The Court received only one potential objection to these proposed awards.[46]  This objection argued that plaintiffs' counsel should have sought money damages or incentive payments for other (non-representative) class members. However, as noted, the Settlement Agreement does not provide for money damages.[47]

## IV.    CLASS MEMBER CORRESPONDENCE

The Notice was likely seen by thousands of inmates in DOCCS custody, including those in the SHU who were hand-delivered a copy of the Notice.[48]  As of March 28, 2016, two weeks beyond the close of the Notice Period, the Court had received a total of 164 letters from class members.[49]

Although most of the comments were supportive of the Settlement Agreement, I will discuss both favorable and unfavorable comments, as this

---

[46]    *See* 3/18/16 Letter from John Smolen (Dkt. No. 294).

[47]    Named plaintiff Leroy Peoples also submitted a letter requesting "re-negotiation" of his incentive award, but later withdrew that request after consultation with plaintiffs' counsel.  *See* 3/14/16 Declaration of Leroy Peoples.

[48]    *See* Pl. Final Mem. at 9.

[49]    There may be some overlap between letters that are and are not considered objections, as some letters both expressed support for the Settlement Agreement yet also identified shortcomings in its terms.  Additionally, some class members submitted multiple letters.

correspondence offers significant insight into the immediate benefits of this settlement as well as the areas in which further reforms might be considered.

## A.   Letters in Support

As noted, the majority of class member correspondence expressed support for the Settlement Agreement and a belief that the Settlement Agreement will substantially improve the conditions of SHU confinement.

According to plaintiffs' March 21, 2016 submission,

> [a]pproximately 52% of the . . . substantive comments submitted to the Court clearly approved of the Settlement Agreement. Many of the comments in support . . . were forceful, speaking of the dire or long overdue need for the provisions of the Settlement Agreement and the momentous change these provisions would bring, and commenting in detail on how specific provisions would benefit the class.[50]

I include here some of those comments.

- "I feel that if the Judge does approve the settlement it will be a success not only because it will help those like myself in extreme isolation but it will be great for society . . . it will help rehabilitate those of us who will be returning back to the outside world."[51]

- "I do believe for the most part the new agreement is fair.  I only wish it could [have] been implemented years ago. . . . So to read now that things God Willing will be changing for the better for us unfortunate

---

[50]   Pl. Final Mem. at 9-10 (quotation marks omitted) (citing Dkt. Nos. 149, 150, 153, 156, 163, 164, 175, 184, 186, 187, 189, 192, 195, 205, 214, 217, 225, 241, 244, 256, 267, 269, 272, 291, 295, 296, 303, 305, 313).

[51]   1/26/16 Letter from Ellier Acevedo at 1 (Dkt. No. 244).

inmates, truly gladdens my heart.  I thank you for all your time and consideration to make the changes needed to better inmates['] unfortunate confinement time while in the SHUs through[ou]t New York State."[52]

- "I feel these new terms will reduce the mental stress sustained while in the course of completing SHU time. . . . Allowing inmates to contact their family/friends via phone will give them something to look forward to, as a short-term goal.  The reading material will occupy the person leaving less time to do any other conduct to warrant more SHU time.  Allowing people to participate in rehabilitative programs will keep people in a positive and responsible mind set preparing them for general population/community."[53]

- "[T]his is the first time I've ever written a letter like this but I feel it inside my heart that if one letter could possibly get the attention of some much needed help, I ask you to please help grant this settlement."[54]

- "I believe it[']s very fair for what the people are fighting for[.]  I believe inmates will be very gr[ate]ful i[f] this falls through for us[.]  I just wanna say thank you for fighting for us[,] it[']s good to know someone cares about us[] and you['re] trying to help."[55]

- "I would like to praise the individuals for taking the initiative."[56]

- "I can honestly say it is my opinion that it is a fair and long awaited change in the SHU confinement procedures, in all honesty I didn't think it would ever happen. . . . From what I see this settlement

---

[52]    1/11/16 Letter from Craig Brown at 1-2 (Dkt. No. 149).

[53]    1/11/16 Letter from Jerry Knight at 1 (Dkt. No. 156).

[54]    1/13/16 Letter from Chad Penn at 1 (Dkt. No. 165).

[55]    1/12/16 Letter from Devan Miller at 1 (Dkt. No. 169).

[56]    1/11/16 Letter from Louis Gomez at 1 (Dkt. No. 185).

agreement will improve things greatly for prisoners in SHU, especially for those with long term SHU confinement."[57]

- "I am gr[ate]ful and thankful for the settlements proposal and strongly feel it['s] time for us as the people to finally be treated with fairness and equality."[58]

Further, during the March 28, 2016 Fairness Hearing, the Court heard from a mother who stated that her son has been in the SHU for fifteen years.[59] She voiced her appreciation for some of the reforms secured by the Settlement Agreement, including those improving her son's access to telephone calls, reading material, and other programming.[60]

## B.   Objections

However, the Court also received a number of letters that could be classified as partial or total objections to the Settlement Agreement.  As calculated by plaintiffs' counsel in their March 21, 2016 submission, "even taking the most conservative approach [for counting objections], the[] 57 [objections received to date] account for only 1.54% of the current number of class members in SHU and .

---

[57]   1/17/16 Letter from Mark Carballo at 1 (Dkt. No. 202).

[58]   1/12/16 Letter from Michael Watkins at 1 (Dkt. No. 212).

[59]   *See* 3/28/16 Tr. at 26:15-29:16.

[60]   *See id.*

. . 0.11% . . . of the more than 50,000 individuals in [DOCCS] custody."[61, 62]

These comments fall into three categories:  (1) those requesting money damages; (2) those requesting additional information about the settlement terms and process; and (3) those expressing their disappointment that the settlement did not cover certain additional subjects.  In addition, many comments — whether or not viewed as objections — expressed apprehension about DOCCS' ability to implement the settlement and urged the importance of ensuring DOCCS' compliance with the settlement's terms.  I briefly address each of these concerns.

### 1.    Requests for Money Damages

As the Class has been conditionally certified under Rule 23(b)(2), the Settlement Agreement provides injunctive relief only and does not provide any money damages to individual class members.  The Notice explained that this case did not seek any money damages, and that it would not affect the right of any individual class member to seek damages.  Accordingly, class members' requests

---

[61]     Pl. Final Mem at 11.  At the March 28, 2016 Fairness Hearing, plaintiffs' counsel explained that a handful of additional class member letters were filed after their March 21, 2016 submission, but that these letters were of the same nature as those addressed in their brief.  *See* 3/28/16 Tr. at 14:7-9.

[62]     Plaintiffs' counsel also explained that although several attorney-client privileged letters were sent directly to their office, none of these letters expressed concerns about the Settlement Agreement other than those raised by the letters sent directly to the Court.  *See* 3/28/16 Tr. at 14:14-17.

for money damages are not true objections to the Settlement Agreement.  I reiterate, however, that the Settlement Agreement does not foreclose any claims for money damages that individuals may have.

### 2.    Requests for Additional Information

As explained, the Settlement Agreement Notice was posted in English and Spanish within all general population housing units and delivered to all inmates in SHU, the Correctional Alternative Rehabilitation program, and the Juvenile Program.[63]  Plaintiffs' counsel also responded directly to class members who requested further information.[64]

Accordingly, although a small fraction of inmates have reported difficulty reviewing or understanding the Settlement Agreement, I find that substantial and appropriate measures were taken to ensure that class members had the broadest possible access to the Notice, full Settlement Agreement, and information about the settlement.  However, I urge plaintiffs' counsel to continue to respond to inmates' requests for additional information throughout the implementation process.

### 3.    Subjects Not Covered by the Settlement Agreement

---

[63]    This Opinion has already described the contents of the Notice, *supra* at Section III(A).

[64]    *See* 3/28/16 Tr. at 19:17-21.

Class members also raised a number of subjects that they wish were either included in, or more comprehensively addressed by, the Settlement Agreement.  The most common requests were for the following reforms:

- Additional cameras in SHU areas;

- Enhanced mental health diagnoses and treatment;

- Placement of date and time stamps to record receipt of incoming inmate mail;

- Improved food quality and portions;

- Improvements to Administrative Segregation conditions;

- Greater access to religious services and accommodations;

- Warmer clothing and cells; and

- Reforms to protect inmates from physical and sexual abuse, including reforms of the disciplinary techniques that are used against inmates.

Although this list of additional areas for reform does not diminish the importance of the Settlement Agreement that *has* been reached, it is my hope that class members' efforts to bring these and other issues to light will not go unnoticed.  In fact, the parties have stated that their lines of communication remain open, such that they will attempt to implement additional requested reforms, where

feasible.[65]

### 4.    Monitoring Compliance

Finally, class members have also voiced concerns about the enforceability of the Settlement Agreement terms.  Like any settlement which calls for the implementation of a number of measures, compliance with the Settlement Agreement will require significant and continuing effort by DOCCS and careful monitoring by plaintiffs' counsel.

However, the Settlement Agreement sets forth a detailed monitoring and compliance framework, which I have discussed in Section III(B)(3).  Although enacting the agreed-upon reforms will take time and commitment, the parties have engaged in substantial negotiations over the years, and I am confident that plaintiffs' counsel will continue to vigorously represent the interests of the Class.[66]

## V.    APPROVING THE SETTLEMENT

### A.    Legal Standard

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, a

---

[65]    *See* 3/28/16 Tr. at 16:14-22 (Plaintiffs' Counsel Pendergrass); *id.* at 23:1-11 (AAG Brewster).

[66]    Indeed, as explained during the March 28, 2016 Fairness Hearing, DOCCS has previously implemented reforms in the context of at least one other solitary confinement action.  *See* 3/28/16 Tr. at 23:5-11 (AAG Brewster) (discussing *Disability Advocates, Inc. v. New York State Office of Mental Health, et al.*, No. 02 Civ. 4002 (S.D.N.Y.) (GEL)).

court may approve a class action settlement where it finds the settlement to be

"fair, reasonable, and adequate."  The evaluation of a proposed settlement requires

an assessment of both the procedural and substantive fairness of the settlement.[67]

A court must consider both "the terms of the settlement and the

negotiation process leading up to it."[68]  Regarding the negotiation process, a class

action settlement enjoys a presumption of fairness where it is the product of

arm's-length negotiations between experienced and capable counsel.[69]  With

respect to the substantive terms of a settlement, courts in the Second Circuit

consider the following factors (known as the "*Grinnell* factors") when determining

whether to approve a class action settlement:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; [and] (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant

---

[67]    *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009).

[68]    *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008).

[69]    *In re Advanced Battery Techs., Inc. Secs. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (further citation omitted).

risks of litigation.[70]

Although the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation."[71] "Due to the presumption in favor of settlement, '[a]bsent fraud or collusion, courts should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.'"[72]  Finally, "a favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our . . . inquiry."[73]

## B.      The Settlement is Fair, Reasonable, and Adequate

Pursuant to Rule 23(e) and the *Grinnell* factors, I find that the proposed settlement is fair, reasonable, and adequate.  This action was very complex, involving the circumstances and conditions of incarceration for prisoners

---

[70]      *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 117 (2d Cir. 2005).

[71]      *Advanced Battery*, 298 F.R.D. at 174.

[72]       *Id.* (alteration in original) (quoting *In re EVCI Career Colls. Holding Corp. Secs. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007)).

[73]      *Wal-Mart Stores, Inc.*, 396 F.3d at 119.

assigned to solitary confinement throughout the vast number of New York State prisons.  Litigating such a case would have been expensive and taken years to reach a final judgment.  The attorneys engaged in extensive discovery and arm's-length settlement negotiations.  A settlement is vastly superior to a litigated outcome, which would have been a non-consensual process not likely to result in an improved attitude or atmosphere within the prisons.  Additionally, the favorable reaction of the Class — particularly the large number of letters in support which were submitted to the Court — indicates that this Settlement Agreement achieves welcome reforms.  The remainder of the *Grinnell* factors do not apply in this case as they address monetary damages.[74]

## VI.    CONCLUSION

This Settlement Agreement represents a significant step toward improving the conditions of solitary confinement throughout New York State. Nonetheless, it could not and did not address every problem experienced by prisoners in general or in solitary confinement in particular.  Further reforms are likely to follow, especially when the Governor, Attorney General, and Commissioner of DOCCS, representing the people of New York, have all

---

[74]     *See, e.g.*, *Jermyn v. Best Buy*, No. 08 Civ. 214, 2012 WL 2505644, at *7 (S.D.N.Y. June 27, 2012) ("Moreover, the Court need not address the *Grinnell* factors pertaining to damages, because the settlement only offers injunctive relief.").

demonstrated their strong commitment to improving the conditions of confinement for prisoners within the State's custody.

This litigation, and the way it has been handled by all of the attorneys, is the best example of the power of impact litigation to redress conditions that affect the most vulnerable members of our society. Another benefit of the successful resolution of this case is that it will undoubtedly inspire other members of the legal community to accept representation of individuals like Mr. Peoples, Mr. Richardson, and Ms. Fenton — who, with the help of outstanding counsel, were able to bring about the system-wide result that the Court approves today.

For the foregoing reasons, the Joint Motion for Final Approval of Settlement is GRANTED. The Clerk of the Court is directed to close this motion (Dkt. No. 315).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 14, 2016

-29-

**- Appearances -**

**For Plaintiffs**:

Taylor S. Pendergrass, Esq.
Christopher T. Dunn, Esq.
Aimee K. Stewart, Esq.
Philip L. Desgranges, Esq.
New York Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004
(212) 607-3344

David J. Fioccola, Esq.
Jennifer K. Brown, Esq.
Kayvan B. Sadeghi, Esq.
Adam J. Hunt, Esq.
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
(212) 468-8000

Alexander A. Reinert, Esq.
55 Fifth Avenue, Room 1005
New York, NY 10003
(212) 406-3095

**For Defendants**:

Richard W. Brewster
Jeb Harben
Assistant Attorneys General
Office of the Attorney General, New York State
120 Broadway
New York, NY 10271
(212) 416-6185